Chester J. RYBICKI, et al., Plaintiffs,

v.

The STATE BOARD OF ELECTIONS OF the STATE OF ILLINOIS, et al., Defendants.

Miguel DelVALLE, et al., Plaintiffs,

v.

The STATE BOARD OF ELECTIONS OF the STATE OF ILLINOIS, et al., Defendants.

Bruce CROSBY, et al., Plaintiffs,

v.

The STATE BOARD OF ELECTIONS OF the STATE OF ILLINOIS, et al., Defendants.

Nos. 81 C 6030, 81 C 6052 and 81 C 6093.

United States District Court, N.D. Illinois, E.D.

Jan. 12, 1982.

Kenneth J. Jurek, Douglas A. Poe, Roger W. Barrett, Mayer, Brown & Platt, Chicago, Ill., Jerris Leonard, Jerris Leonard and

Assoc., Washington, D.C., for plaintiffs in No. 81 C 6030.

Virginia Martinez, Raymond G. Romero, Mexican American Legal Defense and Educational Fund, Chicago, Ill., Lizette A. Cantres, for plaintiffs in No. 81 C 6052.

Carol Moseley Braun, Thomas P. Sullivan, John A. Rupp, Jenner & Block, Richard H. Newhouse, Jr., Chicago, Ill., for plaintiffs in No. 81 C 6093.

Jeffrey D. Colman, Jenner & Block, Chicago, Ill., for plaintiffs in Nos. 81 C 6030, 81 C 6093.

Chicago Urban League, Frank L. Bixby and Joan Perry Protess, Sybille C. Fritzsche, Chicago, Ill., amicus curiae in No. 81 C 6030.

Lawrence T. Krulewich, Cook County Asst. State's Atty., Chicago, Ill., for intervenor-defendant Kusper.

Arthur C. Thorpe, Klein, Thorpe & Jenkins, Ltd., Chicago, Ill., for Village of Oak Park.

William J. Harte, Ltd., Jeffrey B. Whitt, Joseph N. Casciato, William J. Harte, Chicago, Ill., for John L. Lanigan, Michael J. Hamblet, The Legislative Redistricting Com'n, James Philip, Michael McClain, Arthur Telcser, Martin Murphy, James Donnewald, James Skelton and Robert Casey.

Tyrone C. Fahner, Atty. Gen. of Illinois, Paul P. Biebel, Jr., Asst. Atty. Gen., Chicago, Ill., for Michael J. Hamblet, James Philip, Michael McClain, Arthur Telcser and Martin Murphy.

John R. Keith, Springfield, Ill., for John L. Lanigan, Michael J. Hamblet, Teresa M. Petrone, The Legislative Redistricting Com'n, James Donnewald, James Philip, Arthur Telcser, Martin Murphy, Michael McClain, James Skelton, Robert Casey and Samuel Shapiro.

John L. Swartz, Springfield, Ill., for The Legislative Redistricting Com'n, James Donnewald, Michael McClain, Martin Murphy, James Philip, Arthur Telcser, James Skelton, Robert Casey and Samuel Shapiro.

---

1. All three cases were originally filed as class actions. The class action allegations were with-

drawn prior to trial. *See* Minute Order (November 23, 1981).

## MEMORANDUM OPINION

Before CUDAHY, Circuit Judge, and GRADY and BUA, District Judges.

### RYBICKI I

CUDAHY, Circuit Judge.

In these consolidated reapportionment cases, three groups of plaintiffs challenge the validity, under the federal and Illinois constitutions and related law, of Illinois' 1981 state legislative redistricting plan (the "Commission Plan"). For the reasons set forth in this opinion, we reject the *Rybicki* plaintiffs' allegations, on behalf of Republican and suburban interests, of noncompactness, partisan unfairness and impermissible fracturing of counties (and other political subdivisions) and suburban communities. We accept, in part, the *Crosby* plaintiffs' claim, on behalf of black voters, that the Commission Plan unconstitutionally dilutes black voting strength. As a remedy for this unconstitutional dilution of the black vote, we adopt certain modifications to the Commission Plan, identified as Court Exhibits 1A, 2A, 7D and 7E (and related documents). We also approve as fair, adequate and reasonable a Settlement Agreement reached between the *DelValle* plaintiffs, on behalf of Hispanic voters, and the Commission defendants, and therefore approve certain further modifications to the Commission Plan, as stipulated in the Settlement Agreement.

### Background

Three groups of plaintiffs in these consolidated cases challenge the redistricting plan adopted by the Illinois Legislative Redistricting Commission (the "Commission") for the election of candidates to the Illinois General Assembly.[1] Plaintiffs in *Rybicki v. State Board of Elections,* No. 81 C 6030, allege that the Commission Plan fails to accord suburban voters equal protection of the laws by disproportionately concentrating voting power, and therefore legislative

representation, in the City of Chicago. They also allege that the plan is politically unfair, contains numerous non-compact districts and indiscriminately fractures political subdivisions. Plaintiffs in *Crosby v. State Board of Elections*, No. 81 C 6093, allege that the Commission Plan intentionally discriminates against black voters by diluting their voting strength and providing white voters a disproportionate opportunity to elect candidates of their choice. Plaintiffs in *DelValle v. State Board of Elections*, No. 81 C 6052, allege that the Commission's redistricting effort similarly dilutes the voting power of Hispanics, thereby depriving them of a reasonable opportunity to elect representatives of their choice. All three complaints charge that the Plan violates the Fourteenth and Fifteenth Amendments to the United States Constitution, 42 U.S.C. § 1973 (1976), 42 U.S.C. § 1983 (1976), and Article I, § 2 and Article IV, § 3 of the 1970 Illinois Constitution.[2] Jurisdiction in each case is alleged under 28 U.S.C. § 1343 (1976) and the principles of pendent jurisdiction.

Defendants in all three cases are James Edgar, the Secretary of State of Illinois, who is charged under Article IV, § 3 of the 1970 Illinois Constitution, with publication of the legislative redistricting map; the Illinois State Board of Elections and its members who, pursuant to Ill.Rev.Stats. ch. 46, § 1A–8 (1979), are primarily responsible for the administration and supervision of elections in Illinois; and the Illinois Legislative Redistricting Commission (and its Democratic members individually), which is charged pursuant to Article IV, § 3 of the 1970 Illinois Constitution with the task of promulgating a redistricting plan in the

event that the legislature fails to adopt such a plan.[3]

On November 2, 1981, a three-judge court was convened pursuant to 28 U.S.C. § 2284(a) (1976) to hear these cases and, on November 23, all three cases were consolidated for expedited consideration. Trial was concluded on December 7, 1981, after the court had heard testimony from 25 witnesses and received into evidence more than 200 exhibits.

I. Facts

A. *Procedural Background of the 1981 Legislature Redistricting in Illinois*

Article IV, § 3 of the 1970 Illinois Constitution requires a redistricting of the Illinois General Assembly in the year following each federal decennial census. The Illinois Constitution provides the legislature with the first opportunity to adopt a plan that redistricts all legislative seats in the Illinois House and Senate in a manner such that an equal share of the population, under the most recent census, resides in each district.[4] If the legislature does not adopt a plan by June 30 of the first year following the census, an eight-member Legislative Redistricting Commission must be formed. The Speaker and Minority Leader of the Illinois House and the President and Minority Leader of the Illinois Senate each appoint two members to the Commission. The Commission may not include more than four members from one political party nor more than four members who hold seats in the General Assembly. The constitution further requires that the Commission complete a plan by August 10 of the year it is convened. If the Commission fails to agree

---

**2.** Article I, § 2 of the 1970 Illinois Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law nor be denied equal protection of the laws." Article IV, § 3 provides in relevant part that "legislative Districts shall be compact, contiguous and substantially equal in population."

**3.** Defendants Board of Elections and the Secretary of State did not adduce evidence at trial in "defense" of the Commission Plan. That task was undertaken by the five Democratic mem-

bers of the Commission. No appearance was filed on behalf of the four Republican members of the Commission.

**4.** Throughout this opinion, the terms "legislative district" or "legislative seat" are used in their generic sense to refer generally to Senate or House districts. Whenever there is a need to differentiate, specific districts are denominated "Senate" or "House" districts, as appropriate.

on a plan, the Illinois Supreme Court provides the Secretary of State with the names of two persons from different political parties, one of whom is chosen by lot to become the ninth member of the Commission. The Commission then has until October 5 to file a redistricting plan approved by a majority of its members.

In view of the importance of legislative history to proof of a claim of intentional discrimination,[5] we set forth in some detail the background evidence of the redistricting efforts of both the legislature and the Commission.[6] During the first few months of 1981, the results of the federal census were delivered to ranking Illinois legislative and executive officials.[7] Figures in hand, the leaders of both parties immediately engaged the services of consultants to aid in both the development and political analysis of the possible redistricting plans. The political data utilized by both parties included voting results and patterns at the census tract level for a variety of legislative and state-wide races run from 1978 through 1980.

In the course of their preparations, the Democratic staff, under the direction of House Minority Leader Michael Madigan, solicited the views of all Democratic legislators. A number of black legislators told Madigan that blacks were underrepresented both in the legislature as a whole and in the party caucuses. A House Select Committee on Reapportionment also conducted public hearings to solicit the views of citizens in general. The Committee was advised at these hearings in Chicago of the desire of the black community for greater representation in the legislature.

By May, 1981, Republican legislators had created a plan which they introduced in the Illinois House. The Democrats had also succeeded in developing a plan which they submitted to the state Senate.[8] A major impediment to passage of both plans, however, was Madigan's fear that Governor Thompson, a Republican, would exercise his amendatory veto with respect to any plan presented to him. Consequently, neither plan passed and, in July, the Legislative Redistricting Commission was formed.[9]

Before making his appointments, Madigan circulated among House Democrats a form requesting that they submit their recommendations for potential Commission appointees. Madigan stated that he had committed himself to the appointment of one member from a racial or ethnic minority. Although most of the black legislators recommended the appointment of Rep. Emil Jones, currently an Assistant Minority Leader, Madigan followed the advice of other black legislators, two of whom are plaintiffs in this case, and appointed a former State Representative and black community leader, Corneal A. Davis. Apart from Davis, there was no black or Hispanic representation on the Commission or on its staff.

The Democratic and Republican Commission members and their staffs worked separately and developed their own proposals. On the Democratic side, Madigan[10] and Martin Murphy (who is the Commissioner of Planning for the City of Chicago), worked on the Chicago and Cook County portions of their redistricting plan. Rep. Michael McClain, a Madigan appointee,

---

5. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 268, 97 S.Ct. 555, 565, 50 L.Ed.2d 450 (1977).

6. Our discussion of this background evidence is also necessary to convey the intensely political nature of the redistricting process in Illinois.

7. The various parties to the suit stipulated to the accuracy of the census data (although there was considerable testimony in the record about the "undercounting" of blacks and Hispanics).

8. House Bill 1903 and Senate Bill 278, which contain these respective plans, appear in Def. Exs. 52–54.

9. The Republican members appointed to the Commission were Sen. James Phillip, Rep. Arthur Telcser, James M. Skelton and Robert Casey. Their Democratic counterparts were Sen. James H. Donnewald, Rep. Michael F. McClain, Corneal A. Davis and Martin Murphy.

10. Although he was not a member of the Commission, Madigan took the leading role in development of the Democratic Plan.

drew the map for the so-called "collar counties" (which are those counties adjacent to Cook), while Senator James Donnewald busied himself with the downstate region. Commissioner Davis drew no district lines.

The Democratic Map [11] for Chicago and Cook County, which is the prototype for the map of those areas ultimately adopted by the Commission, was drawn according to a systematic procedure. The drafters began with the districts as they appeared in the 1971 redistricting map.[12] They intended to enlarge those districts that had lost population and shrink those that had gained. Throughout the process, Madigan solicited the views of all legislators, including black legislators, concerning various aspects of the map. The map was completed in rough form by the end of June. Although Madigan testified that he made no attempt to hide the Cook County map from various black legislators and community leaders and Hispanics, only Commissioner Davis had the opportunity to study the entire Chicago and Cook County portions of the map at this stage or at any time prior to its adoption as the Commission Plan on October 2, 1981.[13]

Notwithstanding the fact that the Democrats had completed drafting the major portions of their map, the Commission held public hearings in Chicago on July 23, 1981, to obtain public suggestions for redistricting. A number of witnesses, including representatives of the black and Hispanic communities, presented their views on redistricting at these hearings. Several black witnesses testified that in the past blacks had fared poorly in the redistricting process; that percentage-wise the black population had increased in relation to the white population in Chicago between 1970 and 1980; and that any redistricting should accord blacks greater representation. The Hispanics pointed out that they had no representation in the General Assembly and urgently requested an opportunity to secure such representation. *See* Plaintiffs' Ex. 52.[14]

Among the other witnesses who testified at the hearings were representatives of the villages of Oak Park and Evanston, as well as the Chicago neighborhood of Hyde Park. These communities, which had been fractured by prior redistricting, all requested that each be included in only one district. Although the protestations of black witnesses produced no changes in the draft plan, the drafters did revise the plan to accommodate the desires of these three geographical communities.

Unfortunately, the work of the eight-member Commission was doomed to failure from the start since neither side was willing seriously to negotiate with the other over various aspects of their respective

11. "Map" or "Plan" are used interchangeably to refer to a redistricting plan with its accompanying maps of legislative districts.

12. The 1971 plan was adopted pursuant to a partisan compromise within the Legislative Redistricting Commission. Cecil Partee, former President of the Illinois Senate, testified in detail about the drafting process in 1971. *See* Tr. at 1238–41. Because it was the product of a compromise, certain features of the 1971 map were assertedly understood by the Democratic drafters to represent a politically fair solution to partisan differences. The compromise was therefore accorded, at least by the Democrats, a great deal of precedential value. The outstanding feature of the compromise was that a number of the districts located in predominantly Democratic Chicago overlapped into largely Republican, suburban Cook County. Although the procedures used for selecting the Commission members who drew the 1971 plan were later ruled invalid, both the Illinois Supreme Court and a three-judge panel of this court upheld that plan against various federal and state constitutional challenges. *See Grivetti v. Illinois State Electoral Bd.,* 335 F.Supp. 779 (N.D.Ill.1971), *aff'd,* 406 U.S. 913, 92 S.Ct. 1772, 32 L.Ed.2d 113 (1972); *People ex rel. Scott v. Grivetti,* 50 Ill.2d 156, 277 N.E.2d 881 (1971), *cert. denied,* 407 U.S. 921, 92 S.Ct. 2460, 32 L.Ed.2d 806 (1972).

13. *See* Def. Ex. 107.

14. At the time of the hearings in Chicago, Madigan and Murphy held private meetings with Mayor Jane Byrne of Chicago, Senate President Philip Rock, and George Dunne, Chairman of the Cook County Regular Democratic Organization, for the purpose of displaying the draft plan. No black or Hispanic political leaders were similarly consulted at this time. Commissioner Davis was apparently unaware that such meetings were held.

plans. Whether this was due to the lack of mutual trust that permeated the legislative attempts at redistricting, the intransigence of both sides with respect to particular redistricting issues, the unwillingness of anyone to assume responsibility for a compromise or the Republicans' willingness to gamble on winning the draw for the ninth member is difficult to say. In any event, both sides stuck to their guns and, on August 9, the Democratic and Republican members of the Commission presented their respective plans for approval. With each side perceiving adverse political effects from the plan of the other side, the eight Commission members split along party lines on both proposals.

Pursuant to the constitutional procedure (of drawing by lot), former Governor Samuel Shapiro, a Democrat, was then selected to become the ninth member of the Commission on September 2, 1981. Governor Shapiro unsuccessfully urged a compromise between the Republican and Democratic Commission members before he ultimately acceded to the Democratic proposal.[15] On October 2 the Commission met to vote on what had then become known as the "Shapiro Plan."[16] The Republican

Commissioners, now comprising an unenviable minority of four, criticized the plan as being unduly partisan and having a discriminatory impact on minorities in Chicago. Plaintiffs' Ex. 39 at 39–42. The Shapiro Plan was adopted by a vote of five to four, and it was officially filed with the Illinois Secretary of State on October 5, 1981.

### B. General Considerations

We briefly describe the more salient features of the Commission Plan, together with an overview of the demographics of the State of Illinois before turning in detail to the evidence presented by the challengers and defenders of the Plan at trial. With respect to general characteristics, the Plan divides the State into 59 Senate districts, each of which is in turn divided geographically into two House districts.[17] The ideal population for each Senate district is 193,533. The total deviation of the Senate districts in the Commission Plan from this ideal is 1.59%, with an average deviation of .29%. The ideal population for each of the 118 House districts is 96,767. The total deviation from this ideal is 1.97%, with an average deviation of .42%.[18]

---

**15.** Governor Shapiro insisted on one change in the plan developed by the Democratic Commission members, namely that "independent" Democratic incumbent Senators Dawn Clark Netsch and William Marovitz be placed in separate districts. The original proposal of the Democratic Commissioners had placed both Netsch and Marovitz in Senate District 3. Governor Shapiro also asked that the population deviation of the plan be reduced.

**16.** During trial, issue was taken with the procedures employed by the Democratic Commission members in adopting their plan. The law required that a plan be completed and adopted by October 5 and the rules adopted by the Commission required that any plan considered for adoption must be presented at least 24 hours before a final vote was taken. Accordingly, a meeting of the Commission was called by the Democrats for October 2 at 8:30 p.m. Although a map reflecting the plan was given to the Republican members on October 1, a complete set of census materials supporting the plan were not distributed until the evening of October 2. Commissioner Casey, a Republican appointee, did not state how the Republican Commission members were prejudiced by this alleged failure by the Democrats to produce on time the more

complex details of their plan, such as metes and bounds descriptions.

**17.** Under the 1971 reapportionment, the state was divided into 59 districts, each of which elected one senator and three representatives. The representatives were elected at large from each district with the use of cumulative voting procedures. In November of 1980, this system of apportionment for the House was abolished by the so-called "Cutback Amendment." Under the Cutback Amendment, the size of the House was decreased from 177 seats to 118 seats; multi-member districts and cumulative voting were also eliminated. Under the new system, which is being implemented in Illinois for the first time in this redistricting process, the state is divided into 59 Senate districts each of which in turn is divided geographically into two single-member House districts of equal population.

**18.** None of the plaintiffs in this case challenge the population deviations of the Commission Plan's legislative districts under the "one person, one vote" standard of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Indeed, refinements were made in the plan developed by the Democratic Commission members,

A better understanding of the details of the Commission Plan and its impact on the plaintiffs in this case is facilitated by reviewing the demography of Illinois and, in particular, of metropolitan Chicago. Evidence presented at trial indicated that Illinois may, for reapportionment purposes, be divided into three or four areas: (1) Chicago, (2) Cook County outside Chicago, (3) the five counties adjacent to Cook (the "collar counties": DuPage, Kane, Will, McHenry and Lake), and (4) the remaining counties (*i.e.*, the "downstate counties"). Of the 11,418,000 residents of Illinois, the 1980 census reveals that Chicago accounts for 3,005,000 (28%), Cook County (including Chicago) for 5,253,000 (46%), the collar counties for 1,849,000 (16%) and the downstate counties for 4,316,000 (38%). *See* Defendants' Ex. 121.

Chicago and Cook County constitute, of course, the largest urban and suburban center in Illinois. The collar counties are generally characterized as suburban and the downstate counties as rural. The tripartite (or quadrapartite) division of the state also generally correlates with political affiliation: Chicago is heavily Democratic while suburban Cook and the collar counties are predominantly Republican, as are many of the downstate counties.

Of the 5,253,190 residents of Cook County, 1,308,763 are black (21.5%). Approximately 84% of the Cook County black population resides in Chicago, where the blacks comprise nearly 40% of the city's total population. The black population of Chicago is concentrated in two areas. The largest concentration is found in the South and Southeastern portions of Chicago, extending roughly from the city-center "Loop" area to Chicago's southernmost boundary. This area is, for the most part, over 85% black and it contains 792,000, or 66.2%, of the city's blacks. The area in question is commonly referred to as the South Side and is so denominated in this opinion. A

smaller concentration of blacks exists in the West Central portion of Chicago, centered in the Austin neighborhood. It too is over 85% black and contains approximately 300,000 blacks or 23% of Chicago's black population. This area has been frequently denominated the West Side in this litigation and is referred to as such in this opinion. Blacks also constitute a significant percentage of the population in and around the southern suburban municipalities of Harvey, Robbins and Markham. The concentration of blacks in this area of Cook County is not as high as on the South and West Sides, but it ranges from 35% to over 85%. The total black population in this area—46,000—is also relatively small. This southern area where blacks are concentrated has been denominated the South Suburban area.

A substantial Hispanic[19] population also resides in Illinois. The majority of Hispanics live in Chicago, where they number 422,061, or approximately 14% of the city's population. In general, the Hispanic population is not as highly concentrated as the black population. The Hispanic population is more dispersed than the black population, with Hispanics residing in various areas throughout Chicago. Notwithstanding this general dispersal, at least two major Hispanic aggregations are easily identified in Chicago, one on the Northwest Side and the other on the Southwest Side.

### C. *Evidence Adduced at Trial*
#### 1. *The Rybicki Plaintiffs*

The *Rybicki* plaintiffs submitted various testimonial and documentary evidence to support their claims of suburban vote dilution, lack of compactness of certain districts, excessive fracturing of political subdivisions and political unfairness.

*Suburban Vote Dilution.* The *Rybicki* plaintiffs argued that, based on changes in

---

at the request of Gov. Shapiro, to make the population deviation percentages as low as possible.

**19.** Hispanics are persons of Mexican, Puerto Rican, Cuban, Central American, South American, or other origins related to Spanish cultures regardless of race.

population between 1970 and 1980,[20] the collar counties are "entitled" to more and Chicago is "entitled" to fewer legislative districts than were accorded to these areas under the Commission Plan.

Under the 1971 redistricting plan, Chicago voters constituted part of the population in 20 Senate districts. Defendants' Ex. 12. Plaintiffs argue that in proportion to the City's 1980 population, the voters of Chicago should control or constitute a majority in 31 House districts and only 15.5 Senate districts. However, under the Commission Plan, Chicago voters "control" 35 House districts and 17 Senate districts.[21]

Plaintiffs similarly observe that the number of districts controlled by collar county voters has not increased between 1970 and 1980, despite the population shifts from Chicago and Cook County to the collar counties evident in the 1980 census. Under the 1971 plan there were six Senate districts (then referred to as "Legislative" districts) entirely within the collar counties and five that overlapped into adjacent counties. Under the Commission plan, there are still six Senate districts wholly within the collar counties, but the number of overlap districts has increased to nine.[22]

*Compactness.* The *Rybicki* plaintiffs allege that 15 House districts and 2 Senate districts are not compact.[23] The noncompactness of these districts is evident, according to plaintiffs, both under a visual analysis and as demonstrated by mathematical standards. In *Schrage v. State Board of Elections*, 88 Ill.2d 87, 58 Ill.Dec. 451, 430 N.E.2d 483 (1981), the Illinois Supreme Court invalidated former Commission House District 89, which extended 125 miles at its longest point and six miles at its narrowest, a length to width ratio of roughly 21:1. By comparison, Commission Senate District 19, the most egregious district on plaintiffs' list, extends 36 miles at its longest point and is two miles wide at its narrowest, a ratio of 18:1.[24]

Defendants sought to minimize the significance of plaintiffs' compactness complaints by introducing examples of oddly shaped districts from the court-approved 1971 redistricting effort. *See* Defendants' Exs. 61 and 62. Moreover, the Commission's expert witness, Mr. Brace, testified that the irregular shapes appearing in the Commission Plan were necessitated in some circumstances to comply with the low (1%) population deviation standard employed as a goal by the Commission. Mr. Brace also stated that the desire to achieve some other redistricting goals, such as respect for the integrity of political subdivisions, communities of interest or natural boundaries contributed to the irregularly shaped districts. Plaintiffs attempted to

---

**20.** The changes in the Chicago metropolitan area for the relevant ten year period are set forth below:

| Area | 1970 | 1980 | % Change |
|------|------|------|----------|
| Chicago | 3,369,357 | 3,005,072 | − 10.8 |
| Cook County | 5,493,766 | 5,253,190 | − 4.4 |
| Collar Counties | 1,483,845 | 1,849,138 | + 24.6 |

*See* Def. Ex. 121.

**21.** The *Rybicki* plaintiffs credit Chicago with control of 38 House seats and 19 Senate seats. They include in their count, however, two Senate districts and three House districts which overlap from Chicago into Cook County in which the population of the district is evenly balanced between Chicago and the suburbs or in which the majority of voters reside outside Chicago. *See Rybicki* Pls. Findings of Fact at ¶ 72.

**22.** Seven Senate districts overlap into Cook County (19, 22, 23, 25, 29, 30 and 40). Of these,

Cook County voters constitute a majority in all but two Senate districts (23, 30). Of the two that overlap into downstate counties (32, 85), collar county voters constitute a majority in one (32). Deft. Ex. 49.

**23.** These are House Districts 7, 22, 35, 37, 39, 41, 42, 50, 58, 77, 80, 84, 87, 95, 104; and Senate Districts 19 and 46.

**24.** It is interesting from a forensic as well as a mathematical standpoint that defendants' calculations of extreme lengths and widths are quite different from plaintiffs'. *See* Def. Ex. 48. Defendants' ratios were obtained by comparing the longest length against the widest (and therefore the most extreme) width, rather than against the narrowest width. The result is that the House districts plaintiffs complain of (*e.g.*, 58, 87, 37, 104) have relatively innocuous ratios under defendants' criteria of 2.16:1, 1.26:1, 1.46:1, 1.96:1 and 1.66:1, respectively.

rebut these arguments by presenting their own "Coalition Plan" which, they alleged, contained more compact districts.[25] But this alternative map also indicates the difficulty of achieving uniform compactness. The Coalition Map was drafted utilizing a less stringent population deviation standard;[26] nonetheless, as Defendants' Exhibit 62 demonstrates, even the Coalition Plan contains a number of highly irregular, elongated districts.[27]

*Political Fairness.* The *Rybicki* plaintiffs also assert that the presence of non-compact districts is evidence of the Commission's intent to preserve a disproportionate number of Democratic incumbents. Moreover, plaintiffs allege that the extensive use of "overlap" districts designed to maintain the power of Chicago (and hence, the Democratic Party) by fracturing suburban areas, demonstrates the political unfairness of the Commission Plan. Defendants vigorously deny that the Commission Plan is politically unfair. Evidence submitted by the defendants indicated that historically, Illinois has been a "swing state" which elects Democrats and Republicans in equal numbers to legislative and executive offices. *See* Defendants' Exs. 23 and 24. In this connection, defendants analyzed the political effects of their map by examining past voting patterns for each census tract in every district.[28] On the basis of this analysis, defendants concluded that the Commission Plan would produce in the House 39 "firm" and 5 "soft" Democratic districts; 41 "firm" and 10 "soft" Republican districts; and 23 "swing" districts. In the Senate, it would produce 21 "firm" and no "soft" Democratic districts; 25 "firm" and 3 "soft" Republican districts; and 10 "swing" districts. Defendants observed that this alignment slightly favors the Republicans.[29]

*Fractured Counties.* The *Rybicki* plaintiffs also introduced evidence demonstrating that the Commission Plan indiscriminately fractures political subdivisions. Representative Lee Daniels of DuPage County testified at length that fracturing can produce undesirable political consequences, particularly when a legislator is charged with representing areas that have divergent political interests. Representative Daniels pointed out that, even though Cook County and the collar counties have seemingly antagonistic interests on issues of transportation, taxation and education, nine Senate districts overlap between these two areas.

Witnesses for the Commission agreed that the fracturing of political subdivisions

25. The three plaintiff groups jointly developed the Coalition Plan. It was utilized at trial to demonstrate that various alleged infirmities in the Commission Plan could be cured in the redistricting process. Each group also recommended, at various phases in the trial, the adoption of the Coalition Plan as one means for remedying the Commission Plan's deficiencies.

26. The total population deviation percentages for House and Senate districts in the Coalition Plan were 1.955% and 1.646%, respectively. *See* Def. Ex. 118.

27. *See, e.g.,* Senate District 11 and House Districts 31 and 98.

28. The political fairness of the plan was analyzed by reviewing the voting patterns at the census tract level for five different elections: The University of Illinois Trustee elections in 1978 and 1980; the State Senate elections for 1978 or 1980 (Senate terms being staggered); and the State Representative elections for 1978 and 1980. Political strength was gauged by the number of wins and losses sustained by each party throughout the six elections. If one party won all five elections, the district was considered a "firm" district. If the party won four of the elections, the district was considered "soft." If a party won two or three of the elections, the district was denominated a "swing" district.

29. Plaintiffs attack defendants' projections on the ground that the projections do not consider the residence of incumbents, the quality of the candidates and the type of campaign likely to be waged. Plaintiffs have submitted no specific evidence, however, contradicting the validity of defendants' basic assumption that voting will tend to proceed roughly along party lines. Moreover, we do not believe that the existence of the variables identified by the plaintiffs necessarily renders defendants' projections invalid. The very existence of 80 "firm" House seats out of a possible 118 might suggest that party affiliation is a highly significant factor in voter preference in Illinois.

was not desirable; they disagreed, of course, as to how much fracturing was tolerable. The 1971 redistricting plan split 29 counties into two or more districts. Defendants' Ex. 75. Plaintiffs' evidence showed that the Commission Plan splits 48 counties into two or more districts, resulting in 122 separate fractures. Cook County outside Chicago is fragmented into nine parts, DuPage County into eight and Will County into seven. By comparison, the Coalition Plan splits 35 counties, resulting in 72 separate fractures.

Focusing more closely on the Chicago metropolitan area, we note that in the 1971 plan, eleven Senate districts were entirely within Chicago while nine overlapped into Cook County.[30] Two districts overlapped from Cook County into the collar counties. *See* Defendants' Exs. 9, 10. Under the Commission Plan, eight Senate districts are wholly within Chicago, eleven overlap into Cook County and seven overlap from Cook County into the collar region.[31]

The alleged political result of overlapping districts in the metropolitan Chicago area is that a disproportionate number of seats are "controlled" by Chicago and Cook County voters. Defendant Commission members admitted at trial and in their depositions that they intended to achieve this result of widening the influence of Chicago voters.[32] Defendants suggest that, in the absence of overlapping districts in the Chi-

cago and Cook County area, a redistricting plan grossly favors the Republican Party.

### 2. *Crosby Plaintiffs*

The *Crosby* plaintiffs introduced several types of evidence attempting to establish that the Commission Plan was the product of purposeful discrimination to dilute black voting strength and to unconstitutionally gerrymander districts in black population areas. Their proof may be categorized as evidence of (1) retrogression; (2) "packing" and "fracturing" of the black population; (3) movements of large racial populations in certain areas to preserve the incumbencies of white legislators; (4) "admissions" of certain Commission members; and (5) prior instances of discrimination allegedly practiced by the regular Democratic Party organization in Chicago.

*Retrogression.* The evidence showed that while the black population increased, both absolutely and especially in relation to the white population in Chicago and Cook County between 1970 and 1980,[33] the number of districts where black voters had a "meaningful" opportunity to elect a candidate of their choice did not increase appropriately. At the time of the 1971 redistricting, blacks constituted a majority in five Chicago Senate districts (21, 22, 24, 26 and 29). When the 1980 census figures are applied to the 1971 lines, blacks constitute a majority in six Senate districts (the former five districts plus district 28). Under the Commission Plan, blacks will constitute

---

**30.** Population breakdowns for the districts overlapping from Chicago into Cook County under the 1971 plan were not presented. Visual inspection indicates that Chicago voters probably constituted a majority of the population in the nine districts.

**31.** Of the eleven Senate districts that overlap into Cook County, Chicago voters are a majority in nine. *See* Def. Ex. 85. There are 15 House districts which overlap under the Commission Plan, of which Chicago voters constitute a majority in 13. Of the seven Senate districts that overlap from Cook County into the collar counties, Cook County voters constitute a majority in five. Ten House districts overlap into the collar counties, of which Cook voters are a clear majority in six. The other four districts have roughly equal percentages of Cook and collar county voters. *See* Def. Ex. 49.

**32.** *See* Tr. at 1172 (Donnewald, cross); Murphy Dep. at 130–131, 142–143; Pl. Ex. 70.

**33.** The population changes between 1970 and 1980 were as follows:

Chicago

| Race | 1970 | % | 1980 | % |
|------|------|------|------|------|
| White | 1,959,910 | 58.2% | 1,287,077 | 42.8% |
| Black | 1,102,630 | 32.7% | 1,188,221 | 39.5% |

Cook County (including Chicago)

| | | | | |
|------|------|------|------|------|
| White | 3,954,014 | 72.0% | 3,217,021 | 62.3% |
| Black | 1,183,475 | 21.5% | 1,308,763 | 24.9% |

*See* Def. Ex. 121.

The figures for blacks may be somewhat understated due to a possible undercount of blacks in the census. Evidence suggested that blacks are likely to be undercounted at a rate of four times that of whites.

a majority in only five of the Commission Senate Districts (9, 12, 13, 16 and 17). Thus, although blacks increased in population, both absolutely and especially in relation to whites in Chicago between 1970 and 1980, they hold a majority in the same number of Senate districts as in 1971. Blacks are also a majority in one less Senate district than would have been the case had the current redistricting not occurred.

By contrast, white representation in districts where Chicago voters constitute at least part of the population has not diminished significantly. Under the 1971 district lines as applied to the 1980 census figures for districts wholly or partially located within Chicago, whites constitute a majority in 14 of the 19 Senate districts [34] even though they account for only 45.5% of the population in those districts.[35] The Commission Plan, under the 1980 census figures, results in whites being in the majority in 14 of 19 [36] Senate districts wholly or partially located in Chicago. Although the white population of the City of Chicago has declined, the Commission Plan, which employs several more overlap districts than the 1971 plan, actually increased to 51.1% the white population in these Chicago-area districts, thus explaining, in part at least, why 14 of 19 districts are still populated by a majority of whites.

**34.** The number of House seats held by blacks and whites between 1970 and 1980 cannot be accurately compared since the Cutback Amendment reduced the size of the Illinois House and created single-member districts.

**35.** *See* Def. Ex. 120; Pl. Ex. 300. The number of districts controlled by whites may actually have been 15. As noted before, there were apparently 20 districts wholly or partially in Chicago under the 1971 lines. *See* Def. Ex. 12 (overlay). However, both plaintiffs and defendants used the figure 19 for purposes of this comparison.

**36.** Defendants claim that the number should be 13 rather than 14. The difference is based on plaintiffs' assumption that white voters control Senate District 10. Although whites make up only 19% of the voters in that district, with blacks making up 45% and Hispanics 36%, plaintiffs point out that the district contains a white incumbent who is backed by a powerful political organization and is therefore likely to be reelected.

*Packing and Fracturing.* Packing and fracturing are the terms used by plaintiffs in this lawsuit to describe two somewhat different means of reducing the voting strength of a geographically unified minority group. Packing occurs when a minority group is concentrated into one or more districts so that it constitutes an overwhelming majority in those districts (and part of its vote is "wasted"). Fracturing occurs when a geographically unified minority group is unnecessarily split among a number of districts.

All five of the majority black Senate districts located in Chicago under the Commission Plan have black concentrations in excess of 80% of the total district population.[37] The black population is also highly concentrated in the 12 Chicago House districts in which blacks constitute a majority although black percentages in these districts are generally not as high as in the majority black Senate districts.[38]

Plaintiffs also contend that the packing on the West and, in particular, on the South Side of Chicago was greatly furthered by drawing district lines which correspond to the racially segregated housing patterns evident in these areas. This South Side "wall," as plaintiffs refer to it, runs, for example, along the westernmost boundary of Commission House Districts 23 (94.33%

**37.** Senate District 9 is 81.35% black; District 12 is 96.38% black; District 13 is 83.93% black; District 16 is 98.69% black; and District 17 is 85.26% black.

**38.** Commission House District 27 contains a 66.4% black population; three Commission House districts (19, 26 and 34) contain black populations ranging between 72% and 78%; two Commission House districts (17 and 18) contain an 81% black population; two other Commission House districts (23 and 25) are between 89% and 94% black; and four Commission House districts (24, 31, 32 and 33) contain black populations exceeding 97%.

As these figures illustrate, and as plaintiffs noted at trial, all majority black House districts contain black concentrations of 65% or greater. However, the *Crosby* plaintiffs also argued that it would be difficult for blacks to elect a candidate of their choice in any district that was less than 65% black. *See* note 87 *infra.*

black), 24 (98.43% black), 31 (98.44% black) and 34 (73.37% black), and separates these districts from predominantly white Commission House Districts 21 (4.03% black), 22 (4.18% black), 28 (9.27% black) and 29 (11.56% black).

Both fracturing and packing are allegedly evident in the voting districts on the West Side. Of the 300,000 blacks who reside on the West Side, approximately 160,000 reside in Commission House Districts 17 and 18, both of which are over 80% black. The rest of the black population is distributed among Commission House Districts 11, 19 and 20, which have black populations of 48%, 72% and 18%, respectively.[39] Defendants, of course, presented various reasons not related to packing and fracturing for the existence of district lines tracing racial boundaries on the South and West Sides, which will be discussed *infra*.

During the course of this litigation, the *Crosby* plaintiffs presented several alternative plans that they claim would more fairly and equitably promote the interests of black voters in Chicago. The Coalition Plan, which was offered as a completely packaged alternative to the Commission Plan, contains districts which incorporate more white areas into black-controlled districts, thereby enhancing black voting strength. By creating districts which overlap from black areas into neighboring white areas the Coalition Plan produces five Senate districts on the South Side with black populations ranging from 70% to 85%. (There are four majority black Senate districts on the South Side under the Commission Plan.) The Coalition Plan would also avoid alleged packing and fracturing of the black population on Chicago's West Side, by creating two black Senate districts (with black populations of 66% and 84%) and four black House districts (with black populations of 65%, 67%, 72% and 96%). (There is one black Senate district

and three black House districts in this area under the Commission Plan.)

After trial was completed, another plan, denominated the "Crosby Plan," was presented to the court as an offer of proof. This plan reconfigures most of the Commission Senate and House districts located within Chicago and Cook County by allegedly reducing the coincidence of racial and electoral boundaries and increasing the number of districts in which blacks constitute a majority of the population.

*Movements of Racial Populations To Preserve White Incumbencies.* Plaintiffs presented evidence of racial population shifts in several districts, allegedly motivated by the desire to preserve the incumbencies of various white legislators or potential white candidates on both the South and West Sides. These districts included Commission Senate District 14, where incumbent Senator Jeremiah Joyce resides, Commission Senate District 18, where incumbent Senator Glenn Dawson resides, and various West Side districts, particularly Commission Senate District 8, home of Senator Philip Rock and Commission House District 15, which is part of Senate District 8. A detailed analysis of these population movements, which we regard as very significant, is included in Section III *infra*.

*Alleged Admissions of Defendants.* The drafters of the Commission Plan acknowledged that, at the time they drew the Map, they were aware of the relationship between legislative districts and racial demographics in the City of Chicago. Throughout the line drawing process, the drafters possessed color coded maps reflecting the location and the degree of concentration of blacks and Hispanics in metropolitan Chicago. Extensive population statistics reflecting the percentages of minority groups as well as statistics showing their population growth between 1970 and

---

**39.** Plaintiffs also identify an instance of fracturing in the South Suburban area of Cook County. At the conjunction of Commission House Districts 27, 36 and 78, a black population of approximately 46,000 is scattered among these three districts. Blacks constitute 16% of Com-

mission House District 36 and 29.6% of Commission House 78. In District 27, however, the blacks from the South Suburban area are joined with blacks from Chicago to the north to constitute a majority of 66.37% in Commission House District 27.

1980 were also available to the Commission.

Representative Madigan who, together with Commissioner Murphy, drew the Chicago portion of the plan, stated that he studied the maps and that he was aware of the percentages of blacks placed in each district.[40] Representative Madigan and Commissioner Murphy also testified that racial factors, including the existence of racial feeling antagonistic to blacks in some South and Southwest Side white communities, were taken into account in drawing the district boundaries. *See* Tr. at 1432 (remarks of Rep. Madigan); 1838–39 (remarks of Comm'r Murphy). Neither Madigan nor Murphy indicated, however, that any district lines were drawn for the purpose of diluting black voting strength.

*History of Civil Rights Violations in Chicago.* To strengthen the inference of intentional discrimination against blacks, the *Crosby* plaintiffs introduced evidence of past racial discrimination by the City of Chicago and, allegedly, by the City's regular Democratic organization. In particular, plaintiffs pointed to several lawsuits involving the Chicago Police[41] and Fire Departments,[42] the Chicago Housing Authority,[43] and the Board of Education[44] in which the city defendants were either found to have discriminated against blacks or entered into consent decrees which recognized the existence of racial bias within the agency. Plaintiffs noted that the heads of all three city agencies are appointed by the Mayor (inevitably a Democrat). Plaintiffs also introduced evidence of the new Chicago ward map, which they asserted to be biased, and which furnished a guide in some instances for the challenged legislative redistricting.

*Interests of Blacks and Hispanics.* Defendants introduced evidence indicating that the Democratic Party has strongly espoused the cause of blacks in Illinois. They noted that the Democratic Party has sponsored and passed civil rights legislation, social welfare legislation and legislation providing for bilingual education—all matters of special concern to blacks and Hispanics. Blacks in Illinois are overwhelmingly Democratic.

### 3. *DelValle Plaintiffs.*

The *DelValle* plaintiffs alleged that the Commission Plan intentionally dilutes Hispanic voting strength by fracturing the two largest Hispanic concentrations in Chicago among several House and Senate districts. The evidence presented at trial revealed that Representative Madigan and Commissioner Murphy were aware of the dilutive impact of the relevant districts on the Hispanic community. The Commission witnesses justified their choice of district lines by arguing that the Commission Plan accommodated projected migration patterns of Chicago Hispanics and, thus, that the challenged districts will eventually maximize Hispanic voting strength. As a result of directions from the court to the Commission and negotiations between the Hispanic plaintiffs and the Commission defendants, a Settlement was reached between these parties on January 7, 1982. The Hispanic plaintiffs believe that this Settlement Agreement provides Hispanics residing in both the Pilsen—Little Village (Mexican-American) area and the Humboldt Park— West Town (Puerto Rican) area a fair and reasonable (and, in fact, the best achieva-

---

**40.** Defendants were also alerted to the effects of their plan on the black and Hispanic communities at the July 23 public hearing in Chicago. Madigan received some of the same information during meetings with black members of the House during May and June and during a Democratic caucus at the close of the legislative session.

**41.** *United States v. City of Chicago,* 411 F.Supp. 218 (N.D.Ill.1976), *aff'd,* 549 F.2d 415 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

**42.** *United States v. City of Chicago,* Nos. 73 C 661 and 80 C 1590 (N.D.Ill. March 13, 1980) (consent decree).

**43.** *Gautreaux v. Chicago Housing Authority,* 503 F.2d 930 (7th Cir.), *aff'd sub nom. Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976).

**44.** *United States v. Board of Education,* 88 F.R.D. 679 (N.D.Ill.1980) (consent decree).

ble) opportunity to elect candidates of their choice to the Illinois General Assembly.[45]

## II. *Complaint of the Rybicki Plaintiffs: Compactness, City-Suburban Overlap, and Political Fairness*

The *Rybicki* plaintiffs allege that the Commission Plan unlawfully discriminates against suburban voters in the Chicago area, that the Plan contains noncompact districts, that political subdivisions are unnecessarily fractured and that the Plan is not politically fair.[46] We first consider the claims of noncompactness under Illinois law before considering the claims of discrimination against suburban voters and political fairness under the appropriate federal constitutional standards. We also consider fracturing of political subdivisions under the appropriate law.

### A. *Compactness*

■ Art. IV, § 3(a), *Ill. Const.* (1970), provides that "[l]egislative districts shall be compact, contiguous and substantially equal in population."[47] The substance of this provision was first incorporated into the Illinois Constitution of 1870, and the drafters of the Illinois Constitution of 1970 reincorporated the provision into the current constitution. *See* 6 *Record of Proceedings, Sixth Illinois Constitutional Convention*, 1352–53 (1972). Although seldom interpreted by the Illinois courts, *see, e.g., People ex rel. Woodyatt v. Thompson*, 155 Ill. 451, 40 N.E. 307 (1895); *People ex rel. Scott v. Grivetti*, 50 Ill.2d 156, 277 N.E.2d 881 (1971) *cert. denied*, 407 U.S.

921, 92 S.Ct. 2460, 32 L.Ed.2d 806 (1972), this provision was most recently construed by the Illinois Supreme Court in *Schrage v. State Board of Elections*, 88 Ill.2d 87, 58 Ill.Dec. 451, 430 N.E.2d 483 (1981), a case arising out of the redistricting plan presently under challenge. In *Schrage*, the Illinois Supreme Court considered a challenge under this provision to one representative district (the 89th) created by the Commission Plan. In the course of invalidating the Commission Plan with respect to this district (and, concomitantly, to the 90th representative district), the court adopted an "eyeball" standard to determine if a given district met the compactness requirement:[48]

It is possible to establish a mathematically precise standard of compactness. . . . However, we find it unnecessary to adopt such a procedure in this case. Rather, we can rely on a visual examination of the questioned district as other courts have done. . . .

. . . . .

A visual examination of Representative District 89 reveals a tortured, extremely elongated form which is not compact in any sense. . . . Nor were the plaintiffs able to advance any reason which might possibly justify such a radical departure from the constitutional requirement of compactness in this case.

*Schrage*, 88 Ill.2d at 98, 58 Ill.Dec. 451, 430 N.E.2d 483.

Plaintiffs have directed our attention to numerous districts which allegedly lack

---

**45.** A more detailed discussion of the *DelValle* plaintiffs' claims, as well as of the Hispanic Settlement Agreement, appears in Section IV *infra*.

**46.** The *Rybicki* complaint also alleges unconstitutional racial vote dilution. That issue, which was presented at trial by the *Crosby* and *DelValle* plaintiffs, is dealt with in subsequent parts of this opinion.

**47.** We have pendent jurisdiction to consider this state law claim. As noted previously, equality of population in the districts is not an issue in this case. Moreover, no evidence was introduced at trial that any district is non-contigu-

ous. Hence, we have not considered any question of contiguity.

**48.** The court also emphasized that adherence to the compactness standard was important with respect to the challenged district because Commission House District 89's extremely elongated shape might "significantly impede[ ] vital constituent-representative communication." *Schrage*, at 100, 58 Ill.Dec. 451, 430 N.E.2d 483. We note that plaintiffs here did not allege, nor present any evidence to ·the effect, that such communication would be jeopardized in any of the assertedly noncompact Commission Plan districts challenged in ·the instant proceeding.

compactness.[49] Several other witnesses identified districts that, in their opinion, represented such shapes as a "microscope" or a "Buddha" and thus lacked compactness. Finally, plaintiffs have also directed our attention to examples of legislative districts found to be noncompact in cases other than *Schrage* but interpreting similar requirements of compactness. *See, e.g., Preisler v. Doherty*, 365 Mo. 460, 284 S.W.2d 427 (1955); *State ex rel. Barrett v. Hitchcock*, 241 Mo. 433, 146 S.W. 40 (1912); *In re Sherill*, 188 N.Y. 185, 81 N.E. 124 (1907).[50]

We have examined the districts described by plaintiffs as noncompact and conclude that under the principles articulated in *Schrage*, none of the districts in the Commission Plan reveal "a tortured, extremely elongated [or other] form which is not compact in any sense." *Schrage*, 88 Ill.2d at 98, 58 Ill.Dec. 451, 430 N.E.2d 483. In reaching this conclusion, we are, of course, mindful that the compactness standard is recognized by Illinois as a means to "improv[e] legislative representation through seeking to insure that districts are not gerrymandered," 6 *Record of Proceedings, Sixth Illinois Constitutional Convention* 1353 (1972) (Report of the Legislative Comm.). Consistent with this goal, the Illinois Supreme Court reemphasized in *Schrage* that the constitutional compactness standard cannot be ignored. *Schrage*, at 96, 58 Ill.Dec. 451, 430 N.E.2d 483. We clearly recognize the importance of the compactness standard not only because Illinois law and its interpretation by Illinois

courts is controlling on this issue but also because we agree with the underlying policies and ideals on which *Schrage* is based. Nevertheless, we are aware of the various difficulties involved in drawing legislative districts and the constraints imposed by the one-person, one-vote standard, the imperatives of census tract data, the desire to follow natural, ecological and political boundaries, and the competing demands of incumbents, voters and the courts.

Bearing in mind these considerations, we note that no other districts in the Commission Plan are as relatively noncompact as Commission House Districts 89 and 90 (before their modification by the Illinois Supreme Court in *Schrage*).[51] Indeed, although plaintiffs identified many districts in the Commission Plan as noncompact, a quick perusal of the plaintiffs' alternative Coalition Plan reveals that it contains districts also comparatively lacking in strict compactness. This comparison with the Coalition Plan is significant because it reveals the problems with compactness which pervade many approaches to similar redistricting problems. Thus, we decline to invalidate the Commission Plan, or any of its individual districts, as lacking in compactness in the sense required by the Illinois Constitution.

B. *Fracturing Political Subdivision Boundaries, Overlap Between Urban and Suburban Districts and Suburban Vote Dilution*

Plaintiffs contend that the Commission Plan unduly fractures or splits political

---

49. *See* discussion *ante* at 1097. These districts include Commission Senate Districts 17, 18, 19 and 46; and Commission House Districts 7, 22, 35, 37, 39, 41, 42, 50, 58, 77, 80, 84, 87, 95 and 104.

Plaintiffs' expert witness, Dr. Hofeller, articulated another test for compactness (different from the length-to-width comparison test) that involved drawing a polygon around the outside of a district and comparing the area inside the district to the area outside the district but within the line segments of the polygon. The evidence did not establish, however, that Dr. Hofeller analyzed any districts using this method.

50. *See generally In re Legislative Districting of General Assembly*, 193 N.W.2d 784 (Iowa 1972); *Acker v. Love*, 178 Colo. 175, 496 P.2d 75 (1972).

51. Defendants have, for the most part, justified any slight deviations from normal "compactness" by demonstrating that the districts were drawn as such to recognize alleged communities of interest, to follow natural, ecological or political boundaries or to satisfy population equality standards. Such justifications are appropriately considered, given that Illinois does not require perfect compactness, *Schrage*, 88 Ill.2d at 96, 58 Ill.Dec. 451, 430 N.E.2d 483. The explanations proffered tend to rebut the inference that the arguable lack of normal "compactness" was related to efforts at gerrymandering.

subdivisions in Illinois, especially counties.[52] By drawing districts which "overlap" a county line, plaintiffs argue that the defendants violated their own criteria of keeping political subdivisions and their concomitant communities of interest intact within the same legislative district.[53] The most vehemently criticized fracturing noted in the Commission Plan involves districts that "overlap" between the City of Chicago and Cook County. There was also strong criticism of the number of districts which "overlap" between Cook County and the "collar" counties.[54] According to the plaintiffs, the net effect of districts which overlap from Chicago into the suburbs is the impermissible minimization of the voting strength of suburban residents (who are predominantly Republican voters in contrast to the predominantly Democratic voters residing in Chicago). This alleged minimization of suburban voting strength assertedly violates the Fourteenth Amendment's guarantee of equal protection.

Although they do not deny that their plan in fact fractures many political subdivisions, several Commission members testified that two of their guiding criteria in designing districts were to minimize the number of fractures and to maintain communities of interest. Defendants argue that the Commission Plan does not unduly violate these redistricting criteria. Defendants also concede that they intentionally created districts that overlap between Chicago and surrounding areas in Cook County and between Cook County and the collar counties. The bulk of the overlap districts between Chicago and its suburbs were created, according to the Commission members, by generally following the district lines from the 1971 districting plan, with adjustments where necessary to add or subtract population to meet the population equality standard. Moreover, defendants concede that a major motivating factor for creating overlap districts was to enhance and maximize the influence of Chicago, its voters and the Democratic party in the General Assembly. We address first the question of alleged indiscriminate fracturing of political subdivision boundaries before considering the claim of suburban vote dilution under the Fourteenth Amendment.

■ Plaintiffs argue that the "overlap" district lines, as well as other district lines which indiscriminately fracture municipal, township and county boundaries, impermissibly split recognized communities of interest by indiscriminately fracturing political subdivision boundaries. As evidence of this, plaintiffs point to various examples of alleged divergence of interest between the residents of Chicago and suburbanites, or between residents of one county (particularly Cook County) or of a group of counties and residents of neighboring counties.[55] Although this argument has some

52. Illinois is comprised of 102 counties. Under the Commission Plan, 48 counties are fractured, *i.e.,* they contain districts that cross over county lines. Some of these counties are fractured a number of times thus creating a total of 122 separate fractures of county boundary lines in the Commission Plan.

53. The Village of Oak Park, Illinois, a suburban community west of Chicago, filed a brief as *amicus curiae* urging the court to adopt a redistricting plan that avoids any unnecessary fracturing of the community among legislative districts containing parts of its population. Unfortunately, although we recognize the merit of Oak Park's objections (based on fracturing) to portions of the remedy we have adopted in this proceeding, we feel that the black voting dilution claim, which was addressed in part by certain changes in the border area of Chicago and Oak Park, must be accorded high priority. Since we have relied on the Commission to address the details of the necessary census tract shifts, we cannot without risking loss of control of the process, accommodate all other objections.

54. The counties surrounding Cook—Lake, McHenry, Kane, DuPage and Will Counties—are commonly referred to as the collar counties.

Eleven Senate districts and fifteen House districts include areas both within and without the City of Chicago and are thus denominated as overlap districts. Chicago residents account for more than 50% of the population in nine of these Senate districts. Seven legislative districts overlap between Cook, Will, Lake and DuPage Counties.

55. Most of the examples relied upon by the plaintiffs compare the interests of voters in the collar counties to the interests of voters in Chicago and in Cook County. Plaintiffs also note

force, plaintiffs have not cited any legal authority which would require (or authorize) us to invalidate the Commission Plan on such a ground.[56] In fact, the 1970 Illinois Constitution did not reenact those provisions of the 1870 Constitution that required districts outside Cook County to "be bounded by county lines unless the population of any county entitled it to more than one representative district." Art. IV, § 7, *Ill. Const.*, (1970) (repealed).[57] Moreover, districts that overlap between Chicago and suburban Cook County were approved by the Illinois Supreme Court in *People ex rel. Scott v. Grivetti,* 50 Ill.2d 156, 277 N.E.2d 881, 888 (1971), *cert. denied,* 407 U.S. 921, 92 S.Ct. 2460, 32 L.Ed.2d 806 (1972), and the Democratic Commission members relied on that decision when they drafted their plan. *Cf. In re Illinois Congressional Districts Reapportionment Cases,* No. 81 C 3915, slip op. at 24–25 (N.D.Ill. Nov. 23, 1981), *aff'd sub nom. McClory v. Otto,* 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284 (1982) (approving Congressional redistricting that creates districts which overlap between Chicago and suburbs).[58] Thus, we are unwilling to condemn the Commission Plan merely because it fractures a number of political subdivision lines or creates districts that overlap between Chicago and its surrounding suburbs.[59]

that Cook County and Chicago are treated differently under state law than other areas with respect to real estate taxes, budgeting authority, etc., thus indicating divergent interests between Chicago and Cook County voters and other voters.

**56.** In *Skolnick v. State Electoral Board,* 336 F.Supp. 839 (N.D.Ill.1971), the court purported to reject a redistricting plan because in an attempt to create compact and contiguous districts, it failed to respect political boundaries. The statements made in *Skolnick* which subordinate compactness to respect for political boundaries did not purport to interpret Illinois law. As we discuss elsewhere, Illinois recently deemphasized the significance of political boundaries while revitalizing the compactness standard in *Schrage.* Moreover, the *Skolnick* opinion did not purport to hold that preservation of traditional political boundaries was mandated by the federal Constitution. Indeed, in a similar case involving a challenge to the population deviations of a state redistricting plan, the Supreme Court also denied any special constitutional privilege for political boundaries by noting that "[r]ecognition that a state may properly seek to protect the integrity of political subdivisions or historical boundary lines permits no more than 'minor deviations' from the basic requirement that legislative districts must be 'as nearly of equal population as is practicable.'" *Connor v. Finch,* 431 U.S. 407, 419, 97 S.Ct. 1828, 1836, 52 L.Ed.2d 465 (1977) (quoting *Roman v. Sincock,* 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964)). We believe this principle is also appropriate in an Equal Protection challenge alleging vote dilution as in this case.

**57.** The intent underlying this deletion was clearly expressed by one of the drafters of the 1970 Constitution as follows: "The least we can do is not to mandate the legislature to follow municipal boundaries, county boundaries, or others, but to apportion this state as near as possible on a basis of equal population." 4 *Record of Proceedings, Sixth Illinois Constitutional Convention* 2937 (1970) (remarks of Delegate Nicholson).

**58.** The Illinois Supreme Court's most recent decision in *Schrage v. State Board of Elections,* 88 Ill.2d 87, 58 Ill.Dec. 451, 430 N.E.2d 483 (1981), is not to the contrary. To be sure, in *Schrage,* at 104, 58 Ill.Dec. 451, 430 N.E.2d 483, the court noted that "'[i]ndiscriminate districting, without regard for political subdivisions or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering'" (quoting *Reynolds v. Sims,* 377 U.S. 533, 578–79, 84 S.Ct. 1362, 1390–91, 12 L.Ed.2d 506 (1964)). The challenged district in that case—House District 89—involved the indiscriminate disregard of political subdivision boundaries, since that district fractured at least six counties and numerous townships. But, notwithstanding its discussion of political boundaries, it is also clear that the *Schrage* court was primarily concerned with the *compactness* of the district in question. Indeed, the court's stated reason for invalidating the Commission Plan as to District 89 was not the fracturing of county lines *per se* but rather the production of a noncompact district by fracturing. As previously noted, we have found no other districts in the Commission Plan which violate the compactness standard. We think it would be incorrect to interpret the *Schrage* language on fracturing in a context isolated from the question of compactness.

**59.** Witnesses for the *Rybicki* plaintiffs sharply criticized the Commission Plan's apparent indiscriminate fracturing of DuPage County, among other collar counties. At the request of the court during the trial, the Commission made several changes in its Plan to accommodate some of the objections of all plaintiffs, including the *Rybicki* plaintiffs, in an effort to reach a

■ The *Rybicki* plaintiffs also allege that the Commission Plan's overlapping Chicago/suburban districts impermissibly dilute the votes of suburban residents. These overlap districts were carefully designed, plaintiffs contend, so that most of them contain a majority of Chicago residents.[60] The voting strength of the suburban residents of these districts is allegedly diluted because the districts are controlled by the majority Chicago voters and their political organizations.[61]

Although this argument has appeal, we reject it for two reasons—one grounded in policy, the other in the Constitution. The *Rybicki* plaintiffs' argument can be reduced to the simple proposition that the Commission intentionally failed to increase the number of "suburban" districts [62] even though Chicago lost population and the suburbs gained population during the 1970's. The Coalition Plan espoused by the *Rybicki* plaintiffs would cure this alleged infirmity by reducing the number of overlap districts, thereby increasing the number of districts located wholly outside Chicago. This shift would reduce the number of districts "controlled" by Chicago voters. Of course, at the heart of the *Rybicki* plaintiffs' claim seems to be the concept that Chicago voters are the highly disciplined "agents" of that city's political interests (including the interests of its dominant political organizations)—and that these interests are in major part inimical to the interests of suburban voters. We think there

may be some reality to this concept although the record is quite uninformative on the subject in general. We also believe that the concept may exaggerate the submissiveness of Chicago voters and the gross antagonism of City and suburban interests. It is not disputed that, on some questions, some residents of Chicago may support positions strongly in conflict with those supported by their suburban counterparts. But to extrapolate from this modest assumption to a rule that Chicago residents must be excluded from any district including suburban residents is unsupported either by logic or by the record before us. The extreme parochialism in legislative districting seemingly espoused by the *Rybicki* plaintiffs is not required by law and has some tendency to derogate the intelligence and independence of the average modern voter. We think this approach may be somewhat more reflective of traditionally hallowed concepts than of current reality.

Our conclusion is not at odds with the Constitution. The *Rybicki* plaintiffs argue that any dilution of the votes of suburban residents by their inclusion in a Chicago majority district violates the Equal Protection Clause of the Fourteenth Amendment. Although acknowledging that no clearly apposite Supreme Court (or even lower court) precedent directly supports this assertion, the plaintiffs argue that the Court has recognized that, in addition to racial or ethnic minorities, political groups of any nature may also assert a claim of unconsti-

settlement. *See* Court Exhibits 1A, 2A and 2E (and supporting documents). We are accepting these proffered changes as they affect DuPage County and the other collar counties. The suggestion in the *Rybicki* plaintiffs' Offer of Proof filed on December 11, 1981 (in opposition to these Court Exhibits), that the majority of the Commission be allowed to draw the Chicago districts while the *Rybicki* plaintiffs be permitted to draw all districts in the collar counties seems to violate the thrust of Illinois redistricting procedure. The defendant Commission (which is controlled by its majority, is charged under Illinois law with responsibility for redistricting the General Assembly. We are also accepting the changes made by the various Court Exhibits in connection with the claims of the *Crosby* and *DelValle* plaintiffs. We think any further changes are unnecessary and would

not be congruent with the rest of the map as modified.

**60.** *See* note 54 *supra.*

**61.** We may fairly characterize the evidence presented at trial concerning the partisan politics of these geographic areas by noting that the majority of voters residing in Chicago are Democrats while the majority of their suburban counterparts are Republicans. To the extent that plaintiffs' claim of suburban vote dilution involves partisan political concerns, we address those concerns separately, *infra.*

**62.** In the context of this discussion, we use the generic term "suburbs" to refer to Cook County outside Chicago, together with the collar counties.

tutional vote dilution.[63] We decline to give the dicta or separate opinions cited by plaintiffs such an authoritative interpretation, especially in light of refusals by the Supreme Court to accord to political or other identifiable groups the same Fourteenth Amendment protections in the electoral context as are accorded to racial and ethnic minorities. As Justice White, writing for the majority, explained in *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971):

> The District Court's holding, although on the facts of this case limited to guaranteeing one racial group representation, is not easily contained. It is expressive of the more general proposition that any group with distinctive interests must be represented in legislative halls if it is numerous enough to command at least one seat and represents a majority living in an area sufficiently compact to constitute a single-member district. This approach would make it difficult to reject claims of Democrats, Republicans, or members of any political organization in Marion County who live in what would be safe districts in a single-member district system but who in one year or another, or year after year, are submerged in a one-sided multi-member district vote. There are also union oriented workers, the university community, religious or ethnic groups occupying identifiable areas of our heterogeneous cities and urban areas.

403 U.S. at 156, 91 S.Ct. at 1875–76 (footnotes omitted). *Accord, City of Mobile v. Bolden*, 446 U.S. 55, 78 n. 26, 100 S.Ct. 1490, 1506 n. 26, 64 L.Ed.2d 47 (1980). *See also Cousins v. City Council of Chicago*, 466 F.2d 830, 844–45 (7th Cir.), *cert. denied*, 409 U.S. 893, 93 S.Ct. 85, 34 L.Ed.2d 181 (1972); *Graves v. Barnes*, 343 F.Supp. 704, 733–34 (W.D.Tex.1972), *aff'd in part and rev'd in part sub nom. White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

## C. *Political Fairness*

A great deal of testimony was introduced at trial about the "political fairness" of the Commission Plan (and the Coalition Plan as well). The *Rybicki* plaintiffs argue that "[u]nder the guise of political fairness, the Democratic Commission members have drawn a map which sacrifices compactness and the integrity of political subdivisions for the preservation of incumbency." *Rybicki* Post Trial Brief at 26. We have already concluded that the Commission Plan neither lacks compactness nor impermissibly ignores the integrity of political subdivisions. We now conclude that what the *Rybicki* plaintiffs call the Commission's "overt political gerrymandering," *Rybicki* Post Trial Brief at 27, similarly does not require us to invalidate the Commission Plan.

---

**63.** Plaintiffs cite statements from *Reynolds v. Sims*, 377 U.S. 533, 567 n. 43, 84 S.Ct. 1362, 1384 n. 43, 12 L.Ed.2d 506 (1964), and *Dallas County v. Reese*, 421 U.S. 477, 480, 95 S.Ct. 1706, 1707, 44 L.Ed.2d 312 (1975) (per curiam), to indicate that the Court has at least contemplated the protection of suburbanites or other groups from vote dilution. We note that the Court's statements regarding "fast-moving suburban areas" in *Reynolds* were expressly related to the possibility of a suburban-based *population equality* (i.e., one-person, one-vote) challenge. We do not view this sort of claim as necessarily comparable to a vote dilution claim such as the instant one, which is unaccompanied by any contention that districts do not contain equal population. Similarly, the statement plaintiffs rely upon from *Reese* was the Court's attempt to explain that, under *Dusch v. Davis*, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967), a single-member districting scheme actually operated on a county-wide basis as an at-large districting scheme which would "dilute" the votes of some city or county residents by violating the population equality principle.

The only other authorities cited by plaintiffs for the proposition that suburbanites are protected from vote dilution are several opinions by Justice Stevens, *see City of Mobile v. Bolden*, 446 U.S. 55, 86, 100 S.Ct. 1490, 1509, 64 L.Ed.2d 47 (1980) (Stevens, J., concurring in judgment); *Cousins v. City Council of Chicago*, 466 F.2d 830, 853 (7th Cir.) (Stevens, J., dissenting), *cert. denied*, 409 U.S. 893, 93 S.Ct. 85, 34 L.Ed.2d 181 (1972). Despite our great respect for the wisdom and insight of Justice Stevens, we note that no other Supreme Court Justice nor any other judge of this circuit has followed Justice Stevens and adopted his views on this subject.

■ As a prerequisite to our consideration of this issue, we note that partisan politically-based challenges to redistricting and reapportionment may be nonjusticiable. *See WMCA, Inc. v. Lomenzo*, 382 U.S. 4, 86 S.Ct. 74, 15 L.Ed.2d 2 (per curiam), *aff'g* 238 F.Supp. 916 (S.D.N.Y.1965); *Cousins v. City Council of Chicago*, 466 F.2d 830, 844–45 (7th Cir.), *cert. denied*, 409 U.S. 893, 93 S.Ct. 85, 34 L.Ed.2d 181 (1972). Although plaintiffs seem ambivalent in their approach to political end-result as a test of fairness, they do contend that the Democratic-controlled Commission improperly designed districts to maximize the number of Democrats likely to be elected to the Illinois General Assembly. Nevertheless, we consider the political fairness issue here because it is inexorably linked to the questions of compactness and the integrity of political subdivision boundaries, *see Wendler v. Stone*, 350 F.Supp. 838, 841 (S.D.Fla.1972) (Roettger, J., dissenting), and because the fairness question may require us to interpret the Court's decision in *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973).

■ Plaintiffs' political fairness argument is premised upon the assertion that the Commission members, although claiming to have created a districting plan that fairly represents the balance between Republican and Democratic political strength in Illinois, purposefully designed districts that maximized Democratic voting strength while minimizing and fracturing Republican voting power. Plaintiffs also assert that the Commission purposefully "gerrymandered" districts "to enhance the ability of Democratic incumbents ... to get reelected." *Rybicki* Post Trial Brief at 27.

Aside from the questions of detailed techniques, such as the alleged creation of noncompact districts and the dilution of the suburban vote (which we have discussed, *supra*), plaintiffs apparently assert the broader proposition that the end-result of these efforts—an overall bias toward a Democratic legislature—is constitutionally impermissible. We note, however, that the *Rybicki* plaintiffs never presented evidence

of what result in detail they expected from the Commission Map. The Commission, on the other hand, did adduce such evidence.

We believe that plaintiffs' argument with respect to the fairness of political result misconstrues the Supreme Court's decision in *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). In *Gaffney*, a state redistricting plan was consciously designed, in "the spirit of 'political fairness,'" to "achieve a rough approximation of the statewide political strengths of the Democratic and Republican Parties." 412 U.S. at 752, 93 S.Ct. at 2331. The challengers in *Gaffney* contended, however, that the plan was "nothing less than a gigantic political gerrymander, invidiously discriminatory under the Fourteenth Amendment." 412 U.S. at 752, 93 S.Ct. at 2331 (footnote omitted).

The Court, in rejecting the challengers' claim, intimated that a plan, in order to pass muster, did not necessarily have to be wholly "politically fair" in end-result or designed with total even-handedness to reflect the respective strengths of political parties in a state. Even a plan that reflected some partisan leanings on the part of its drafters should not be invalidated *solely* because the drafters of the plan indulged some partisan political biases. Based in part on *Gaffney*, we do not think it the function of the courts to attempt to totally depoliticize a process so inherently political as districting. As Justice White, speaking for the majority in *Gaffney*, explained:

We are quite unconvinced that the reapportionment plan offered by the three-member Board violated the Fourteenth Amendment because it attempted to reflect the relative strength of the parties in locating and defining election districts. *It would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it.* Our cases indicate quite the contrary .... The very essence of districting is to produce a different—a more "politically fair"—result than would be

reached with elections at large, in which the winning party would take 100% of the legislative seats. *Politics and political considerations are inseparable from districting and apportionment . . . . The reality is that districting inevitably has and is intended to have substantial political consequences.* 412 U.S. at 752–53, 93 S.Ct. at 2331–32 (emphasis supplied).

We believe that the *Gaffney* decision in no sense mandates the invalidation of the Commission Plan solely on the grounds that Commission members considered partisan political advantage when drafting the Plan.[64] In any event the Commission presented extensive evidence to demonstrate that its Plan, like the plan approved in *Gaffney*, would achieve a fair representation of the two major parties in Illinois based upon past election results. Indeed, under the Commission Plan, the Republican party may control more relatively secure seats in the General Assembly than the Democratic party.[65] *Cf. In re Congressional Districts Reapportionment Cases*, No. 81 C 3915, slip op. at 21–22 (N.D.Ill. Nov. 23, 1981), *aff'd sub nom. McClory v. Otto*, 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284 (1982) (Otto plan preferable because it approximates statewide political strength of two major parties). The Court's admonition in *Gaffney* is, we believe, equally applicable here: "[J]udicial interest should be at its lowest ebb when a State purports fairly to allocate political power to the parties in accordance with their voting strength and, within quite tolerable limits, succeeds in doing so." 412 U.S. at 754, 93 S.Ct. at 2332.

Notwithstanding the asserted and apparent statewide balance between the two major parties achieved by the Plan, plaintiffs still contend that the Commission Plan must fail because it was intentionally designed to produce in end-result a maximum Democratic party representation. This argument, however, does not, as we have suggested, rise to the level of a Constitutional contention. Although the Court in *Gaffney* refused to abstain entirely from judicial scrutiny of a state redistricting plan motivated in part by political factors, the Court expressly limited the permissible scope of the challenge to such a plan:

> What is done in so arranging for election, or to achieve political ends or allocate political power, is not wholly exempt from judicial scrutiny under the Fourteenth Amendment. As we have indicated, for example, multimember districts may be vulnerable, if racial or political groups *have been fenced out of the political process and their voting strength invidiously minimized. Beyond this, we have not ventured far or attempted the impossible task of extirpating politics from what are the essentially political processes of the sovereign States.*

412 U.S. at 754, 93 S.Ct. at 2332 (emphasis supplied) (citations omitted). It would be equally absurd for us to attempt to take the politics out of legislative redistricting. Plaintiffs do not assert, nor can they assert, that the Democratic-controlled Commission attempted to fence out or invidiously minimize Republican voting strength in Illinois. Similarly, we do not, in general, find fault with the efforts of Democratic

---

**64.** This analysis does not apply, however, to the extent that purposeful dilution of minority voting strength rather than partisan political concerns may be the issue. *See* Section III *infra.*

**65.** Based upon an analysis of the 1978 and 1980 election returns from the University of Illinois Trustee elections and from the Illinois House and Senate elections, the Commission estimates that its Plan will provide 39 "firm" Democratic, 5 "soft" Democratic, 41 "firm" Republican, 10 "soft" Republican and 23 "swing" seats in the Illinois House of Representatives. For the Illinois Senate, the Commission estimates 21 "firm"

Democratic, 25 "firm" Republican, 3 "soft" Republican and 10 "swing" seats. Plaintiffs challenge the defendants' use of this data, especially the results of trustee elections and of legislative elections, to predict the results of elections in the new single-member districts for the General Assembly. We note, however, that plaintiffs have not produced any alternative systematic methodology for more accurately predicting election results and, thus, we must accept the defendants' evidence as the most systematic available.

Commission members to protect incumbent Democratic legislators. Indeed, the Supreme Court has expressly indicated that a redistricting plan is not *per se* invalid merely because the drafters considered the effect of district lines on incumbents of either party. *See White v. Weiser,* 412 U.S. 783, 791, 93 S.Ct. 2348, 2352, 37 L.Ed.2d 335 (1973); *Burns v. Richardson,* 384 U.S. 73, 89 n. 16, 86 S.Ct. 1286, 1295 n. 16, 16 L.Ed.2d 376 (1966).[66] Plaintiffs have not persuaded us that attempts by the Democratic-controlled Commission to protect some of its members or other Democratic incumbents would invidiously minimize Republican voting strength.

In sum, we do not believe that the role of courts in addressing alleged unfairness to political parties is equivalent to their role in evaluating unfairness to racial and ethnic minorities. The major political parties (absent "fencing out" or invidious minimization) are presumed to have the capacity to protect their own interests in the political process. The federal courts are not in business to compensate for political errors, misfortunes or strokes of fate, which may leave political parties at some temporary disadvantage. The case for judicial action on behalf of blacks and Hispanics is significantly different.

We conclude that the Commission Plan is not invalid because the Commission members considered (within limits) partisan advantage when drawing district lines.[67]

### III. *Complaint of the Crosby Plaintiffs: Dilution of Black Voting Strength*

The *Crosby* plaintiffs have alleged that the Commission unconstitutionally discriminated against black voters in this redistricting by intentionally diluting their voting strength and thereby denying them a fair electoral opportunity. These plaintiffs contend that the Commission Plan is a product of racial gerrymandering designed to limit the participation of blacks and Hispanics in the Illinois electoral process and to protect various white incumbents whose districts have become, in the 1970–1980 period, heavily populated by blacks and Hispanics.[68] According to the *Crosby* plaintiffs, the white leaders of the Chicago Democratic organization purposefully set out to undermine the vote of the black electorate and were successful in their efforts under the Commission Plan.[69]

### A. *Fifteenth Amendment and the Voting Rights Act*

██ First, we address the question whether, if proven, plaintiffs' claims of vote dilution are properly cognizable under the Fifteenth as well as the Fourteenth Amendment. Although an answer to this question may not emerge with blinding clarity from the Supreme Court's recent decision in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47

---

**66.** As will be indicated *infra,* however, the relationship of incumbency to race may call for another analysis.

**67.** Somewhat related to their political fairness concerns, the *Rybicki* plaintiffs also alleged that the Democratic Commission members acted in bad faith by failing to provide their Republican counterparts with copies of the "Shapiro Plan" sufficiently in advance of the October 2, 1981, Commission meeting, at which the Plan was adopted by a 5 to 4 vote along party lines. Even if plaintiffs could clearly demonstrate some degree of "bad faith" on the part of the Democrats, we find that the plaintiffs have not shown that the Republican Commission members were prejudiced by the Democrats' conduct prior to the adoption of the Shapiro Plan. By voting unanimously against the Plan, the Republicans merely did what appeared to be inevitable un-

der all the circumstances. It is not clear what they might have done differently even if every detail of the Democrats' plan had been delivered to them weeks earlier.

**68.** The allegations relating to the effect of the Commission Plan on Hispanics are not considered in this section since the Hispanic plaintiffs reached a settlement of their claims with the Commission after trial, as set forth in the Hispanic Settlement Agreement and discussed in Section IV of this opinion.

**69.** Although their complaint concerns all black residents and voters in Illinois, the *Crosby* plaintiffs concentrated their efforts at trial on those portions of the Commission Plan containing House or Senate districts located in whole or in part within the City of Chicago.

(1980), we think that decision furnishes the most authoritative guide to the matter. In *Bolden,* the four plurality justices (Justices Stewart, Burger, Powell and Rehnquist), in considering the constitutionality of the at-large system of elections required by the commission form of government in Mobile, Alabama, held that the Fifteenth Amendment "prohibits only purposefully discriminatory denial or abridgment by government of the freedom to vote 'on account of race, color, or previous condition of servitude,'" and that this constitutional prohibition "does not entail the right to have Negro candidates elected." 446 U.S. at 65, 100 S.Ct. at 1498. Relying on the district court's explicit finding "that Negroes in Mobile 'register and vote without hindrance,'" the four-justice plurality held that both "the District Court and the Court of Appeals were in error in believing that the appellants invaded the protection of [the Fifteenth] Amendment in the present case." 446 U.S. at 65, 100 S.Ct. at 1498.[70] We believe that under *Bolden,* plaintiffs' allegations of racial gerrymandering in the instant case, which do not implicate the rights of minority group members to register and vote without hindrance, but can only entail the asserted right to have candidates favored by the protected groups elected, similarly fail to invade the province of the Fifteenth Amendment.

Accordingly, the black plaintiffs in this case cannot recover under either the Fifteenth Amendment or under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 (1976), which the *Bolden* Court held to be equivalent in basic content and effect to the Fifteenth Amendment. *City of Mobile v. Bolden,* 446 U.S. at 60–61, 100 S.Ct. at 1495–96; *see McMillan v. Escambia County,* 638 F.2d 1239, 1242 n. 8 (5th Cir.), *cert. dismissed,* 453 U.S. 946, 102 S.Ct. 17, 69 L.Ed.2d 1033 (1981).

### B. *Fourteenth Amendment*

The primary issue in this case is thus whether the *Crosby* plaintiffs' vote dilution claim entitles them to any relief under the Equal Protection Clause of the Fourteenth Amendment. *Bolden,* of course, held that voting strength dilution challenges to legislative apportionments "could violate the Fourteenth Amendment if their purpose were invidiously to minimize or cancel out the voting potential of racial or ethnic minorities." 446 U.S. at 66, 100 S.Ct. at 1499.[71] The *Bolden* Court went on to hold that, to sustain a voting strength dilution claim, a "plaintiff must prove that the disputed plan was 'conceived or operated as [a] purposeful devic[e] to further racial ... discrimination.'" 446 U.S. at 66, 1499 (quoting *Whitcomb v. Chavis,* 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363

**70.** Justices Stevens (446 U.S. at 84–85), White (446 U.S. at 102) and Marshall (446 U.S. at 104–05, 125–29) expressly stated that a vote dilution claim is cognizable under the Fifteenth Amendment. Because Justices Brennan and Blackmun did not articulate their view on this question, the majority view is unknown. In these circumstances, we believe it is appropriate to adopt the plurality view of the Fifteenth Amendment—a view which is also consistent with our reading of prior appellate opinions on this subject. *See McMillan v. Escambia County,* 638 F.2d 1239, 1243 n. 9 (5th Cir.), *cert. dismissed sub nom. City of Pensacola v. Jenkins,* 102 S.Ct. 17 (1981). Even if Justice Brennan's opinion can be interpreted as an implicit approval of the application of the Fifteenth Amendment in vote dilution cases, this would not alter the result we reach in the instant case (as the Crosby plaintiffs apparently argue). It is evident that only two Justices—Brennan and Marshall—adopt the "discriminatory impact"

standard for a Fifteenth Amendment claim, 446 U.S. at 94, 130–41; Justice Stevens, although accepting an "objective" approach, rejected any across-the-board application of the discriminatory impact standard, 446 U.S. at 85–86, 90. But five Justices—the plurality Justices, 446 U.S. at 63–65, and Justice White, 446 U.S. at 95, 101–03 —expressly held that the Fifteenth Amendment requires proof of discriminatory purpose or intent. Thus, even if we were to recognize plaintiffs' claims here under the Fifteenth Amendment, we would apply the same standard—discriminatory purpose—as we do under the Fourteenth Amendment, as discussed *infra.*

**71.** *See also Cousins v. City Council of Chicago,* 466 F.2d 830, 841 (7th Cir.), *cert. denied,* 409 U.S. 893, 93 S.Ct. 85, 34 L.Ed.2d 181 (1972) (even though quantitative equality is preserved, members of a racial or ethnic group are protected from invidious minimization of their voting strength).

(1971)). Thus, we must determine whether plaintiffs here have demonstrated that the Commission Plan was purposefully designed to foster racial discrimination. Before we make this determination, however, several preliminary questions concerning the nature of evidence acceptable to prove purposeful discrimination and the appropriate burdens of proof must be addressed.

### 1. *Nature of Evidence and Burdens of Proof*

██ In *Bolden* "[t]here were five clear votes (Stewart, Burger, Powell, Rehnquist and Stevens, JJ.) *against* the proposition that discriminatory impact alone is sufficient in vote dilution cases." *McMillan*, 638 F.2d at 1243 (emphasis supplied). In reaching this conclusion, the *Bolden* Court relied upon *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); and *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) as illustrative of the requirement that a plaintiff must demonstrate purposeful discrimination in order to prevail under the Equal Protection Clause of the Fourteenth Amendment. The *Bolden* plurality also relied on previous electoral discrimination cases such as *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), to support their discriminatory purpose rationale. We agree that a discriminatory purpose must be shown in this case for plaintiffs to sustain a claim of racial vote dilution violative of the Fourteenth Amendment.

In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977), the Court noted that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." The Fifth Circuit recently summarized the evidentiary sources alluded to in *Arlington Heights* which are useful for assessing the existence of purposeful discrimination as follows:

(1) the historical background of the action, particularly if a series of actions have been taken for invidious purposes; (2) the specific sequence of events leading up to the challenged action; (3) any procedural departures from the normal procedural sequence; (4) any substantive departure from normal procedure, i.e., whether factors normally considered important by the decision-maker strongly favor a decision contrary to the one reached; and (5) the legislative history, especially where contemporary statements by members of the decisionmaking body exist.

*McMillan*, 638 F.2d at 1243.

The Supreme Court's opinion in *Arlington Heights* also demonstrates that in order to establish a Fourteenth Amendment violation, a plaintiff need not prove that the challenged action was motivated *solely* by a purpose to discriminate:

Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated *solely* by a single concern, or even that a particular purpose was the "dominant" or "primary" one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. *When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.*

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. at 265–66, 97 S.Ct. at 563–64 (emphasis supplied) (footnotes omitted).

Similarly, it seems clear that *Bolden* does not require that the purpose to discriminate be the *only* underlying purpose

for the challenged redistricting decisions. The plurality opinion in *Bolden* relied upon *Arlington Heights* and *Davis* for its interpretation of the Fourteenth Amendment, and as indicated above, *Arlington Heights* specifically rejects the "sole purpose" test. Justice Stevens' apparent contrary view garnered no support from other Justices.[72]

The more challenging question is whether the analysis of *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), is appropriately applied to mixed motive redistricting cases such as the one at bar. Under the principles of *Mt. Healthy* (decided the same day as *Arlington Heights*), if plaintiffs are able to show that a discriminatory purpose was one of the factors in the redistricting, the burden shifts to the defendant Commissioners to demonstrate that the same redistricting would have occurred even if a discriminatory purpose had not motivated the Commissioners. In the case at bar, the Crosby plaintiffs argue vigorously that the *Mt. Healthy* analysis is inappropriate while defendants, relying on *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Wren v. Jones*, 635 F.2d 1277 (7th Cir.1980); and *Nekolny v. Painter*, 653 F.2d 1164 (7th Cir.1981), as well as *Mt. Healthy* itself, argue with equal vigor that the *Mt. Healthy* analysis applies.

Defendants further contend that the applicable burden of proof in voting dilution cases has been modified by the Supreme Court's recent decision in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). They argue that under *Burdine*, once defendant Commissioners have articulated a legitimate, non-discriminatory reason for the challenged redistricting plan, the burden shifts back to plaintiffs to dem-

onstrate that defendants' purported explanation is merely a pretext for intentional discrimination.

We agree that the principles of *Mt. Healthy* are applicable to the instant case. The Supreme Court in *Arlington Heights* explicitly noted and approved the application of the *Mt. Healthy* burden of proof standard to race discrimination claims:

> Proof that the decision by the Village was motivated in part by a racially discriminatory purpose would not necessarily have required invalidation of the challenged decision. Such proof would, however, have shifted to the Village the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision. But in this case respondents failed to make the required threshold showing. See *Mt. Healthy City Board of Education v. Doyle, post*, [429 U.S.] p. 274 [97 S.Ct. 568, 50 L.Ed.2d 471].

429 U.S. at 270–71 n. 21, 97 S.Ct. at 566 n. 21. And although *Arlington Heights* is not itself a vote dilution case, it furnishes a controlling precedent for intentional discrimination as a necessary element of racial vote dilution. See *City of Mobile v. Bolden*, 446 U.S. at 66–68, 100 S.Ct. at 1499–1500.

Applying the *Mt. Healthy* analysis to the instant case involves the following analytical steps. First, plaintiffs must establish a *prima facie* case of purposeful vote dilution under the principles established in *White v. Regester, Arlington Heights* and

---

**72.** The concurring opinion of Justice Stevens in *Bolden*, in which none of the other Justices joined, apparently espoused the position that only decisions which were "totally irrational or entirely motivated by a desire to curtail the political strength of the minority" would violate the Fourteenth Amendment. 446 U.S. at 90, 100

S.Ct. at 1512. Concomitantly, Justice Stevens also noted that decisions affecting voting rights could still be valid even if motivated in part by "irrational or invidious factors." 446 U.S. at 91, 100 S.Ct. at 1512. No other Justice has, to our knowledge, stood with Justice Stevens on this interpretation of the Equal Protection Clause.

*Bolden.* Assuming that plaintiffs are able to make such a *prima facie* showing, the burden would then shift to the defendant Commissioners to establish that the redistricting in question would have occurred even absent the purpose to dilute minority voting strength. . Thus, following the scheme of *Wren v. Jones,* 635 F.2d 1277, 1285–86 (7th Cir.1980), once plaintiffs have demonstrated that racial discrimination substantially influenced the redistricting process, the defendant Commissioners must persuade the court, by a preponderance of the evidence, that they would have arrived at the same decisions and adopted the same redistricting scheme even absent the prohibited racial motivation.

We acknowledge that once plaintiffs have established a *prima facie* case, the *Mt. Healthy* analysis places upon defendants the heavy burden of demonstrating that the same redistricting process would have occurred, even in the absence of any prohibited motive. We also recognize that in the context of very complex reapportionment decisions the discharge of such a burden may be exceedingly difficult. But we also believe that under *Bolden,* establishment by plaintiffs of their *prima facie* case is quite difficult. Therefore, we feel strongly that once plaintiffs have sustained a *prima facie* claim, it is not unreasonable to shift to defendants the burden of showing that the same decision would have been reached even absent the influence of any discriminatory purpose.

We do not agree with the defendants' further contention that the three-part burden of proof test set forth in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), is applicable to the instant case. *Burdine* involved not a constitutional mixed-motive question, but a claim of disparate treatment under Title VII of the Civil Rights Act of 1964.[73] The three-part burden of proof analysis articulated in *Burdine,* although appropriate for ascertaining the one "true reason" for a particular employment-related action, does not deal with the problem of evaluating mixed-motive decisions made by a multi-member legislative or administrative body. In the latter context, unlike in *Burdine,* the role of plaintiffs' *prima facie* case is not to "eliminate the most common nondiscriminatory reasons for the plaintiff's rejection," 450 U.S. at 254, 101 S.Ct. at 1094, but to establish the influence of at least some impermissible purpose in the decision-making process. Once this has been established, the judicial task becomes one of determining whether the relevant state actors would have arrived at the same decision even absent the effect of that admittedly improper purpose. We believe that the two-part burden of proof test articulated in *Mt. Healthy* and *Arlington Heights,* rather than the "pretext" analysis employed in *Burdine,* is most appropriate to this task.

### 2. *Evidence of Purposeful Vote Dilution on Chicago's South and West Sides*

■ With respect to the *Crosby* plaintiffs' claims, we believe that purposeful dilution of black voting strength, in several significant instances, has been demonstrated in the instant case. First, under the 1980 census as applied to the 1971 Chicago area legislative redistricting lines, blacks constitute a majority in six Senate districts (former districts 21, 22, 24, 26, 28 and 29). Under the 1980 census as applied to the Commission Plan, blacks will constitute a majority in only five Chicago area Senate districts (Commission Senate Districts 9, 12, 13, 16 and 17). This simple statistic is evidence of retrogression[74] from which a strong inference of a purpose to dilute may

---

**73.** Moreover, the Supreme Court in *Burdine* explicitly recognized that "the factual issues and therefore the character of the evidence presented, differ when the plaintiff claims that a facially neutral employment policy has a discriminatory impact on protected classes." 450 U.S. at 252 n. 5, 101 S.Ct. at 1093 n. 5.

**74.** Retrogression, in the context of reapportionment and redistricting, represents a lessening or decrease in the voting strength of a cohesive voting bloc (such as a racial group) measured over time.

be drawn.[75] In addition, Dr. Amy Tsui, a sociologist and demographer from the University of Chicago, testified that in her opinion, implementation of the Commission Plan would result in a lessening—or retrogression—of the voting strength in Senate districts presently held by Chicago area blacks under the 1971 redistricting plan.

More precise and identifiable indications of a purpose to dilute may be found in the actions of the redistricting Commissioners with respect to Senate Districts 14 and 18 of the Commission Plan. Under the Commission Plan, black voting strength in former Senate District 28 under the 1971 district boundaries has been fractured by the creation of Commission Senate District 14, the district in which white incumbent Senator Jeremiah Joyce resides. Under 1970 census figures, District 28 was 73.8% white and 21.6% black. Under 1980 census figures, the black population of District 28 is now 106,830, making the district approximately 57.7% black and 39% white. To reach the ideal population for a Senate district, after the 1980 census, present District 28 had to be increased by approximately 8,000 persons.

The Commission, in the course of adding the necessary 8,000 persons to District 28, removed 34,000 blacks from that District and added 42,000 whites, thereby reducing the black population percentage in the newly created Commission district to 38%.[76] The result of this shift in racial populations, apparently to preserve Senator Joyce's incumbency, was to dilute the voting strength of the nearly 73,000 blacks who remained in Commission Senate District 14 after the shift in populations. It may, of course, be argued that this manipulation of racial populations in the district was accomplished for the purpose of maintaining the incumbency of a white Senator and was not necessarily indicative of an intent to discriminate against blacks *qua* blacks. We believe, however, that under the peculiar circumstances of this case, the requirements of incumbency are so closely intertwined with the need for racial dilution that an intent to maintain a safe, primarily white, district for Senator Joyce is virtually coterminous with a purpose to practice racial discrimination. *Cf. McMillan v. Escambia County,* 638 F.2d 1239, 1245 (5th Cir.), *cert. dismissed,* 453 U.S. 946, 102 S.Ct. 17, 69 L.Ed.2d 1033 (1981), ("[T]he desire to retain one's incumbency *unaccompanied by other evidence* ought not to be equated with an intent to discriminate against blacks *qua* blacks.") (emphasis supplied).[77]

Similarly, black voting strength in former Senate District 30 under the 1971 district boundaries has been diluted in the course of creating Commission Senate District 18, the district in which white incumbent Senator Glenn Dawson resides. Under 1970 census figures, District 30 was 73.2% white and 26.1% black. Under 1980 census figures District 30 would be 46% white, 45.1% black and 8.9% Hispanic. The

---

**75.** *See City of Port Arthur v. United States,* 517 F.Supp. 987, 1022 (D.D.C.1981) (adoption of annexation plan which significantly diminishes black voting strength evinces "invidious motive"); *Hale County v. United States,* 496 F.Supp. 1206, 1218 (D.D.C.1980) (retrogressive effect of changing to at-large voting system supports inference of discriminatory purpose). *Cf. Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976) (Voting Rights Act prohibits reapportionments that "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."); *City of Rome v. United States,* 446 U.S. 156, 185, 100 S.Ct. 1548, 1566, 64 L.Ed.2d 119 (1980) (same).

**76.** A comparison of racial population percentages in former legislative districts (created in 1971) with percentages in the districts as redrawn by the Commission is pertinent particularly because the drafters of the Commission's Chicago area districts testified that they attempted to follow the 1971 boundaries, readjusting lines where necessary to add or subtract population as mandated by the 1980 census.

**77.** Other evidence of discriminatory intent is abundant here, thus distinguishing the instant case from *McMillan.* As described below, racial population shifts, purportedly designed to preserve white incumbencies, are evident in several other Chicago districts. Moreover, black population has been purposefully packed or fractured in certain districts, resulting in a dilution of black voting strength.

black population in District 30 is currently 85,997. To reach ideal population for a Senate district, after the 1980 census, District 30 had to be increased by approximately 2,000 persons.

In the course of adding the approximately 2,000 persons necessary to bring District 30 to ideal population, the Commission increased the white population in what is now Commission Senate District 18 by nearly 30,000 and decreased the black population by over 40,000 persons. Under the Commission Plan, Commission Senate District 18 will be approximately 60.4% white, 23.4% black and 16.2% Hispanic. The voting strength of the 45,000 blacks left in Commission Senate District 18 has thus been dissipated. As explained earlier, we believe that these shifts in racial population, even if undertaken for the immediate purpose of providing a safe Senate seat for white Senator Dawson, are so closely linked to a desire to minimize black voting strength that they constitute strong evidence of a discriminatory purpose.[78]

Much of the black population that was formerly in the districts of Senators Joyce and Dawson has been moved into a new district, Commission Senate District 17, which replaces former Senate District 29 under the 1971 redistricting plan. Former Senate District 29 was represented by black Senator Charles Chew; he now resides in Commission Senate District 16 together with black Senator James Taylor,

and there is no incumbent Senator in District 17 under the Commission Plan. Blacks are unnecessarily concentrated in Commission Senate District 17,[79] and the resultant "packing" of black votes wastes such votes. *See Beer v. United States*, 425 U.S. 130, 154 n. 12, 96 S.Ct. 1357, 1370 n. 12, 47 L.Ed.2d 629 (1976) (Marshall, J., dissenting) ("Is it not as common for minorities to be gerrymandered into the same district as into separate ones?"); *Nevett v. Sides*, 571 F.2d 209, 219 (5th Cir.1978), *cert. denied*, 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980) ("compartmentalizing or fencing out a group" constitutes unconstitutional gerrymandering). *See also Note, Constitutional Challenges to Gerrymanders*, 45 U.Chi.L.Rev. 845, 846 and n. 8 (1978) ("concentrating a voting block into one district of nearly unanimous opinion ... wastes" the votes of the supermajority). This unnecessary packing represents intentional dilution of the black vote.[80]

Again we believe that the *immediate* purpose of these movements of racial populations was primarily to preserve the incumbencies of two white Senators. But this process was so intimately intertwined with, and dependent on, racial discrimination and dilution of minority voting strength that purposeful dilution has been clearly demonstrated in the construction of Commission Senate Districts 14, 17 and 18.[81]

---

**78.** The Commission's efforts designed to save the seats of white incumbents in Chicago, such as Senator Dawson, can only be construed as exercises in purposeful discrimination. Unlike most efforts to save the seats of incumbent legislators, which can be explained by partisan political concerns, partisan politics does not explain the Commission's actions in this case. It is undisputed that the vast majority, if not all, of the legislators likely to be elected from black areas in Chicago will be Democrats, regardless whether the candidate is white or black. Thus, the Commission's preference for a white incumbent over a potentially black challenger seems clearly to reflect racial rather than partisan political concerns.

**79.** Blacks comprise approximately 85% of the population in Commission Senate District 17.

**80.** An intent to dilute is also evident from the gerrymandering that was necessary to create this district. In the course of creating this unusually-shaped district, the Commission dropped a "finger" from the Chicago portions of the district to reach into part of the South Suburban Cook County area where a substantial black population resides. While a small portion of this black suburban area was fractured off for inclusion in Senate District 17, the remaining portions of this black population center were further fractured between two other suburban Senate districts.

**81.** We recognize, of course, that under circumstances other than those presented in this case, the adjustment of legislative districts to accommodate incumbencies would not necessarily represent purposeful racial discrimination. *See Burns v. Richardson*, 384 U.S. 73, 89 & n. 16, 86

On Chicago's West Side there is also evidence of racial vote dilution primarily with respect to the black population in Commission Senate District 8, and also to a degree in Senate Districts 9 and 10. Black voting strength in former Senate District 18 under the 1971 redistricting plan has been fractured by the creation of Commission Senate District 8, in which white incumbent Senator Philip Rock resides. Under 1970 census figures, former Senate District 18 was 90% white and 9.2% black. Under 1980 census figures, the black population of District 18 is 68,763 or approximately 36.7% of the District's population. To reach ideal population for a Senate District under the Commission Plan, District 18 had to be increased by approximately 6,000 persons. In the course of increasing former District 18 by the required 6,000 persons, the Commission added nearly 56,000 whites to what is now Commission Senate District 8, and removed over 51,000 blacks.[82] Commission Senate District 8 is now about 86% white, 9% black and 5% Hispanic.[83] The black population removed from former Senate District 18 did not, of course, disappear into thin air. The Commission had to find a new district for these blacks, and they found such a district close by—already heavily populated by blacks. Former Senate District 21, represented by black Senator Earlean Collins, contained, under the 1980 census, a black majority of 79%. The Commission redrew this district, now denominated Senate District 9 under the Commission Plan, by including some of the blacks removed from former Senate

District 18. This Commission drafting exercise resulted in a further packing of black voting strength in Commission Senate District 9, increasing the black population to 81.4% of the district's total population. Some of those black voters whose votes were not wasted by being packed into Senate District 9 found that they were now fractured from the rest of the black community by their inclusion in Commission House District 11 (48.3% black). The remainder were included in Commission House District 19 (72.7% black).

The Commission also apparently succeeded in halting and reversing growing black voting strength in another Senate district represented by white incumbents. Former Senate District 19 under the 1970 district boundaries is represented by white Senator Edward Nedza. In 1980, the population breakdown in this district by race was 26% white, 35% black and 39% Hispanic. The corresponding Commission Senate District 6, in which white Senators Nezda and Steven Nash now live, has an increased white population of 47% with a reduced black population of 24% and an Hispanic population of 29%.

The Commission points with some pride to Commission Senate District 10, a "majority minority" district [84] in which white incumbent Senator John D'Arco resides, as evidence that the Commission did not dilute minority voting strength on the West Side. Although the Commission did not substantially alter either the population percentages or the boundaries of this district, the Commission's actions with respect to Dis-

---

S.Ct. 1286, 1295 & n. 16, 16 L.Ed.2d 376 (1966); *McMillan v. Escambia County,* 638 F.2d 1239, 1245 (5th Cir.), *cert. dismissed,* 453 U.S. 946, 102 S.Ct. 17, 69 L.Ed.2d 1033 (1981).

**82.** This shift of blacks out of former Senate District 18 apparently amounted to the removal of most of the black population from the southern part of that Senate district. Thus, this shift of black population and its replacement by whites amounted to dilution to the extent of about one House district (since the blacks were split between Commission districts).

**83.** Defendants attempted to explain the population shifts in former Senate District 18 and

Commission Senate District 8 by asserting that these shifts were made to comply with the request of the Village of Oak Park that it not be fractured among two or more districts (as in the past). In his dissent, Judge Grady apparently accepts defendants' explanation for the configuration of Senate District 18. Even if this explanation is to be accepted, we do not believe it is sufficient to justify the serious dilution of black voting strength. Such selective redistricting would appear to honor municipal interests in preference to racial vote dilution claims in a way which we cannot accept.

**84.** Commission Senate District 10 is 20% white, 44% black and 36% Hispanic.

trict 10 do not necessarily contradict the pattern of purposeful vote dilution at the expense of black citizens. The Commission's own witnesses readily admitted that it was unlikely that a black or Hispanic would be slated by the regular Democratic organization in this district. Hence, it is improbable that a black or Hispanic candidate could win an election against the white incumbent even though whites account for only 20% of the district's population. The split "majority minority" simply could not be expected to elect a candidate from within its own ranks against an organization-backed white incumbent.[85]

Thus, 158,129 of the approximately 300,-000 blacks residing in Chicago's West Side have been packed into Commission Senate District 9 consisting of two concentrated Commission House Districts 17 and 18. The remaining population has been fractured, primarily among Commission House Districts 11, 15 and 19. Under the Commission Plan, therefore, West Side blacks will have a decisive majority only in Senate Commission District 9 from which they will presumably be able to elect a Senator of their choice. They will have decisive majorities only in House Districts 17, 18 and 19 from which they will presumably be able to elect Representatives of their choice. The net effect of these racial population changes has been the purposeful dilution of the black voting strength on the West Side by at least one House District.[86]

### 3. Election Districts and Racially Segregated Housing Patterns

Plaintiffs also argue strenuously that the boundary lines for Commission House Districts 17 and 18 on the West Side and Commission House Districts 23, 24, 25, 31, 33 and 34 on the South Side trace in great

measure the boundaries of the heavy black concentrations in Chicago. They argue, *inter alia*, that these lines create a racially-defined "wall" around the residentially-segregated black communities in Chicago, thereby appearing to confer an official governmental sanction on the residential racial segregation which exists in Chicago.

At the outset, we reject plaintiffs suggestion that any consideration of racial factors in the districting process automatically constitutes invidious discrimination under the Fourteenth Amendment. The Supreme Court in *United Jewish Organizations, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) ("*UJO*") explicitly held that consideration of race in legislative apportionment did not constitute a *per se* violation of either the Fourteenth or the Fifteenth Amendment. In *UJO*, a group of Hasidic Jews challenged a New York reapportionment plan which split the Hasidic community among several state legislative districts, on the ground that racial considerations played a major role in the plan's formulation and adoption. In upholding the plan, the Supreme Court stated:

> Contrary to petitioners' first argument, neither the Fourteenth nor the Fifteenth Amendment mandates any *per se* rule against using racial factors in districting and apportionment. Nor is petitioners' second argument valid. *The permissible use of racial criteria is not confined to eliminating the effects of past discriminatory districting or apportionment.*

430 U.S. at 161, 97 S.Ct. at 1007 (emphasis supplied).

Although the Court's opinion in *UJO* relied in part on the fact that the New York plan was adopted in order to comply with the non-dilution requirements of Section 5

---

**85.** Although we have clearly not included this Senate district among those where blacks are accorded a meaningful opportunity to elect a candidate of their choice, we retain the hope that under changed political circumstances, it could provide an opportunity for a minority candidate.

**86.** As noted previously, we find insufficient an apparent explanation that the various population shifts in the South and West Side districts

were effected to preserve incumbents' seats in the General Assembly. Defendants have not indicated how the purpose to preserve incumbencies can be unraveled from simple racial motives. Thus, we hold that the defendants have not discharged their burden of proof under *Mt. Healthy* of demonstrating that similar district lines would have been drawn absent the purpose to dilute the black vote.

of the 1965 Voting Rights Act, at least five Justices agreed that the challenged redistricting plan, and the explicit consideration of race it embodied, would be valid "[w]hether or not the plan was authorized by or was in compliance with § 5 of the Voting Rights Act." 430 U.S. at 165, 97 S.Ct. at 1009 (Opinion of White, J., joined by Stevens, J. and Rehnquist, J.). *See also* 430 U.S. at 179, 97 S.Ct. at 1016–17 (Stewart, J., joined by Powell, J., concurring in the judgment). As Justice White explained:

> It is true that New York deliberately increased the nonwhite majorities in certain districts in order to enhance the opportunity for election of nonwhite representatives from those districts. Nevertheless, there was no fencing out of the white population from participation in the political processes of the county, and the plan did not minimize or unfairly cancel out white voting strength.

430 U.S. at 165, 97 S.Ct. at 1010. Justice Stewart in his concurring opinion invoked a similar rationale:

> The petitioners' contention is essentially that racial awareness in legislative reapportionment is unconstitutional *per se.* Acceptance of their position would mark an egregious departure from the way this Court has in the past analyzed the constitutionality of claimed discrimination in dealing with the elective franchise on the basis of race.
>
> The petitioners have made no showing that a racial criterion was used as a basis for denying them their right to vote, in contravention of the Fifteenth Amendment.... They have made no showing

that the redistricting scheme was employed as part of a "contrivance to segregate"; to minimize or cancel out the voting strength of a minority class or interest; or otherwise to impair or burden the opportunity of affected persons to participate in the political process.

430 U.S. at 179, 97 S.Ct. at 1017.

The Supreme Court's analysis in *UJO* indicates that plaintiffs here must do more than show that racial considerations have played some role in the drawing of voting lines on the South Side. In addition, they must demonstrate that the state used its redistricting authority as part of a "contrivance to segregate" or that the challenged line or lines were designed to minimize or dilute the voting strength of minority voters.

With respect to the *Crosby* plaintiffs' *vote dilution* claims (which are the primary claims advanced in this case), the most relevant district lines are the lines drawn along the western edge of areas that are 85% or more percent black on the South Side of Chicago. The challenged South Side district lines are pertinent here insofar as they arguably contribute to the "packing" of the black population. Plaintiffs' contention is that black voters are "packed" into South Side Senate and House districts, thus maintaining a situation where blacks comprise a very high percentage of the population in a number of these districts. According to the "packing" theory, black votes are "wasted" to the extent that black population percentages greatly exceed the percentage—suggested to be 65%—[87] needed in voting districts to elect

---

**87.** The 65% figure is a general guideline which has been used by the Department of Justice, reapportionment experts and the courts as a measure of the minority population in a district needed for minority voters to have a meaningful opportunity to elect a candidate of their choice. *See Mississippi v. United States,* 490 F.Supp. 569 (D.D.C.1979), *aff'd,* 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980). The 65% guideline, which the Supreme Court characterized as "reasonable" in *United Jewish Organizations, Inc. v. Carey,* 430 U.S. 144, 164, 97 S.Ct. 996, 1009, 51 L.Ed.2d 229 (1977), takes into account the younger median population age and the lower

voter registration and turnout of minority citizens.

Testimony in the instant case established that Representative Madigan and his staff were made aware of the 65% guideline by Mr. Brace, their consultant, during the summer of 1981. (Tr. at 1957). At trial, witnesses for both sides referred approvingly to the 65% figure. (Tsui, Tr. at 26–27; Newhouse, Tr. at 623; Hofeller, Tr. at 403–04; Brace, Tr. at 1956–57). Moreover, defendants' expert testified that the 65% guideline had been used in state reapportionment and redistricting. (Brace, Tr. at 1957). The 65% standard was also referred to in the

black candidates. Thus, the argument is that if the South Side district lines did not correspond so closely to black residential patterns, substantial white populations from such areas as Bridgeport, Canaryville, Marquette Park and Marquette Manor could be included as minorities in the black-controlled districts, thereby increasing the power of black votes. The Coalition Plan presented by the plaintiffs illustrates this potential by creating more South Side districts in which there is a substantial white minority but where the black percentage exceeds 65%—the percentage presumed adequate for control. Plaintiffs therefore argue that the South Side district lines must be redrawn in order to alleviate "packing" and its concomitant vote dilution and, in effect, to increase black voting power by including a more substantial white population base in majority black districts.

As we have indicated, plaintiffs in this case must demonstrate purposeful vote dilution in order to prevail. *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1519, 64 L.Ed.2d 47 (1980). Moreover, we must be convinced, under the *Mt. Healthy* standard, that different electoral boundary lines would have been drawn in the absence of a discriminatory purpose. We find that the evidence before us fails to establish a sub-

stantial purpose on the part of the defendants to dilute the black vote on the South Side through "packing". *Cf. Canton Branch, N.A.A.C.P. v. City of Canton,* 472 F.Supp. 859, 868 (S.D.Miss.1978). Even had such a purpose been established, moreover, we think that defendants have demonstrated that the South Side districts would have been drawn as they were even absent any motive to dilute black voting strength. *See Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

Defendants explain the congruence of electoral and racial boundaries on bases other than those involving purposeful vote dilution. For example, Representative Michael Madigan, who drew the districts, testified that he actively considered the interests of black Representatives in fashioning the challenged South Side boundaries.[88] In addition, a number of black South Side legislators testified that the inclusion of neighboring white areas in their districts would place them in political peril and might lead to the nomination of a white in the Democratic primary. Success in the Democratic primary is tantamount to election in both the predominantly black and the predominantly white districts in this area.[89] Some of these black legislators

---

recent opinion of the three-judge court in *In re Illinois Congressional Districts Reapportionment Cases,* No. 81 C 1395, slip op. at 19 (N.D.Ill. Nov. 23, 1981), *aff'd sub nom. McClory v. Otto,* 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284 (1982).

**88.** Representative Madigan testified:
 Q. [By Mr. Harte] Former District 20 was the first district drawn[?]
 A. [By Rep. Madigan] The next district drawn was former District 22.

 \* \* \* \* \* \*

 I was also concerned that the 22nd District not move west because, if it did, it would mean that it would be a majority black district with black legislators expected to represent the communities of Bridgeport and Canaryville.
 I have lived in Chicago all of my life. I know of my knowledge that there are very strong racial attitudes in the communities of Bridgeport and Canaryville and that it would not be in my opinion a wise judgment to

cause this majority black district to include parts of these two communities. Therefore—
 Q. Excuse me.
 Have you consulted with the black legislators in that regard also?
 A. Yes, I had, and, in particular, with regard to this district; this is the district that had been represented by former Representative Davis, who at this time was serving as a member of the reapportionment commission. He and I specifically discussed the ability of a black representative to represent the people of Bridgeport. And it was his judgment that it would not be wise to have a majority black district include part of Bridgeport.
 Tr. at 1376–78.

**89.** On the West Side, the Commission has put white voters from census tracts in Cicero into the heavily black Commission House Districts 17 and 18. The *Crosby* plaintiffs contend this is inconsistent with the Commission's failure or refusal to put somewhat similar white census tracts into the South Side districts. Although

also testified to the difficulty or impossibility of their campaigning effectively in adjacent white neighborhoods, and some testified that they did not believe they could effectively represent white voters in adjacent areas.[90] The record also contains evidence of racial animosity in white areas such as Bridgeport and Canaryville, which are adjacent to the "wall" separating black and white residential areas on the South Side.

Some of these reasons, of course, recognize the existence of racial animus or ill-feeling as a factor deterring the inclusion of white areas in highly-concentrated black districts. But such recognition by no means establishes a *purpose to dilute* the black vote. *Cf. Johnson v. Board of Education of Chicago*, 604 F.2d 504 (7th Cir. 1979), *vacated for possible mootness*, 449

U.S. 915, 101 S.Ct. 339, 66 L.Ed.2d 162 (1980), *opinion reinstated*, 664 F.2d 1069 (7th Cir.1981). Obviously, this court cannot and does not condone racial animosity or ill-feeling between the races on the South Side of Chicago. But we think it our obligation to confine the present inquiries to the issues of voting dilution which are the basis of the complaint in this case. It is true that the "packing" of black votes on the South Side in highly concentrated black areas tends to "waste" the black vote. But it is also true that considerably greater dilution of the black vote could presumably have been achieved by "fracturing" parts of the black areas into minority fragments attached to neighboring white majority districts, so that the voters in these fragments would lose the opportunity to elect a candidate of their choice.[91]

---

90. Black Representative Ethel Alexander testified:

Q. [By Mr. Harte] What about the areas of Bridgeport, Canaryville, Marquette Park and Mount Greenwood, Beverly, and here in Hegewisch, do those give you concern as to risks that could be entertained by black legislators running in that area?
A. [By Rep. Alexander] There would definitely be some risk for any black candidate that would be running in those areas.
Q. Is it, in your judgment, a legitimate concern for persons drawing the line to remove that risk?
A. I would hope so, yes.
Q. And you are familiar, are you not with the ecological boundary, or the differences in the communities, the white community, say, in Bridgeport and the black community in the east, Canaryville, and the rest of these, are you not?
A. Yes, I am.
Q. And would, in your judgment, there be an antagonism which a white or black legislator would have to deal with in those communities?
A. Yes, there would be.
 A black legislator running in that kind of a district, nine times out of 10, or a hundred per cent, would not even have an opportunity to campaign in that area.
 He just wouldn't cross over and present himself as a candidate in those kinds of areas.

we do not regard the argument as crucial, we note that the white Cicero voters are apparently predominantly Republican and, therefore, presumably incapable of winning control of a predominantly black district with a white candidate in the Democratic primary.

It would be too volatile; conditions that historically have been there have been shown with regards to those areas.
Tr. at 1026–27.
Similarly, Black Representative Sylvester Rhem testified:
Q. [By Mr. Harte] Is there a concern with you, Representative Rhem, as to winning in a primary in that area?
A. [By Rep. Rhem] It is my opinion that I would not be able to win. I feel that the *districts here, the Bridgeport people vote as a block*. The problems are different than what the blacks are, and I just could not communicate.
Q. There would be antagonism between the two?
A. In my opinion, yes.
Q. If you happened to be elected, would you be able to serve in your judgment the white constituency in that area?
A. I would do my best.
 I would say that there would be some hostility toward me, but if I was fortunate enough to win, I would do the best that I can.

. . . . .

Q. Were your views considered in the redistricting process by the leadership?
A. Yes.
Tr. at 1061–62. *See also* Tr. at 1621–28 (testimony of Corneal Davis).

91. Moreover, although not directly relevant here, it is arguable that the inclusion of areas such as Bridgeport and Canaryville in highly concentrated black voting districts might constitute objectionable "fracturing" of the white vote. *See United Jewish Organizations, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977).

At certain points in this litigation, plaintiffs have suggested that the drawing of district boundaries which track racially segregated housing patterns tends to stigmatize racial minorities and to infringe upon the associational rights of minority voters. However, the record in this case is barren of any indication that black voters on the South Side are, or feel themselves to be, stigmatized by the challenged electoral boundaries, or that such voters would prefer to be associated, for voting purposes, with predominantly white neighborhoods such as Bridgeport and Canaryville. Indeed, the only testimony offered at trial concerning the allegedly stigmatizing effects of South Side voting districts was the statement of Representative Carol Moseley-Braun, a black legislator representing portions of Hyde Park and the South Side lakefront.[92] While we acknowledge the importance of Representative Braun's concerns, and have carefully considered her testimony, we believe that in the particular context of redistricting, the desirability of perfectly integrated voting districts must be balanced against the ability of blacks and other minority groups to elect candidates of their choice to the relevant political bodies. In this regard, we note that at-large voting systems, which theoretically offer the maximum degree of integration, or "color-blindness," are generally regarded as disadvantageous to minorities and have been repeatedly attacked on the ground that they unconstitutionally dilute black voting strength.[93] Our point here is not that racial polarization and stigma are unimportant concerns, but merely that in the particular context of legislative reapportionment, a purely color-blind (or integrationist) approach is likely to impede rather than enhance minority participation and effectiveness in the political process.

There is thus little or no *direct* evidence in the record that the alleged South Side "wall" was drawn for the purpose of diluting black voting strength. Certainly, we find it more difficult to *infer* such a purpose from the existence of the line than to infer such a purpose (as we have above) from the manipulation of racial populations in Commission Senate Districts 9, 14, 17

**92.** Representative Braun testified in part as follows:

> Q. [By Mr. Sullivan] Do you have any comments that distinguish between the west and the south sides of Chicago on the original map?
>
> A. [By Representative Braun] On the south side the most stunning aspect, in my opinion, of that map is the wall that it draws around the black community. It segregates the black community from the rest of Chicago.
>
> . . .
>
> Q. Mrs. Braun, in the testimony that has been given in the court there has been justification by several witnesses for reliance on the Commission map on the grounds that there is racial tension in some of these areas.
> Have you heard that testimony?
> A. I have.
> Q. Do you wish to comment on that point to the Court?
> A. The history of this country has been marked by racial tension. It is something that people who are fair-minded, who believe in democracy, who believe in integration, have to get around. There was racial tension in the South when the desegregation of the buses occurred, desegregation of the lunch counters and of the schools. There is still

racial tension. There is still racial tension in Chicago. But it seems to me that is a very poor reason to segregate people and to have an official imprimatur on the creation of a legislative ghetto in Chicago, and that is what this map, in my opinion, does.

Tr. at 2058, 2062. Plaintiffs' other witnesses, including Senator Richard Newhouse, testified in general about the separation of black and white communities, indicating their preference for a redistricting plan that would include more white areas in majority black districts. *See* Tr. at 646–47, 650–52, 666–75 (remarks of Sen. Newhouse).

**93.** *See, e.g., City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1519, 64 L.Ed.2d 47 (1980); *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); *Lodge v. Buxton,* 639 F.2d 1358 (5th Cir.1981), *prob. juris. noted,* 454 U.S. 811, 102 S.Ct. 86, 70 L.Ed.2d 80 (1981); *McMillan v. Escambia County,* 638 F.2d 1239 (5th Cir.), *cert. dismissed,* 453 U.S. 946, 102 S.Ct. 17, 69 L.Ed.2d 1033 (1981); *Aranda v. Van Sickle,* 600 F.2d 1267 (9th Cir.1979), *cert. denied,* 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 808 (1980). *See generally* Bonaphel, *Minority Challenges to At-Large Elections: The Dilution Problem,* 10 Ga.L.Rev. 353 (1976).

and 18.[94] Moreover, it seems clear to us that the challenged districts would have been drawn as they were without any reference to a purpose to dilute the black vote even if such a purpose were presumed or proven. Nothing is before us to suggest that the challenged electoral boundaries are, in and of themselves, invidiously discriminatory. Apart from questions of dilution and so far as this record discloses, *a vote cast on the predominantly black South Side is precisely equal in weight to one cast in Bridgeport.*

We also note that any adverse impact of the South Side district lines from the point of view of voting dilution would necessarily be felt by the black community as a whole in the City of Chicago as a result of the "wasting" of votes which would otherwise be available to form additional black majority districts. Such a dilutive effect is thus not specific to blacks living near the alleged "wall," who in fact have the opportunity to vote for and elect candidates of their choice. Moreover, as suggested above, a more marked dilutive effect on the black vote would have been achieved by running fingers from the white communities to the West into the concentrated black area so as to fracture the black vote and, in effect, cancel it out in majority white districts. Such a configuration would no doubt suggest purposeful dilution of the black vote much more clearly than the existence of a line which tracks, in part, the division between predominantly black and predominantly white communities.[95]

In addition to their vote dilution argument, we understand plaintiffs to contend that the South Side district lines represent illegal racial gerrymandering of the sort condemned in *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). We recognize that allegations of racial gerrymandering present a suspect circumstance requiring close judicial scrutiny, and that such gerrymandering, to the extent it exists, carries strong connotations of invidious racial discrimination. As the Supreme Court has repeatedly indicated, however, the gravamen of a racial gerrymandering claim is the deliberate "fencing out" of a racial or ethnic minority—that is, the exclusion or "canceling out" of such group's political influence in the relevant governmental unit. No such exclusionary purpose or effect has been demonstrated in the instant case.

*Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) presents the paradigmatic example of unconstitutional racial gerrymandering. In *Gomillion,* the Alabama legislature had redrawn the boundaries of the City of Tuskegee, altering its shape from a square to a "strangely irregular twenty-eight-sided figure." 364 U.S. at 341. Plaintiffs in *Gomillion* alleged that the redefined municipal boundaries eliminated all but four or five of the city's 400 black voters without eliminating a single white voter. The Supreme Court held that plaintiffs' allegations, if proven, clearly established invidious racial discrimination under the Fifteenth Amendment.[96]

**94.** Comparable lines, conforming at least in part to the boundaries of heavy black concentrations, have existed for many years antedating the present redistricting.

**95.** Judge Grady, in finding the South Side district lines unconstitutional *per se,* prescribes as a "remedy" the drawing of a whole new Chicago map along "color-blind" lines. Since any *human* redistricter is well aware of the racial concentrations in the City, we can only suppose that a racially "neutral" map would have to be constructed by a computer. We have grave doubts as to whether such a "color-blind" map would be accepted as neutral by any of the parties to this lawsuit.

Moreover, it seems to us that any form of "neutral" construction of compact districts will,

as a matter of mathematical probability, leave the black South Side in just as "packed" a condition as exists under the Commission Plan. For the electoral boundaries on the South Side did not "create" the heavy black voting concentrations; these lines merely stand in the way of affirmative compensation for highly concentrated black populations through the inclusion of neighboring white areas in the black-controlled districts.

**96.** Justice Whittaker, in a concurring opinion, *indicated that he would rest the Court's decision not on the Fifteenth Amendment but on the Equal Protection Clause of the Fourteenth Amendment.* Citing *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct.

The Supreme Court's holding relied heavily on the exclusionary aspect of Alabama's boundary redrawing scheme:

> The result of the Act is to deprive the Negro petitioners discriminatorily of the benefits of residence in Tuskegee, including, *inter alia,* the right to vote in municipal elections.

> These allegations, if proven would abundantly establish that Act 140 was not an ordinary geographic redistricting measure even within familiar abuses of gerrymandering. If these allegations upon a trial remained uncontradicted or unqualified, the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration, *that the legislature is solely concerned with segregating white and colored voters by fencing Negro citizens out of town so as to deprive them of their pre-existing municipal vote.*

364 U.S. at 341, 81 S.Ct. at 127 (emphasis supplied).

In *Wright v. Rockefeller,* 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), plaintiffs also alleged racial gerrymandering in the drawing of election districts. In their complaint, the *Wright* plaintiffs claimed that a New York state reapportionment statute, which divided Manhattan into four electoral districts, violated the Fourteenth and Fifteenth Amendments by "establish[ing] irrational, discriminatory and unequal Congressional Districts in the County of New York and [by] segregat[ing] eligible voters by race and place of origin." 376 U.S. at 53, 84 S.Ct. at 604. Arguing before a three-judge district court, counsel for plaintiffs in *Wright* further contended that the challenged redistricting scheme presented " 'a case of ghettoizing the Island of Manhattan' so as 'to create a white Congressional district and a non-white Congressional district.' " 376 U.S. at 54, 84 S.Ct. at 604. Despite these allegations, and despite the presentation of considerable evidence indicating that racial factors had played some role in the redistricting process, both the three-judge district court and the Supreme Court rejected plaintiffs' constitutional attack.[97] The Supreme Court, in its opinion, expressly contrasted the invidious racial gerrymandering at issue in *Gomillion v. Lightfoot,* and emphasized the lack of an exclusionary motive behind the New York state redistricting scheme:

> We accept the District Court's finding that appellants have not shown that the challenged part of the New York Act was the product of a state contrivance to segregate on the basis of race or place of origin. That finding was crucial to appellants' case as they presented it, and for that reason their challenge cannot be sustained.

376 U.S. at 58, 84 S.Ct. at 606.

The Supreme Court's decision in *United Jewish Organizations, Inc. v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), also underscores the element of exclusion or "canceling out" necessary to support a claim of unconstitutional racial gerrymandering. The Court in *UJO* held that a redistricting body may properly take race into account so long as its redistricting plan does not "slur or stigma[tize]" any racial group, and does not "fence out" a racial or ethnic group from the political process, or "minimize or unfairly cancel out" that group's voting strength. 430 U.S. at 165, 97 S.Ct. at 1009–10.[98] Similar-

---

1401, 3 L.Ed.2d 5 (1958), Justice Whittaker stated that Alabama's purpose "of fencing Negro citizens out of" Tuskegee politics was tantamount to unlawful racial segregation. 364 U.S. at 349, 81 S.Ct. at 131–32.

**97.** It may have been significant in *Wright* that black Congressman Adam Clayton Powell, who represented the allegedly segregated 18th Congressional District in New York City, was permitted to intervene as a *defendant* supporting the constitutionality of the challenged apportionment scheme. *See Wright,* 376 U.S. at 58, 84 S.Ct. at 606. *See generally* Bickerstaff, *Reapportionment by State Legislatures: A Guide for the 1980's,* 34 Sw.L.J. 607, 682 (1980).

**98.** *See also Nevett v. Sides,* 571 F.2d 209, 218–19 (5th Cir.1978), *cert. denied,* 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980) (unconstitutional racial gerrymander infringes right to effective electoral participation "by compartmentalizing or fencing out a group" or "by slicing up a compact minority"); *Robinson v. Commission-*

ly, in *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), the Supreme Court recognized that redistricting plans may be vulnerable to constitutional attack "if racial or political groups have been fenced out of the political process," 412 U.S. at 754, 93 S.Ct. at 2332, or if district lines have been used "to minimize or cancel out the voting strength of racial or political elements of the voting population." 412 U.S. at 735, 93 S.Ct. at 2322 (quoting *Fortson v. Dorsey,* 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965)). Conversely, the *Gaffney* Court held that

> [C]ourts have [no] constitutional warrant to invalidate a state plan, otherwise within tolerable population limits, because it undertakes, not to minimize or eliminate the political strength of any group or party, but to recognize it and, through districting, provide a rough sort of proportional representation in the legislative halls of the State.

412 U.S. at 754, 93 S.Ct. at 2332. *See also United Jewish Organizations, Inc. v. Carey,* 430 U.S. at 168, 97 S.Ct. at 1011.

We believe that the instant case presents a situation much more akin to that in *Wright* and *UJO* than to the situation in *Gomillion v. Lightfoot.* Unlike the boundary adjustment in *Gomillion,* the South Side redistricting at issue here was not designed to "fence out" blacks or to impede their participation in Chicago politics. Nor do the challenged district lines "slur or stigmatize" a racial minority. Moreover, as was the case in *Wright v. Rockefeller,* black politicians representing the affected districts have testified in support of the challenged district lines and have expressed their discomfort with plaintiffs' proposed alternatives. *See* note 90 *supra.* Under these circumstances, we do not believe that the South Side redistricting represents either an unconstitutional racial gerrymander or an impermissible attempt

to minimize or cancel out black voting strength.

Moreover, we believe there is a fundamental tension between plaintiffs' apparent desire for color-blind redistricting on Chicago's South Side, and the voting dilution theory which lies at the heart of plaintiffs' constitutional challenge in the instant case. *Cf. Whitcomb v. Chavis,* 403 U.S. 124, 156 n. 34, 91 S.Ct. 1858, 1875 n. 34, 29 L.Ed.2d 363 (1971). Voting dilution claims, including this one, are premised at least in part on the frankly race conscious theory of racial bloc voting—the idea that black voters will vote overwhelmingly for black candidates while white voters will support non-minority candidates. Indeed, the main focus of the *Crosby* plaintiffs' claims here is that there have been intentional efforts to minimize the impact of black bloc voting.

We thus find it difficult to accept plaintiffs' argument that the drawing of district lines which track, in some measure, the boundaries of racially identified communities is tantamount to government sponsored segregation. The immediate effect of the alleged districting "wall" in the instant case is that black voters residing in the vicinity of the wall will have the opportunity to vote for and elect candidates of their choice—precisely the opportunity sought in this case. Absent a showing of racial vote dilution or the fencing out of minority voters, we do not believe black voters are being denied equal protection merely because their districts contain few white residents who may share the opportunity to vote for the same legislative candidates. As we emphasized earlier, under the Commission Plan, a vote cast on the black South Side has precisely the same weight as a vote cast in Bridgeport. We do not foreclose the possibility that under some circumstances, the drawing of election district lines which track racially segregated housing patterns could amount to

---

*ers Court,* 505 F.2d 674, 679 (5th Cir.1974) (racial gerrymander found where precinct lines were drawn so as to fragment an otherwise "compact and cohesive" black voting community); *Cousins v. City Council of Chicago,* 466 F.2d

830, 841 (7th Cir.), *cert. denied,* 409 U.S. 893, 93 S.Ct. 85, 34 L.Ed.2d 181 (1972) (members of racial and ethnic groups constitutionally protected from purposeful maneuvers to deprive them of political effectiveness).

state imposed segregation and thus constitute invidious discrimination under the Fourteenth Amendment. *See Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Wright v. Rockefeller,* 376 U.S. 52, 59–62, 84 S.Ct. 603, 606–08, 11 L.Ed.2d 512 (1964) (Douglas, J., dissenting). We merely hold that such circumstances have not been demonstrated in the instant case.[99]

#### 4. *Other Evidence of Racial Discrimination*

The *Crosby* plaintiffs presented other, more general, evidence which they allege demonstrates a discriminatory purpose on the part of the Commission. We have considered this evidence, as summarized below, but we do not find it dispositive in resolving the issues presented in this case. We think, however, that it is at least consistent with our findings and with the remedies we have provided.

First, the plaintiffs directed the court's attention to their alternative Coalition Plan. They suggest that the assertedly simple, compact districts of the Coalition Plan provide a more meaningful opportunity for black and Hispanic voters to elect candidates of their choice than the "strange configurations" characteristic of districts in the Commission Plan. Although the existence of alternative patterns of redistricting does not, standing alone, support an inference of discriminatory purpose, the Coalition Plan does demonstrate the feasibility of avoiding retrogression of black voting strength through the creation of additional

voting districts in which blacks will have a meaningful opportunity to elect a candidate of their choice. The Coalition Plan is thus of some, albeit limited, probative value in establishing purposeful dilution of black voting strength in at least some of the Commission's districts. *Cf. Cousins v. City Council of Chicago,* 466 F.2d 830, 843–44 (7th Cir.), *cert. denied,* 409 U.S. 893, 93 S.Ct. 85, 34 L.Ed.2d 181 (1972).

Plaintiffs also contend that the drafters' use of anticipated ward boundaries in the City of Chicago, which are alleged to be discriminatory, tend to establish intentional racial discrimination. Since ward boundaries have not been adjudicated to be discriminatory, we cannot conclude that the relation of legislative lines to ward lines is any more than marginally relevant to racial dilution by the legislative redistricting at this time. Moreover, alleged retrogression in the wards (which we understand to be a plausible basis of challenge to them) does not necessarily infect legislative districts, since legislative district lines only partially correspond to ward lines.

Plaintiffs have also cited as evidence of purposeful dilution "[t]he pattern of the racial discrimination in which the Democratic organization has long engaged in Cook County, through the Chicago Police Department, the Chicago Housing Authority, the Chicago Board of Education, the Chicago Public Library, and the Chicago Park District." *Crosby* Post Trial Brief at 3. Plaintiffs allege that the heads of each of these governmental bodies is appointed

---

**99.** Judge Grady's dissent fundamentally mischaracterizes the thrust of our analysis. Our opinion does not sanction state-imposed segregation nor does it even remotely adopt some "separate but better off" theory noted by Justice Douglas in dissent in *Wright v. Rockefeller.* The portions of our opinion that Judge Grady quotes prominently merely point out the obvious tension (if not contradiction) between recognizing claims based on the dilution of racial bloc voting, on the one hand, and proposing a "colorblind" redistricting process on the other. Like the Supreme Court in *Wright,* we have specifically held that the South Side voting districts are *not* "the product of a state contrivance to segregate." 376 U.S. at 58, 84 S.Ct. at 606. Given this holding, the post-*Brown* segregation

cases relied on by Judge Grady, all of which involved the use of an *explicit racial classification* by the government, are totally inapposite to the instant case. We agree with Judge Grady that explicit racial classifications are inherently stigmatizing and need no evidentiary support. However, we also believe, and the Supreme Court has held, that state action which *on its face* relies on criteria other than race (such as neighborhood affiliation) requires a far more sophisticated analysis. *Compare Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), with *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

by the Mayor (and requires the concurrence of the Chicago City Council), and that these offices have long been controlled by the Democratic organization. We recognize that employment or other discrimination has been alleged and/or proven in many of these City activities. We are also aware that racial prejudice continues to manifest itself throughout the City of Chicago and in that City's Democratic organization, as well as throughout many other leading organizations in Illinois and the United States (including the courts). We believe that these perceptions are worthy of consideration in evaluating the issue of purposeful dilution of voting strength, and we have considered them fully in making our assessment. An analysis of the relevant Supreme Court precedents, however, convinces us that such general evidence of discrimination, not directly related to electoral participation, is, in itself, insufficient to establish purposeful vote dilution under the Fourteenth Amendment.

In *City of Mobile v. Bolden* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the Supreme Court explicitly disapproved the district court's reliance on racial discrimination in municipal employment and in the dispensing of public services to support a finding that the City's at-large electoral system violated the Fourteenth Amendment. Acknowledging that the Equal Protection Clause proscribes purposeful racial discrimination by any unit of state government, the Supreme Court plurality nonetheless held that "evidence of discrimination by white officials ... is relevant only as the most tenuous and circumstantial evidence of the constitutional validity of the electoral system under which they attained their offices." 446 U.S. at 74, 100 S.Ct. at 1503 (footnote omitted). The Supreme

Court in *Bolden* also rejected the lower court's reliance on past official discrimination as evidence of present discriminatory intent:

[T]he District Court and the Court of Appeals supported their conclusion by drawing upon the substantial history of official racial discrimination in Alabama. But past discrimination cannot, in the manner of original sin, condemn governmental action that is not in itself unlawful. The ultimate question remains whether a discriminatory intent has been proved in a given case. More distant instances of official discrimination in other cases are of limited help in resolving that question.

446 U.S. at 74, 100 S.Ct. at 1503.

The Supreme Court in *Bolden* was careful to distinguish its earlier decision in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), in which the Court had held that multi-member legislative districts in Texas unconstitutionally diluted the voting strength of black and Hispanic voters.[100] The *Bolden* Court characterized the system attacked in *White v. Regester* as one in which "the political processes leading to nomination and election were not equally open to participation by the group[s] in question." 446 U.S. at 68–69, 100 S.Ct. at 1500 (quoting 412 U.S. at 766, 93 S.Ct. at 2339).

In analyzing the problems before it in *White v. Regester*, the Supreme Court underscored the district court's reference to the history of official racial discrimination in Texas, which had at times touched the rights of Negroes to register, vote, and otherwise participate in democratic processes. The district court had also found that

the plaintiffs' burden was "to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." 412 U.S. at 766, 93 S.Ct. at 2339.

**100.** In *White v. Regester,* the Supreme Court stated that multi-member districts were not *per se* unconstitutional, but noted that it had entertained claims that multi-member districts were being used invidiously to cancel out or minimize the voting strength of racial groups. The Court stated that to sustain such claims, it was not enough that the racial group allegedly discriminated against had not held legislative seats in proportion to its voting potential. Instead

since Reconstruction days, there had been only two Negroes in the Dallas County delegation to the Texas House of Representatives and that these two were the only two Negroes ever slated by the Dallas Committee for Responsible Government (DCRG), a white-dominated organization that is in effective control of Democratic Party candidate slating in Dallas County.

412 U.S. at 766, 93 S.Ct. at 2339. Moreover, the district court had noted that the DCRG "did not need the support of the Negro community to win elections in the county, and it did not therefore exhibit good-faith concern for the political and other needs and aspirations of the Negro community." 412 U.S. at 766–67, 93 S.Ct. at 2339–40 (footnote omitted). Finally, the district court had pointed out "that as recently as 1970 the [DCRG] was relying upon 'racial campaign tactics in white precincts to defeat candidates that had the overwhelming support of the black community.'" 412 U.S. at 767, 93 S.Ct. at 2340 (quoting 343 F.Supp. at 727). Based upon this and other evidence the district court had concluded that " 'the black community has been effectively excluded from participation in the Democratic primary selection process,' and was therefore generally not permitted to enter into the political process in a reliable and meaningful manner." 412 U.S. at 767, 93 S.Ct. at 2340 (quoting 343 F.Supp. at 726).

The district court in *White v. Regester* reached similar conclusions with respect to the Mexican-American community in Bexar County. Indeed, the district court found that the typical Mexican-American suffered a cultural and language barrier that severely impeded his participation in political life, and that this " 'cultural incompatibility ... conjoined with the poll tax and the most restrictive voter registration procedures in the nation have operated to effectively deny Mexican-Americans access to the political processes in Texas even longer than the Blacks were formerly denied access to the white primary.'" 412 U.S. at 768, 93 S.Ct. at 2340 (quoting 343 F.Supp. at 731).

Although racism certainly exists in the City of Chicago and in that City's Democratic organization, the record before us does not disclose a history of overt and systematic electoral discrimination comparable to that identified by the district court in *White v. Regester*. For example, Illinois has never had a white primary or a poll tax. Moreover, unlike the organization previously in control of the Democratic Party in Dallas County, the Democratic organization in the City of Chicago depends upon the support of the black community to win elections and must, therefore, be at least somewhat responsive to the needs and aspirations of black voters. The record in the instant case does not suggest that causes helpful to blacks have been ignored by the Democratic organization; in fact, just the opposite seems to be the case. The Democratic Party in Illinois has been a principal exponent of civil rights legislation and of social legislation important to blacks. It has also supported bilingual education, an issue of particular importance to Hispanics. In sum, there has been no systematic exclusion of either blacks or Hispanics from the Illinois political process comparable to the history referred to in *White v. Regester*.

On the other hand poor socio-economic conditions, unemployment, low voter registration and the like afflict both the black and the Hispanic communities in Chicago to an extent which may be comparable to that presented in *White v. Regester*. We conclude, therefore, that while plaintiffs' general evidence of racial discrimination in the City of Chicago supports our present findings of purposeful vote dilution, we place greater reliance on such specific factors as retrogression in black legislative representation and the manipulation of racial populations in the interest of white incumbents to demonstrate purposeful racial vote dilution than we do on the general acts and attitudes of city and state officials.

IV. *Complaint of the DelValle Plaintiffs: Dilution of Hispanic Voting Strength*

■ At trial, the *DelValle* plaintiffs presented evidence in an effort to prove

that the Commission purposefully diluted Hispanic voting strength. There are approximately 425,000 Hispanics residing in the City of Chicago, comprising 14% of the City's total population. Although not nearly as concentrated as the blacks, the majority of Chicago's Hispanic population reside in two large aggregations, referred to at trial as the Northwest Hispanic group (primarily Puerto Ricans residing in the West Town and Humboldt Park neighborhoods) and the Southwest Hispanic group (primarily Mexican-Americans residing in the Pilsen and Little Village neighborhoods).[101] The *DelValle* plaintiffs contended that although Commissioner Murphy and Representative Madigan were aware of these sizable Hispanic population centers, they intentionally fractured both Hispanic communities by dividing each community among four separate legislative districts. Murphy and Madigan justified their decision by claiming that these districts were designed to accommodate future growth and migration patterns which they allege are characteristic of these Hispanic communities. Commissioner Murphy analogized this justification to buying a snowsuit for a young child—purchasing a suit several sizes larger than the growing child's present dimensions is warranted in order to allow the child to grow into the suit and thus prolong its use.

The Hispanics challenged this explanation by noting that no other racial, ethnic or political group was fitted to "snowsuit" districts and that the Commission's actions served to exacerbate existing underrepresentation of Hispanic interests in the General Assembly.[102] The *DelValle* plaintiffs adduced considerable additional evidence concerning further unsuccessful efforts to alert the Commission to their needs, changes in proposed districts to their detriment based on incumbent and other influences, the depressed socio-economic condition of their constituency and various other factors tending to show vote dilution.

During and after the trial and at the urging of the court, representatives of the Commission and the *DelValle* plaintiffs developed several alternative configurations for the districts in the two Chicago Hispanic communities. Negotiations between the parties (fortified by instructions from the court as to modifications of the Commission Plan) eventually resulted in a settlement proposal, embodied in Court Exhibits 7D and 7E, which was accepted by both the Commission and the *DelValle* plaintiffs.[103] Under the resulting Hispanic Settlement Agreement, Hispanics will constitute approximately 71% of the population in Commission House District 20, encompassing the Pilsen and Little Village neighborhoods.[104] The *DelValle* plaintiffs believe

**101.** A third identifiable but much smaller Hispanic concentration exists on Chicago's far Southeast Side.

**102.** No Hispanic has ever been elected to the Illinois General Assembly.

**103.** The parties' final Stipulation of Settlement makes minor changes in these Court Exhibits in order to correct an error appearing in the metes and bounds descriptions of Representative Districts 9 and 10. *See* Letter to this court from William J. Harte (Jan. 7, 1982). The court accepts these changes as well as any other minor adjustments which may be necessary to put into effect the terms of the Settlement Agreement. Any further adjustments will be reported promptly to the court, which retains jurisdiction for this purpose.

We also note that although the Hispanic Settlement will increase the total deviation for Commission Plan House districts to approximately 2.4%, and to approximately 1.8% for Commission Senate districts, these deviations

are well within the guidelines approved by the Supreme Court for both a court-developed plan, *see Connor v. Finch,* 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed. 465 (1977), and a plan developed by the state legislature or a constitutionally created agency. *See Mahan v. Howell,* 410 U.S. 315, 328–29, 93 S.Ct. 979, 986–87, 35 L.Ed.2d 320 (1973).

**104.** The Hispanic Settlement Agreement reads in part as follows:

... the Hispanic plaintiffs believe that Senate Districts 3, 4, 5, 6, 10, 11 and 18, and House Districts 5, 6, 7, 8, 9, 10, 11, 12, 20, 21, 22 and 35, as constituted in the [Settlement Agreement], fairly and reasonably provide Hispanics in those districts with the right to participate and vote in electing representatives from those districts to the Illinois General Assembly without fear of dilution of their vote considering the 1980 Census data and the geographic location of concentrations of Hispanic population....

that Hispanic residents of this area will now have a meaningful opportunity to elect a candidate of their choice to the Illinois legislature. On Chicago's Northwest Side, Hispanics will constitute approximately 63% of the population in Commission House District 9 and 50% of the population in Commission House District 10. Commission Senate District 5, which encompasses these two House districts, will contain an Hispanic population of approximately 56%. The *DelValle* plaintiffs believe that the Settlement Agreement similarly accords Hispanics residing in this area the best achievable opportunity to elect candidates of their choice.

Under all the circumstances, we find that the Hispanic Settlement Agreement is fair, adequate and reasonable to Hispanics and affords them a fair opportunity to elect candidates of their choice to the General Assembly. Under the Settlement Agreement there is no purposeful dilution of the Hispanic vote. We further find that the Hispanic Settlement is fair to other minorities whose voting power is allegedly subject to dilution. In addition, we find that the Settlement Agreement is fair to the Commission and to all the voters of the State of Illinois, and is in accordance with state and federal constitutional standards. We therefore accept and approve those portions of Court Exhibit Plans 1A, 7D and 7E (together with other supporting documents that relate to redistricting of the House Districts 9, 10 and 20 and related districts) as a reasonable settlement of the *DelValle* claims. The changes produced by the Hispanic Settlement Agreement have been in-

corporated into the Plan and Map for the State of Illinois approved by this opinion.

## V. *Remedy*

 We have held that the Commission Plan unconstitutionally dilutes the voting strength of blacks in two areas: first, in Commission Senate Districts 8 and 9 (Commission House Districts 15, 17 and 18) on Chicago's West Side; and second, in Commission Senate Districts 14, 17 and 18 (Commission House Districts 27, 28, 33, 34, 35 and 36) on Chicago's South Side. Our work is not finished, however, with this finding of liability. In redistricting and reapportionment cases, the Supreme Court has instructed us to provide for a remedy that cures the unconstitutional aspects of a redistricting plan.[105] *See, e.g., Connor v. Finch,* 431 U.S. 407, 414–15, 97 S.Ct. 1828, 1833–34, 52 L.Ed.2d 465 (1977); *Mahan v. Howell,* 410 U.S. 315, 330–33, 93 S.Ct. 979, 987–89, 35 L.Ed.2d 320 (1973); *Reynolds v. Sims,* 377 U.S. 533, 584–87, 84 S.Ct. 1362, 1393–94, 12 L.Ed.2d 506 (1964); *Roman v. Sincock,* 377 U.S. 695, 710–11, 84 S.Ct. 1449, 1458–59, 12 L.Ed.2d 620 (1964). *See also Robinson v. Commissioners Court,* 505 F.2d 674 (5th Cir.1974); *Graves v. Barnes,* 408 F.Supp. 1050 (W.D.Tex.1976). Because our finding of liability is limited to two relatively small groups of districts, we believe that the remedy should be designed to ameliorate the effects of unconstitutional vote dilution in those two areas. *Cf. White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) (approving dis-

---

Because no class was certified in this case, the parties needed only to secure the approval of the named plaintiffs for this settlement. Attorneys for the *DelValle* plaintiffs diligently secured such approval.

**105.** We are providing specific remedies designed to cure specific unconstitutional features of the Commission Plan. Contrary to Judge Grady's apparent assertion, this is not "affirmative action," and we do not believe affirmative action is mandated in these circumstances. *See Whitcomb v. Chavis,* 403 U.S. 124, 156–60, 91 S.Ct. 1858, 1875–77, 29 L.Ed.2d 363 (1971). Nor

have we adopted a theory of proportional representation, as Judge Grady initially suggests, but is later forced to retreat from, in his dissent. Rather, our remedy comports with the mandate of the Supreme Court that once purposeful discrimination has been found, a federal court is authorized, under its inherent equitable powers, to take race into account in fashioning an appropriate and effective remedy. *See e.g., Milliken v. Bradley (Milliken II),* 433 U.S. 267, 280–88, 97 S.Ct. 2749, 2756–61, 53 L.Ed.2d 745 (1977); *Swann v. Board of Education,* 402 U.S. 1, 25, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971).

trict court order that disestablished multi-member districts in two Texas counties).[106]

During the course of trial, the Commission, pursuant to direction of the court, prepared several plans (denominated as the Court Exhibit Plans) to incorporate adjustments to the original Commission Plan. Those adjustments were specifically directed at the districts we have now identified as the products of unconstitutional dilution of black voting strength.[107] We believe that the adjustments to the Commission Plan embodied in Court Exhibits 1A (South Side black objections), 2A (suburban objections) and 7B (West Side black objections and Hispanic settlement), together with their supporting documents, computer printouts and metes and bounds descriptions, adequately purge the Commission Plan of unconstitutional vote dilution and other errors without upsetting the broader contours of the Plan which have passed our close scrutiny.[108]

To recapitulate, the remedy we have adopted eradicates the unconstitutional dilution of black voting strength by increasing by one Senate. and one House district the number of voting districts in which blacks will have a meaningful opportunity to elect a candidate of their choice to the Illinois General Assembly. We have also approved as fair a Settlement Agreement that provides Hispanic voters residing on both the Northwest and Southwest Sides of Chicago a meaningful opportunity to participate in state electoral politics. Finally, we have accepted certain modifications in the Map proffered by the Commission for the Chicago suburbs.

The court therefore enters the following *ORDER:*

**106.** We do not believe it appropriate to discard the entire Commission Plan because part of it is infected by an unconstitutional purpose to dilute. Such a broad remedy is appropriate when the unconstitutional element pervades the entire plan. *Cf. Kirkpatrick v. Preisler,* 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) (congressional districting statute for Missouri invalidated in its entirety since legislature relied on inaccurate *population data and created large* population deviations).

**107.** Court Exhibit 1A corrected the *substantial* vote dilution found in the Commission Plan by reconfiguring (among others) House Districts 33, 34, 35 and 36, resulting in *two* Senate districts (District 17, with a 70% black population, and District 18, with a 66% black population) where blacks will have a meaningful opportunity to elect candidates of their choice, in contrast to *one* Senate district under the original Commission Plan. Court Exhibit 7B (which incorporates the Hispanic Settlement Agreement integrated with Court Exhibit 5B) reconfigures numerous districts in the West and North West areas of Chicago resulting in *one* Senate district (District 9, with a 74% black population) and *four* House districts (District 15 (66% black), District 17 (72% black), District 18 (77% black) and District 19 (76% black) where blacks have a meaningful opportunity to elect representatives of their choice in contrast to only *one* Senate district and *three* House districts under the original Commission Plan. Court Exhibit 2A, which has already been integrated with these adjustments to the Commission Plan, is also adopted in order, *inter alia,* to alleviate the ripple effect of adjustments in the Commission Plan.

**108.** Several plaintiff and amicus parties have urged us to adopt alternative plans that they have formulated during the course of litigation as remedies for various defects they or we perceive in the Commission Plan. These parties have not cited any controlling authority that would require us to adopt such alternative plans. We also note that, in view of the specific and relatively localized defects we have found, adopting such an "outside" plan in its entirety would inappropriately preempt the redistricting procedure authorized by the people of Illinois and the agencies empowered by Illinois law. *See White v. Weiser,* 412 U.S. 783, 795, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 160–61, 91 S.Ct. 1858, 1877–78, 29 L.Ed.2d 363 (1971); *Reynolds v. Sims,* 377 U.S. 533, 584–87, 84 S.Ct. 1362, 1393–94, 12 L.Ed.2d 506 (1964). We think it would be foolish to "draw our own map" or have a third party draw a map for us when we are able, by addressing instructions to the Commission, to eliminate the unconstitutional (and therefore unacceptable) features of the Commission Plan. Moreover, we note that several of these alternative plans, including the so-called *Crosby* Plan which was filed with the court several weeks after trial as an offer of proof and the "plan" submitted by the amicus Village of Oak Park shortly before this opinion was issued, would undoubtedly raise numerous problems if they were to be explored in depth. We do not believe such broadening of the issues is tolerable given the time constraints of this litigation and the lack of findings by the court requiring a sweeping restructuring of the Commission Plan or its effective replacement.

The foregoing memorandum opinion is hereby adopted as findings of fact and conclusions of law in this proceeding. It is therefore ordered that the State Board of Elections put into effect the Commission Plan, as amended by Court Exhibits 1A, 2A, 7B, 7D and 7E.[109] It is further ordered that said plan of reapportionment govern the election of Representatives and Senators to the Illinois General Assembly, beginning with the 1982 primary and general elections and continuing thereafter until these districts are again reapportioned in accordance with law.[110]

BUA, District Judge (concurring):

I fully concur in Judge Cudahy's well-reasoned and exhaustive opinion. I write specially merely to more fully respond to Judge Grady's discussion of the settlement agreement executed between the defendants and the DelValle plaintiffs. As has been repeatedly emphasized, "[f]ederal courts look with great favor upon the voluntary resolution of litigation through settlement." *Airline Steward and Stewardesses Assn. v. Trans World Airlines*, 630 F.2d 1164, 1166 (7th Cir.1980), *cert. granted*, 450 U.S. 979, 101 S.Ct. 1511, 67 L.Ed.2d 813 (1981); *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 616 F.2d 1006, 1013 (7th Cir.1980); *Airline Stewards and Stewardesses Assn. v. American Airlines*, 573 F.2d 960, 963 (7th Cir.1978), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1979). "Settlements are entered into because of 'the uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense ...'" *Airline Stewards*, 573 F.2d

at 963 (quoting *Florida Trailer and Equipment Co. v. Deal*, 284 F.2d 567, 571 (5th Cir.1960)). Thus, in reviewing a settlement agreement, a court "should not attempt to decide the merits of the controversy ... [because] [a]ny virtue which may reside in a compromise is based upon doing away with the effect of such a decision." *Patterson v. Stovall*, 528 F.2d 108, 114 (7th Cir.1976). It is with these considerations in mind that this court has accepted the DelValle settlement agreement.

GRADY, District Judge (concurring in part and dissenting in part).

I join in the decision of the court which finds against the Republican and suburban (Rybicki) plaintiffs. I concur in part and dissent in part as to the finding of liability to the black (Crosby) plaintiffs and dissent from the remedy. I also dissent from the approval of the Hispanic (DelValle) settlement.

*The Crosby Plaintiffs*

I agree with the majority that the Democrat members of the Commission intentionally diluted black voting strength in drawing the boundaries for Senate Districts 14, 17 and 18. While the lines were drawn in this manner to protect the incumbencies of white Senators Joyce and Dawson, this protection was accomplished by racial gerrymandering. The thinking of the Democrat Commission members obviously was that Senators Joyce and Dawson would have better chances for reelection if they ran in districts in which whites rather than blacks were the majority; the lines were drawn according to this racial hypothesis, giving Dawson and Joyce each a gerrymandered

---

**109.** Metes and bounds descriptions for all final district boundaries are contained in a document filed by the Commission on January 4, 1982, as modified by the Commission in the Hispanic Settlement Agreement (to correct various minor errors). The Commission is directed to continue to endeavor to work with the parties and the State Board of Elections to correct any further minor errors in the Plan which may be discovered, in order to render the Plan fully consistent with this opinion. Any further corrections or modifications of any aspect of the Plan shall be promptly reported to this court. This court shall retain jurisdiction to disapprove any such

corrections or modifications not deemed appropriate.

**110.** Because of the delay attributable to this proceeding, an order was issued on January 12, 1982, enjoining various statutory deadlines imposed by Illinois law on the election procedures preceding the scheduled primary election in March. That order sets out a new timetable developed by the State Board of Elections. We approve the new timetable and order that it be applied to the forthcoming primary election.

white district and packing the black population into the grotesquely configured District 17. A clearer example of an intentional dilution of racial voting strength would not be easy to find.

I am not persuaded that the same intentional racial dilution has taken place on the west side in regard to Senate Districts 8, 9 and 10. The boundaries of Senate District 8, for instance, have been shown to be the result of a request by the Village of Oak Park that it be located entirely within one district, without fracturing. The boundaries of District 8 do indeed follow the municipal boundary of Oak Park.

Because of the differences I have with the majority concerning another aspect of the liability question and the whole matter of remedy, it is not necessary to extend this opinion by further discussion of the west side districts. Whether or not intentional dilution has been shown there, the west side districts drawn by the Commission would have to be set aside in my view simply because I believe virtually the entire map as it affects concentrations of black residents in Chicago has to be redrawn.

I agree with the majority that, except in the case of Senate Districts 14, 17, and 18, discussed *supra*, plaintiffs have failed to show the boundary lines were drawn for the purpose of diluting the black vote. Plaintiffs claim that the "wall" on the South Side was drawn with the intention of compacting the black population into the least possible number of districts in which their votes would elect candidates of their choice. The Commission map, according to plaintiffs, affords only five such districts. Plaintiffs argue that this "dilution" of the

black vote was done for the purpose of denying black people a voice in the legislature and in the councils of the Democratic Party. The major premise of the argument is that if blacks had two more senatorial districts, the interests of black people— which plaintiffs say are in conflict with the interests of the Democratic leadership— would be given priority by the candidates elected. Plaintiffs' own evidence, if true, indicates that this is at best a doubtful proposition. Electoral districts which are almost solidly black have traditionally sent organization Democrats to the legislature. Plaintiffs Newhouse and Braun, a black Democratic senator and a black Democratic representative respectively, both testified that most of their black colleagues in the legislature are under the thumb of the Democratic leadership and do not adequately represent their black constituents. These black legislators are said to be loyal, hand-picked candidates the Democratic organization is able to slate and elect in the solid black districts. If this is true, it is difficult to see what the Democratic organization would have to lose from the creation of two more black senatorial districts.

Plaintiffs have another objection to the "wall," however, and unlike the majority, I believe it is a valid one. Plaintiffs complain that the black residents of the walled-in districts are stigmatized by being separated from the white population on the basis of race.[1]

By the defendants' own admissions, the boundaries of various districts in the City of Chicago have been drawn along white and black racial lines.[2] White and black

**1.** The *Crosby* complaint does not specifically allege this theory and could be read as being entirely confined to the question of dilution. However, during the course of the trial, counsel for plaintiffs made clear in argument that they were objecting to the Commission plan on the basis of racial stigma as well as dilution. If there is any problem about the pleadings in this regard, I would simply allow the *Crosby* plaintiffs to amend at this time to conform with the proof. Rule 15(b), Fed.R.Civ.P.

**2.** In addition to the testimony quoted in the majority opinion, *ante* at 1114, Madigan testified on cross examination as follows:

BY MR. SULLIVAN:
Q We have established, I believe, that there were accommodations made in respect of the view of Evanston, Oak Park, Hyde Park, the Marovitz/Netsch matter, and I think you testified that you made certain accommodations to the Bridgeport community in drawing your map, is that right, and the Canaryville community and the Marquette Park community?
A It was my judgment that it would not be wise to have majority black districts representing those communities.

populations have been separated in an effort to avoid racial tensions and to facilitate the conduct of political campaigns. Various witnesses testified, for instance, that if the neighborhoods of Bridgeport and Canaryville were combined in electoral districts with the black neighborhoods to the east of them, creating predominantly black districts, it would be difficult for the black candidates to carry on their campaigns in the white neighborhoods. Several black incumbents testified they would not attempt to campaign in such solid white neighborhoods as Bridgeport and Canaryville. These were the main reasons given for drawing the lines of the South Side electoral districts almost precisely along the boundaries of the areas shown on demographic maps as containing the highest concentrations of black population. The metaphoric reference to a "wall" is entirely apt.[3]

The reasons assigned by the Commission for the drawing of these racial lines do not pass constitutional muster. With narrow exceptions, the Constitution does not permit state action based upon race. This case is not within one of the narrow exceptions. I believe the lines drawn by the

> Q Because of the racist attitude of the white people living in those communities?
>
> A Because of the strong racial feelings, it would have been very difficult for a black person to represent the communities.
>
> Q What community is this down here in 17?
>
> A Cicero.
>
> Q Aren't there hard feelings between the Lawndale and the Cicero areas?
>
> A There are some, and I specifically raised that question with Representative Henry. He told me that—
>
> Q Excuse me. I don't want to get into all this hearsay on my cross-examination.
>
> In any event, you accommodated those racial feelings of these communities, didn't you?
>
> A I don't know if your form of questioning is correct.
>
> Q You took them into consideration in drawing your lines?
>
> A Yes, I did.

Tr. 1431–1432.

Commissioner Murphy who, along with Madigan, drew the lines in Chicago testified on cross-examination as follows:

BY MR. COLEMAN:

Commission which purposefully separate white from black voters on the south side of Chicago are constitutionally impermissible and must be voided. I reach this conclusion without regard to whether the lines have the effect of "diluting" the black vote.

The majority concludes that, since the evidence fails to show the wall is intentionally designed to dilute the black vote, it is constitutionally permissible.[4] As I read the majority opinion, my colleagues find no fault with the idea of racial separation *per se* and, indeed, express the view that it can be a good thing under the circumstances of this case. The majority sees an antagonism between the desire of blacks for racial integration on the one hand and for bloc voting strength on the other. The majority reasons that if the blacks are put into voting districts with whites they will lose their opportunity to elect candidates of their choice; therefore, it is in the interest of black voters that they be segregated into districts of their own. In this connection, the majority cites the testimony of the various black legislators that they would not fare well in districts that were not predominantly black.

> Q Shall we call it a line around the major black concentrations of population in the City of Chicago? Would you accept that?
>
> A Yes.
>
> Q That there is a line that the Commission draws around the black community and on the South and West Sides? You agree with that?
>
> A Yes.
>
> Q And one of the reasons why that line was drawn was because to the west of the line on the South Side there are primarily white communities that you believe have a community of interest that is separate from the black communities to the east of the line, isn't that correct?
>
> A Partly.
>
> Q And it was a concern of yours that if the black populations to the east and the white populations to the west were put into the same districts, that there might be friction.
>
> A Yes.

Tr. 1837–1838.

3. See map in the Appendix to this opinion.

4. In fact, the ultimate decision of the majority is that the wall is constitutionally *required,* as will be demonstrated later in this opinion.

This argument of the majority misses one of plaintiffs' main points: in order for a black candidate to win, it is not necessary that the district be *95 per cent* black. There can be a significant white population and a black can still win. The evidence shows that there are two black legislators in Illinois—one of them from Chicago—who are regularly reelected from majority white districts.[5] A district which is 65 per cent black will, as all parties agree, afford black voters a better than even chance of electing a candidate of their choice. Thus, the majority rationale for the wall—that it is necessary or at least desirable from the standpoint of enhancing the political strength of blacks as a bloc—does not comport with the evidence and does not withstand analysis.

I would have trouble with the majority theory even if I *did* believe that the electoral fortunes of blacks depend upon their having House districts in which they comprise majorities of 94.83, 98.43, 98.44, 97.01 and 89.62 per cent (the percentages in House Districts 23, 24, 31, 33 and 25). This is because I believe state-enforced racial separation cannot be tolerated under *any* circumstances, regardless of motive, even if the motive is apparently benign. The matter was well stated by Justice Douglas in his dissenting opinion in *Wright v. Rockefeller*, 376 U.S. 52, 59–67, 84 S.Ct. 603, 606–11, 11 L.Ed.2d 512 (1963), a case in which certain intervenors sought to justify the creation of a racially segregated congressional district in the City of New York. One of the intervenors was Adam Clayton Powell, the black incumbent Congressman. Justice Douglas described the argument of the intervenors in this way:

> The intervenors are persons who apparently have a vested interest in control of the segregated Eighteenth District. They and the State seem to support this segregation not on the "separate but equal" theory of *Plessy v. Ferguson*, [163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed.

256] *supra*, but on another theory. Their theory might be called the theory of "separate but better off"—a theory that has been used before. A like argument was made in *Buchanan v. Warley*, 245 U.S. 60, 81, [38 S.Ct. 16, 20, 62 L.Ed. 149] in support of municipal segregation of residential areas; in *District of Columbia v. Thompson*, 346 U.S. 100, [73 S.Ct. 1007, 97 L.Ed. 1480] in support of segregation in restaurants; in *Watson v. Memphis*, 373 U.S. 526, [83 S.Ct. 1314, 10 L.Ed.2d 529] in support of delayed integration of municipal parks. Indeed, the final argument of John W. Davis for South Carolina in *Brown v. Board of Education*, *supra*, ended with the words, "The good is sometimes better than the best."

> The fact that Negro political leaders find advantage in this nearly solid Negro and Puerto Rican district is irrelevant to our problem. Rotten boroughs were long a curse of democratic processes. Racial boroughs are also at war with democratic standards.

376 U.S. at 62, 84 S.Ct. at 608. Unlike the majority in the instant case, the majority in *Wright v. Rockefeller* did not adopt the "separate but better off" theory. The basis of the majority opinion in *Wright*, which upheld the challenged apportionment, was that the lower court finding that the boundaries had not deliberately been drawn along racial lines was not clearly erroneous.

Commenting on the general question of racial bloc voting and governmental action designed to facilitate that practice, Justice Douglas concluded:

> Racial electoral registers, like religious ones, have no place in a society that honors the Lincoln tradition—"of the people, by the people, for the people." Here the individual is important, not his race, his creed, or his color. The principle of equality is at war with the notion

---

5. Rep. Jesse White (former District 13), a black, is elected by a constituency in Chicago that is 73 per cent white. Downstate, Sen. Kenneth Hall (former District 57), also a black, is elected by a constituency that is 50 per cent white. There was also evidence that Sen. Earlean Collins (former District 21) receives a substantial vote from whites in her Chicago district.

that District A must be represented by a Negro, as it is with the notion that District B must be represented by a Caucasian, District C by a Jew, District D by a Catholic, and so on. Cf. *Gray v. Sanders*, 372 U.S. 368, 379 [83 S.Ct. 801, 808, 9 L.Ed.2d 821]. The racial electoral register system weights votes along one racial line more heavily than it does other votes. That system, by whatever name it is called, is a divisive force in a community, emphasizing differences between candidates and voters that are irrelevant in the constitutional sense. Of course race, like religion, plays an important role in the choices which individual voters make from among various candidates. But government has no business designing electoral districts along racial or religious lines. We held in *Akins v. Texas*, 325 U.S. 398, 403, [65 S.Ct. 1276, 1279, 89 L.Ed. 1692] and in *Brown v. Allen*, 344 U.S. 443, 471, [73 S.Ct. 397, 414, 97 L.Ed. 469] that courts in selecting juries need not—indeed should not—give each jury list the proportional racial complexion that the community has. If race is not a proper criterion for drawing a jury list, how can it be in designing an electoral district?

In *Anderson v. Martin*, 375 U.S. 399, [84 S.Ct. 454, 11 L.Ed.2d 430] we barred Louisiana from putting on a ballot opposite a Negro candidate's name the word, "Negro," as it was a device encouraging racial discrimination. When we said in that case that a State may not encourage its citizens "to vote for a candidate solely on account of race," *id.*, at 404, [84 S.Ct. at 456] I had assumed that we would hold *a fortiori* that no State could make an electoral district out of any racial bloc unless the electoral unit represented an actual neighborhood. Yet we violate that principle here.

When racial or religious lines are drawn by the State, the multiracial, multireligious communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race or to religion rather than to political issues are generated; communities

seek not the best representative but the best racial or religious partisan. Since that system is at war with the democratic ideal, it should find no footing here.

"Separate but equal" and "separate but better off" have no more place in voting districts than they have in schools, parks, railroad terminals, or any other facility serving the public.

376 U.S. at 66–67, 84 S.Ct. at 610–11.

Although Justice Douglas' views were expressed in a dissenting opinion (concurred in by Justice Goldberg), there is no reason to believe that those views would not have been agreeable to the majority had they found the district lines to have been racially motivated, as is the case here, and then reached the "separate but better off" argument of the intervenors. It seems to me that the above-quoted language of Justice Douglas, considered in light of the authorities he cites, would represent the position of the Supreme Court today.

If the case for racial segregation to enhance minority voting strength is weak, the case for what I regard as the more prominent motivation for the wall is even weaker. I am not persuaded that the Democrat Commission members were motivated by a desire to enhance black voting power. I found equally unconvincing the rote responses given by the regular Democrat organization black legislators to leading question about whether they feared difficulties in the primary if they were to run in districts with less than 90 or 95 per cent black population. In short, my view of the evidence is that a desire to accommodate black voters had little if anything to do with the creation of the wall. The real reason for the wall—and it was not concealed, it was just denied the top billing it deserved—was the desire of the Democrat Commission members to ensure that the *white* populations west of the wall would continue to be represented by white legislators. This concern was based upon the candidly expressed belief that the antagonisms between whites and blacks make it impracticable for any legislator, white or

black, to represent their interests simultaneously. As I understand the opinion of my colleagues, they regard this apprehension as a proper basis for drawing district lines. I do not, for the reasons expressed by Justice Douglas in *Wright v. Rockefeller, supra.* If it is constitutionally permissible to draw segregated voting district boundaries on the theory that the races are antagonistic, I fail to see why it would not be equally valid to draw segregated school attendance boundaries on the same theory. Yet, no one needs to be told that the latter proposition is clearly untenable.

My colleagues also find the "wall" constitutionally permissible since it does not stigmatize blacks. I believe the wall stigmatizes blacks and restricts their freedom of political association. It is no answer to say, as the majority does, that "... the record in this case is barren of any indication that black voters on the South Side are, or feel themselves to be, stigmatized by the challenge to the electoral boundaries, or that such voters would prefer to be associated, for voting purposes, with predominantly white neighborhoods such as Bridgeport and Canaryville." (p. 1116). First of all, as the majority points out, one of the plaintiffs, Carol Mosely-Braun, did testify that she regarded the segregation as a stigma. Secondly, the attorneys for the *Crosby* plaintiffs vehemently argued that blacks were harmed by the segregation. Most importantly, it is too late in the day to require evidence in support of the proposition that racial segregation is stigmatizing. To say that it is not, or to require proof each time that it is, is to ignore the last quarter century of precedents starting with *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). In the decade following *Brown,* the Supreme Court ordered in a series of *per curiam* decisions an immediate end to segregation in all public places. *Muir v. Louisville Park Theatrical Association,* 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112 (1954), *vacating* 202 F.2d 275 (6th Cir.1953) (parks); *Holmes v. City of Atlanta,* 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776 (1955), *rev'g* 223 F.2d 93 (5th Cir.1955) (golf courses); *Mayor of Baltimore v. Dawson,* 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774 (1958), *aff'g* 220 F.2d 386 (4th Cir.1955) (public beaches); *New Orleans Park Improvement Association v. Detiege,* 358 U.S. 54, 79 S.Ct. 99, 3 L.Ed.2d 46 (1958), *aff'g* 252 F.2d 122 (5th Cir.1958) (parks); *State Athletic Commission v. Dorsey,* 359 U.S. 533, 79 S.Ct. 1137, 3 L.Ed.2d 1028 (1959), *aff'g* 168 F.Supp. 149 (E.D.La.1958) (athletic events); *Turner v. City of Memphis,* 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962), *vacating* 199 F.Supp. 585 (W.D. Tenn.1961) (restaurants); *Johnson v. Virginia,* 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed.2d 195 (1963) (courtroom seating); *Schiro v. Bynum,* 375 U.S. 395, 84 S.Ct. 452, 11 L.Ed.2d 412 (1964), *aff'g* 219 F.Supp. 204 (E.D.La.1963) (auditoriums). In not one of these cases did the Supreme Court or those lower courts that were affirmed find it necessary to explore the question whether blacks were stigmatized by the segregation. As Judge Wisdom stated in *Dorsey,* segregation based on race is "inherently discriminatory and a violation of the Equal Protection Clause of the Fourteenth Amendment." 168 F.Supp. at 151. Beyond statements such as these, the courts struck down all forms of segregation on the basis of nothing more than a citation to *Brown* or cases relying on *Brown.* Thus, in segregation cases, stigma may be presumed.[6] In the instant case, the defendants adduced no evidence to rebut the presumption.[7]

**6.** "[T]he essential issue [of stigma] is one of *fact*—whether segregation involves special harm for Negroes and therefore violates the constitutional standard of equality. But the basic factual issue cannot be relitigated in each case which involves the question. [T]he relevance of the issues on which the social scientists wrote and testified is inescapable [and] leads to a general constitutional ruling which will govern subsequent cases until the basic factual assumptions can be shown to be wrong ...." Honnold, Book Review, 33 Ind.L.J. 612, 614–615 (1958).

**7.** Unlike the majority, I do not believe that racial discrimination must be "explicitly" provided for in a statute before a presumption of invalidity attaches. *Ante* at n. 91. In *Yick Wo v. Hopkins,* 118 U.S. 356, 373, 6 S.Ct. 1064, 1073, 30

Again, it should be noted that the black majorities in the walled-in districts far exceed any percentage necessary to guarantee the election of a black candidate. The majority does not even attempt to suggest how the blacks in, say, Senate District 16 will benefit from being 98.69 per cent of the electorate in that district or how the 96.38 per cent majority in District 12 will be better off than if they were only a 70 per cent majority in that district. The majority says that "... the desirability of perfectly integrated voting districts must be balanced against the ability of blacks and other minority groups to elect candidates of their choice to the relevant political bodies." *Ante* at p. 1116. I doubt that anyone argues for "perfectly integrated voting districts." Given the segregated housing patterns in Chicago, there must in the best of plans be some districts in which blacks are a higher percentage than they are in the city at large. "Perfect integration" is not the goal. The goal in this case should be the avoidance of deliberate, governmentally mandated segregation. Even if one were to accept the proposition that such segregation is permissible to augment black voting strength, segregation *in excess* of that required to elect a black candidate would have to be justified on some other ground. The majority has suggested no other justification for the solid black districts.

The courts have long recognized that the freedom to associate with others to effect political change, be it through joining a group that advocates a particular doctrine or campaigning to elect a representative, is among the highest values protected by the First Amendment. *Whitney v. California,* 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (J. Brandeis, dissenting); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The harm occasioned by the

virtually total segregation of the races by voting districts, and the consequent limitation it places on the ability of blacks and whites to join together in the campaign process, cuts to the heart of our principle of self-government.

*The Remedy*

I disagree with several aspects of the remedy the majority accords the *Crosby* plaintiffs. First, the majority remedy adopts the wall which was part of the Commission plan. To my knowledge, this is the first time a federal court has ordered a state to segregate the races. There is some attenuation by reason of the fact that the wall was first devised by the Commission, but the fact remains that these segregated districts are part of an overall plan which the majority is ordering the state to put into effect. The departures the majority has ordered from the original Commission plan are necessarily based upon the remainder of the map being configured the way it is. The districts are pieces of a jigsaw puzzle and each piece must fit.

The plan ordered by my colleagues does give the blacks six senatorial districts in which they are likely to elect a candidate, rather than the five they would have under the Commission plan. The court plan also gives the blacks 13 rather than the 12 House districts provided by the Commission plan. The manner in which this result has been obtained is the basis for my second objection to the majority remedy. The district boundaries have been drawn along racial lines for the purpose of yielding black majorities of 65 per cent or more in selected districts. Just as the line forming the boundaries of the "wall" districts has been precisely drawn along the western edge of the heaviest black concentration, so also the boundaries of the court-ordered districts outside the walled area have

L.Ed. 220 (1886), it was stated that "Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within

the prohibition of the Constitution." The point is somewhat academic in our case because the intent of Messrs. Madigan and Murphy is not just a matter of inference. They testified—as "explicitly" as could be—that they intentionally drew the wall so as to separate whites from blacks.

been precisely drawn along the irregular and sometimes tortuous contours of heavy black concentrations as shown on demographic maps.

The rationale for this method has not been explicitly stated by my colleagues, but it is apparent from what has been done. The majority has obviously adopted the proposition that racial minorities are entitled to proportional representation. Secondly, they have accepted the argument of the plaintiffs that blacks and Hispanics are entitled to be placed in districts in which they will form at least 65 per cent of the population. I disagree with both of these propositions.

It is important to know how the court arrived at its remedy, for the process reveals the principles of reapportionment my colleagues have embraced. The majority did not have to structure its own plan from the ground up. Instead, the majority was able to produce a court plan by splicing several already available maps onto the Commission plan. These additional maps were drawn by the parties in the course of settlement negotiations. The parties discussed settlement throughout the trial of the case, with the encouragement of the court. Everyone realized the case presented difficult problems and that a settlement would probably be preferable to a solution imposed by the court. To make these settlement discussions as concrete as possible, the court requested counsel for the Commission defendants to prepare various alternative district configurations that would represent a compromise between the Commission plan and the demands of the three groups of plaintiffs.[8] It was stipulated that counsel's efforts in this regard would not be taken as any concession or admission. Thereafter, counsel for the Commission spent long hours preparing various alternative maps which were then received as "court exhibits" for purposes of discussion. The principal exhibit was marked Court Exhibit 1A.

One of the criteria counsel used in preparing the court exhibits was the 65 per cent formula urged by plaintiffs, since it was clear that any district which did not have at least a 65 per cent black or Hispanic population would not be regarded by either the *Crosby* or *DelValle* plaintiffs as a district in which blacks or Hispanics would have, using plaintiffs' terminology, "a meaningful opportunity to elect representatives of their choice." Witnesses for both sides acknowledged that "an informal guideline" of 65 per cent has been used in reapportionments to obtain effective minority representation. The figure is arrived at by starting with 50 per cent and adding to it a 5 per cent allowance for the fact that minority populations are generally younger than white populations (and therefore have fewer members of voting age), a 5 per cent allowance on the basis that fewer minority members than whites register to vote, and another 5 per cent on the basis that the turnout of registered minority voters at the polls is less than the turnout of registered white voters. No witness testified to the accuracy of these estimates even in general, let alone as they might apply to Chicago. The 5 per cent allowance for each of the three factors appears to be arbitrary, and whether it has any relation to fact is, on the basis of this record, anyone's guess. At no time did the defendants agree that the "65 per cent formula" was factually legitimate or that its use could legally be required by this court.

The *DelValle* plaintiffs were not satisfied with the court exhibits insofar as they pertained to the Hispanic communities. Therefore, the *DelValle* plaintiffs prepared their own "settlement" map and this became known as *DelValle* Exhibit 208.

The *Crosby* plaintiffs and the defendants, despite considerable effort, were unable to settle. While the court was not privy to their discussions, in subsequent briefs the plaintiffs indicated that the ma-

---

**8.** The reason the attorney for the Commission was requested to draw these maps is that he and his associates were the only ones with adequate knowledge of the geography and demography involved in the case.

jor stumbling block was that Court Exhibit 1A retained the "wall" intact.

After the trial was concluded, my colleagues desired to examine a map which would incorporate *DelValle* Exhibit 208 into Court's Exhibit 1A. Accordingly, counsel for the Commission was directed to prepare such a map, which he promptly did and furnished to the court. Shortly thereafter, we were informed by counsel for the Commission and the *DelValle* plaintiffs that those parties had settled the case between themselves by agreeing to the combination of *DelValle* Exhibit 208 and Court Exhibit 1A.

It should be emphasized that the Commission defendants have at no time agreed that Court's Exhibit 1A is an appropriate map insofar as the *Crosby* plaintiffs are concerned. They have not acceded to the proposition that racial minorities are entitled to proportional representation nor have they conceded the propriety of the 65 per cent formula. During final argument, counsel for the Commission reiterated his position that the court's exhibits were not offered by the Commission and that the Commission was standing by its original plan.

What the majority has now done is to adopt as the court's remedy Court Exhibit 1A combined with *DelValle* Exhibit 208. Because it has ready-made maps it can adopt by simple reference, the majority believes it need not explain how these particular lines came to be drawn and what their legal basis is. The entire exposition is contained in footnote 107 of the majority opinion, which refers to the court exhibits and describes the percentages of minority population which will be contained in each of the revised districts. The absence of a detailed explanation of the plan seems to be addressed by this statement in footnote 107 of the majority opinion:

We think it would be foolish to "draw our own map" or have a third party draw a map for us when we are able, by instructing the Commission, to eliminate the unconstitutional (and therefore unacceptable) features of the Commission plan.

In evaluating the court's remedy, it is important to distinguish this case from one arising under the Voting Rights Act of 1965, or a case in which, due to previous intentional discrimination, affirmative action in favor of racial or ethnic groups may be permitted or even required. *United Jewish Organizations v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (school desegregation). The State of Illinois is not subject to Sections 4 and 5 of the Voting Rights Act, 42 U.S.C. § 1973, so there is no question of the need for affirmative action to comply with that Act. It is arguable that where the Voting Rights Act does not apply a state may not voluntarily reapportion its electoral districts so as to strengthen the voting power of a racial minority at the expense of the white majority. *See* the concurring opinion of Justice Brennan in *United Jewish Organizations, supra*, 430 U.S. 144 at 168–179, 97 S.Ct. 996 at 1011–17, 51 L.Ed.2d 229.[9] However, we are not dealing here with what the State of Illinois might voluntarily have done. We have rejected the reapportionment map the state, through its constitutionally authorized Commission, had decided upon. The question before us now is what the state can be *required* to do as an alternative to the rejected plan. The majority opinion *requires* the state to reapportion its electoral districts so as to afford *proportional* representation to racial and ethnic minorities. The exhibits which the majority superimposes upon the Commission map to create the court-imposed plan are expressly drawn along the lines of census tracts which have known numbers of whites, blacks and Hispanics. The lines have been drawn in a way that will give the blacks and Hispanics greater bloc voting strength than they would have under the Commission map,

**9.** A plurality of the court, however, holds a contrary view. *See* Part IV of the opinion of Justice White, 430 U.S. at 165–168, 97 S.Ct. at 1009–11.

and this is the sole difference between the Commission plan and the court plan. The court plan does not give the blacks the maximum possible bloc voting strength they desire—and for that reason will still be regarded as "discriminatory" by the *Crosby* plaintiffs—but it is nonetheless an adoption of the proposition that racial and ethnic groups are entitled to have the boundaries of electoral districts drawn in a way that will enhance their bloc voting strength.

In a number of cases, the Supreme Court has made it clear that the district court's remedy in a reapportionment case may be an abuse of its equitable discretion if it is not founded on solid constitutional grounds. It is, of course, true that "[o]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). However, as the Court cautioned in *Whitcomb v. Chavis,* 403 U.S. 124, 161, 91 S.Ct. 1858, 1878, 29 L.Ed.2d 363 (1971), "The remedial powers of an equity court must be adequate to the task, but they are not unlimited. Here the District Court erred in so broadly brushing aside state apportionment policy without solid constitutional or equitable grounds for doing so."

The Court has also made it clear that a court-ordered reapportionment plan will be held to stricter standards of constitutionality than those governing plans adopted by a legislature. *Connor v. Finch,* 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977); *Chapman v. Meier,* 420 U.S. 1, 18–19, 95 S.Ct. 751, 761–62, 42 L.Ed.2d 766 (1975); *East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 639, 96 S.Ct. 1083, 1085, 47 L.Ed.2d 296 (1976). The rationale is set forth in *Connor:*

> These high standards reflect the unusual position of federal courts as draftsmen of reapportionment plans. We have repeatedly emphasized that "legislative reapportionment is primarily a matter for legislative consideration and determination, *Reynolds v. Sims,* 377 U.S. at 586 [84 S.Ct. at 1394] for a state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality. The federal courts by contrast possess no distinctive mandate to compromise sometimes conflicting state apportionment policies in the people's name. In the wake of a legislature's failure constitutionally to reconcile these conflicting state and federal goals, a federal court is left with the unwelcome obligation of performing in the legislature's stead, while lacking the political authoritativeness that the legislature can bring to the task. In such circumstances, that must be accomplished circumspectly, and in a manner "free from any taint of arbitrariness or discrimination." *Roman v. Sincock,* 377 U.S. 695, 710 [84 S.Ct. 1449, 1458, 12 L.Ed.2d 620].

*Connor v. Finch,* 431 U.S. at 414–415, 97 S.Ct. at 1833–34.

For the reasons stated in *Connor,* the Supreme Court has held that a federal court abuses its equitable discretion when it creates a plan containing districts with population deviations that are unnecessarily large, *Chapman v. Meier* (5.95 per cent deviation), and when it mandates the use of a multi-member district plan, *Connor v. Finch, East Carroll Parish School Board v. Marshall.* On the other hand, the Court has approved plans submitted by a legislature in which the population deviation is significantly higher than that in *Chapman.* *See, e.g., Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1972) (16.4 per cent deviation), and *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) (9.9 per cent deviation). It has also approved, in certain circumstances, the use of multi-member districts in legislative plans. *See, e.g., Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).

Most recently, the Fifth Circuit Court of Appeals held that a District Court abuses its equitable discretion when it premises a remedial plan on proportional representation of minorities. *Marshall v. Edwards*, 582 F.2d 927 (5th Cir.1978), *cert. denied sub nom East Carroll Parish Police Jury v. Marshall*, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979). In *Marshall v. Edwards*, the court had before it a plan ordered by the district court to remedy a prior history of franchise dilution. *See Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973). In developing its remedy, the lower court sought to create districts in East Carroll Parish exactly proportional to the Parish's black population. Noting that the question whether equitable standards permit a court to approve such a plan was one of first impression, the court looked to the Supreme Court's then most recent pronouncement in *United Jewish Organizations v. Carey* for guidance. The Court of Appeals observed that although *United Jewish Organizations* established that, as a matter of state policy, a *legislature* may voluntarily adopt a plan based on proportional representation, the case provided federal courts with no such license:

> At this time, we read the decisions of the Supreme Court as admonishing lower federal courts to act cautiously in reapportionments and to leave racially proportional representation to legislative bodies, at least in the absence of some impelling reason to take it into account,

for example, where the correction of historic racial discrimination and not merely proper representation is involved.

582 F.2d at 936. The Court of Appeals concluded with some advice to the district court on fashioning an acceptable remedy:

> The judge must analyze the plan and determine that the probable results are such that minority strength is not diluted. But this legitimate concern with the outcome cannot justify a strict proportionality brought about by manipulation of district lines .... *The boundaries should be drawn with an eye to compactness, contiguousness, and the preservation of natural, political and traditional boundaries; not racially balanced representation. We are not legislatures.*

582 F.2d at 937 (emphasis supplied).

Thus, in *Marshall,* it was held an abuse of discretion to remedy a long history of vote dilution with a plan premised on proportional representation. The remedy adopted by the majority in the instant case presents one further turn of the screw. Here, the issue is whether a federal court may require a state that is not subject to the Voting Rights Act and has not been shown to have engaged in voting dilution in the past to adopt a race-conscious remedy that deliberately creates districts in which blacks constitute at least a 65 per cent majority.[10] In my view, the court is with-

---

**10.** In *Taylor v. McKeithen,* 407 U.S. 191, 193–194, 92 S.Ct. 1980, 1981–82, 32 L.Ed.2d 648 (1972), the Supreme Court recognized that a court-ordered redistricting plan premised on the principle of "benign discrimination" presents difficult and, at that time, unresolved issues:

> An examination of the record in this case suggests that the Court of Appeals may have believed that benign districting by federal judges is itself unconstitutional gerrymandering even where (a) it is employed to overcome the residual effects of past state dilution of Negro voting strength and (b) the only alternative is to leave intact the traditional "safe white districts. If that were in fact the reasoning of the lower court, then this petition would present an important federal question of the extent to which the broad equitable powers of a federal court, *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1,

15, [91 S.Ct. 1267, 1275, 28 L.Ed.2d 554] are limited by the colorblind concept of *Gomillion v. Lightfoot,* 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110], and *Wright v. Rockefeller,* 376 U.S. 52, 57, 67 [84 S.Ct. 603, 605, 611, 11 L.Ed.2d 512] (Douglas, J., dissenting). In reapportionment cases, as Justice Stewart has observed, "the federal courts are often going to be faced with hard remedial problems" in minimizing the friction between their remedies and legitimate state policies. *Sixty-Seventh Minnesota State Senate v. Beens,* 406 U.S. 187, 204 [92 S.Ct. 1477, 1487, 32 L.Ed.2d 1] (dissenting opinion).

While some courts have held that the Supreme Court's opinion in *United Jewish Organizations* answered this question in the affirmative, see, e.g., *Kirksey v. Board of Supervisors of Hinds County,* 554 F.2d 139, 151 (5th Cir.1977), I believe this is a mistaken reading of the case.

out "solid constitutional grounds" for doing so.

I begin with the Supreme Court's latest expression, *Mobile v. Bolden,* 446 U.S. 55, 78–79, 100 S.Ct. 1490, 1506, 64 L.Ed.2d 47 (1980) (plurality opinion) since that case both confirmed and extended the holding of *Marshall v. Edwards.* There the Court stated:

It is, of course, true that the right of a person to vote on an equal basis with other voters draws much of its significance from the political associations that its exercise reflects, but it is an altogether different matter to conclude that political groups themselves have an independent constitutional claim to representation. And the Court's decisions hold squarely that they do not [citations omitted].

The fact is that the Court has sternly set its face against the claim, however phrased, that the Constitution somehow guarantees proportional representation.

According to the plurality in *Mobile,* it is not only strict proportional representation that is beyond the equitable power of a court to require. Rather, it is any kind of plan that requires a racial, ethnic or other identifiable group to be given representation *as such a group.* In the quotation from *Mobile, supra,* the plurality opinion rebuffs the idea "that political groups themselves have *an independent constitutional claim to representation*" by noting that the Court has consistently rejected the claim "however phrased, that the Constitution somehow guarantees *proportional representation*" (emphasis added). The majority in the instant case claims that its plan is not proportional representation because the blacks will have six rather than the seven Senate districts they would have under strict proportional representation. In my view, the question is not whether it

is six or seven, but whether the districts have been drawn on the invalid premise that blacks have a constitutional right to district lines that will enable them to vote as a group.

Even apart from the holding of *Mobile v. Bolden,* the majority's remedy suffers from a further defect. As indicated in *Connor v. Finch,* a court abuses its equitable discretion when it adopts a remedy that usurps the prerogative of the state legislature to make critical policy choices in connection with reapportionment. Justice Stewart succinctly stated the job of federal courts in these cases: "In the reapportionment context, it is the duty of a court seeking to remedy an unconstitutional apportionment to right the constitutional wrong while minimizing disturbance of legitimate state policies." *Sixty-Seventh Minnesota State Senate v. Beens,* 406 U.S. 187, 202, 92 S.Ct. 1477, 1486, 32 L.Ed.2d 1 (1972).

The majority's remedy does not merely conflict with legitimate state policies regarding reapportionment, it preempts the state from forming the policies. As *Mobile v. Bolden* makes clear, the object of the remedy in any vote dilution case is to give the minority group *equal access* to the political processes leading to nomination and election. This is all the cases have ever held. *United Jewish Organizations,* 430 U.S. at 165, 97 S.Ct. at 1009–10; *White v. Regester,* 412 U.S. 755, 765–767, 93 S.Ct. 2332, 2339–40, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis,* 403 U.S. at 149, 91 S.Ct. at 1872. Equality of access may be effected in several ways. The legislature may choose to draw "safe" minority districts or it may choose to spread, but not intentionally to fracture, the minority population over a few districts. It is clear, however, that neither choice is constitutionally mandated. *Mobile v. Bolden, supra; Whit-*

First, as *Marshall v. Edwards* recognizes, *United Jewish Organizations* addressed only what a *legislature,* not a federal court, could do to increase minority representation. Moreover, even with respect to a legislature's power, *United Jewish Organizations* did not address the question whether, in the absence of a history of

state action causing vote dilution, the legislature could constitutionally apportion the state on the basis of race. *A fortiori,* whether a federal court, in the absence of official discrimination, may reapportion a state along racial lines is a question *United Jewish Organizations* simply does not answer.

*comb v. Chavis,* 403 U.S. at 156–157, 91 S.Ct. at 1875–76. How equality of access is achieved in a given state is thus a *policy choice* that has been left, in the first instance, to the legislatures.

Where there is a history of official discrimination in connection with exercise of the franchise, a court may be justified in fashioning a remedy, such as "safe" black districts, that remove the "structure and residual effects of the past." *Kirksey,* 554 F.2d at 151; *Marshall v. Edwards,* 582 F.2d at 936. *See also University of California Regents v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Where there is no history of discrimination, a federal court has no business imposing on a state a policy—the creation of black districts and white districts—that represents an extreme departure from prior reapportionments.

The majority plan is not only a substitution of the court's policy for that of the legislature, it is the imposition of a policy that has no constitutional basis. It is a political compromise. It lies half way between the Commission plan and the Coalition plan proposed by the plaintiffs. This is apparent from simply looking at the majority plan: it gives the blacks six senate districts in which they have a 65 per cent majority rather than the five contained in the Commission plan or the seven provided in the Coalition plan and still demanded by the plaintiffs. It gives the blacks 13 House districts in which they are at least a 65 per cent majority rather than the 12 found in the Commission plan or the 14 in the Coalition plan. Thus, on its face, the majority plan appears to be a compromise arrived at by the time-honored method of splitting the difference. But this conclusion need not be based merely upon looking at the various plans. That would be a matter of inference—a good one, but still subject to the usual reservations about circumstantial evidence. It is not necessary to rely on inference here. To the extent that anyone can know anything, we *know* that the majority plan is the result of political compromise because we know it is based entirely upon Court's Exhibit's 1A and *DelValle* Exhibit

208, nothing more. The remedy Court Exhibit 1A provides for the blacks is simply the settlement offer made by counsel for the Commission. It does not purport to be based upon any constitutional principle at all; it was merely a way of trying to dispose of the case. *DelValle* Exhibit 208 is different in one respect, in that it does not represent a compromise. It represents total victory for the Hispanic plaintiffs, who drew this particular exhibit in such a way as to afford the Hispanic communities the maximum possible representation consistent with requirements that legislative districts be compact and contiguous. But I do not see that the Hispanic component of the majority plan is any more constitutionally based than the black component.

The majority remedy does not stop with ordering proportional representation for minorities. It actually goes beyond that and orders that blacks and Hispanics be given special treatment by way of the 65 per cent formula. The majority's discussion of the guideline is, like its discussion of the majority plan itself, contained in footnote 87. The footnote recites that during the testimony "both sides referred approvingly to the 65 per cent figure." I recall no such "approving" reference by any defense witness. Defendants acknowledged that such a formula has been used in reapportionment cases but did not concede its propriety. The only witness for defendants referred to in the footnote was Kimball Brace, a professional reapportioner, and while he said he has used the guideline himself in other cases, he did not say he believes it is valid.

This is the first court to *order* the implementation of such a guideline. I believe the order is without evidentiary basis and without legal precedent. Furthermore, I believe it is bad public policy.

In *United Jewish Organizations v. Carey,* 430 U.S. 144, 164, 97 S.Ct. 996, 1009, 51 L.Ed.2d 229 (1977), a voting rights case where affirmative action was required to remedy past discrimination, the Court stated

We think it was reasonable for the Attorney General to conclude in this case that a *substantial* non-white population majority—in the vicinity of 65 per cent—would be required to achieve a non-white majority of eligible voters. (Emphasis in original).

This language furnishes no authority for *requiring* a state to use a 65 per cent formula, nor does it even support the proposition that a state's voluntary use of a 65 per cent formula would be reasonable in every case.

Justice Brennan, concurring in *United Jewish Organizations*, explored the implications of preferential treatment such as the 65 per cent formula:

Furthermore, even preferential treatment may act to stigmatize its recipient groups, for although intended to correct systematic or institutional inequities, such a policy may imply to some the recipient's inferiority and especial need for protection.

430 U.S. at 173–174, 97 S.Ct. at 1014. *See also University of California Regents v. Bakke,* 438 U.S. 265, 298, 360, 98 S.Ct. 2733, 2752, 2783–84, 57 L.Ed.2d 750 (1978) (opinions of J. Powell and Justices Brennan, White, Marshall and Blackmun); *Califano v. Goldfarb,* 430 U.S. 199, 223, 97 S.Ct. 1021, 1035, 51 L.Ed.2d 270 (1977) (J. Stevens, concurring); *Stanton v. Stanton,* 421 U.S. 7, 14–15, 95 S.Ct. 1373, 1378, 43 L.Ed.2d 688 (1975); *DeFunis v. Odegaard,* 416 U.S. 312, 343, 94 S.Ct. 1704, 1719, 40 L.Ed.2d 164 (1974) (J. Douglas, dissenting). It seems to me that the 65 per cent formula, applied routinely in favor of minorities without reference to whether they have been fenced out of the electoral process, is indeed a suggestion of their inferiority. The evidence is undisputed in this case that there has never been any racial or ethnic bar to voting in the State of Illinois. There has never been a poll tax here, nor a literacy test, nor any history of racial intimidation in electoral matters. There is no ques-tion that blacks in this country have had enormous obstacles to overcome and that the effects of slavery and discrimination are difficult to extirpate. On the other hand, registering to vote and turning up at the polling place to cast that vote is something millions of blacks are able to do. This is because, in a state like Illinois, whatever racial barriers there are in matters such as housing and employment, there are none barring access to the voter's registration office or to the polling place.

Various groups of immigrants to this country have faced and are still facing difficult problems of adjustment that interfere with their participation in the electoral process. Many of these people do not speak English when they arrive in this country but take the trouble to learn it. Millions of immigrants have encountered discrimination in employment. All immigrants, regardless of their national origin, have had to do something to gain the franchise that no black in modern times has had to do: they have had to go through the lengthy and not altogether undemanding process of becoming citizens of the United States.

Despite the deficiencies of the record before us, I do not doubt that a factual basis for each of the predicates of the 65 per cent formula—younger age, lower registration, lower turnout—could be demonstrated. (I do doubt that there is any factual basis for the 5 per cent allowance for each of these factors; I suspect this is entirely arbitrary). I am willing to assume that the Illinois legislature could validly make an allowance for these factors in drawing the boundaries of legislative districts.[11] But I do not think it is proper for this court to order the State of Illinois to make such an allowance. Granting that the black and Hispanic populations have a higher birth rate than whites and thus have a lower average age, how does this translate into a constitutional principle that the states must therefore allow the blacks and Hispanics of

---

**11.** If this were to be tested against the one-person-one-vote principle, I am not sure what the answer would be. It does seem, at least on the face of it, that these compensatory formulas give an added weight to each minority vote.

voting age to cast supercharged ballots? Granting that blacks and Hispanics of voting age have a lesser registration rate than whites, how, in the absence of any state-imposed bar to registration, can a federal court interpret the Fourteenth Amendment to require a gerrymander on this account?[12] And how does the failure of a qualified, registered voter to appear at the polls on election day become a constitutional question? There may be something about failing to vote that is racially or ethnically based, but it would take a great deal more time than was spent on the matter in this trial to show what it is.[13] The Illinois legislature might see fit to draw boundary lines in a way that will relieve blacks and Hispanics of the consequences of failing to cast the votes they are eligible to cast, but it seems to me that is a decision for the legislature to make, not one for this court to dictate.

One wonders just how far this matter of electoral subsidies goes, and where it will end. What if it could be shown that naturalized citizens of Lithuanian extraction in Chicago are registered to vote in lesser percentages than native-born citizens of Irish and Polish extraction? Is this an Equal Protection question? What if Hispanics have a lower average age than blacks; are the Hispanics entitled to more than the 5 per cent allowance for age, or does the black allowance become reduced? The questions are unending, and it does not seem to me that the majority opinion provides any answers. It certainly is not an answer to say that the blacks and Hispanics in this case are being given the advantage of the 65 per cent guideline because of a prior history of state discrimination against them in electoral matters. There is no such history. The black and Hispanic plaintiffs are being given the benefit of this 65 per cent guideline *solely because of the testimony that blacks and Hispanics are younger, register less and vote less.* It follows, it seems to me, that any group which can make a similar claim vis-a-vis the white population, or any identifiable white ethnic group that can make the claim vis-a-vis the white population at large, can request the same relief.

A further problem with the 65 per cent formula is that it seems to be inconsistent with the cases in this Circuit which hold that a defendant in a criminal case cannot complain that grand and petit jurors were selected from a voting list which contains disproportionately few young persons and blacks. *See United States v. Dellinger,* 472 F.2d 340, 364–366 (7th Cir.1972); *United States v. Gast,* 457 F.2d 141 (7th Cir. 1972). As Justice Douglas asked in his dissent in *Wright v. Rockefeller, supra,* "If race is not a proper criterion for drawing a jury list, how can it be in designing an electoral district?" 376 U.S. at 67, 84 S.Ct. at 611.

This completes my criticism of the remedy ordered by the majority. I will describe briefly the remedy I think appropriate for the *Crosby* plaintiffs. The relief I would grant would be a map drawn according to the traditional neutral criteria, without regard to what I believe is the constitutionally impermissible consideration of race or ethnic character. Such a map would consist of compact and contiguous districts, drawn with due regard to the one-person-one-vote requirement as well as natural

---

12. In the case of the Hispanics, the low registration may in part be due to the fact that many Hispanics are not American citizens. The majority decision, in adopting the 15 per cent formula for the Hispanics, accepts the doubtful proposition that American citizens of Hispanic extraction are entitled to have their voting power enhanced because of the presence of Hispanic aliens in the community. *See Burns v. Richardson,* 384 U.S. 73, 92, 86 S.Ct. 1286, 1296, 16 L.Ed.2d 376 (1966):

Neither in *Reynolds v. Sims* nor in any other decision has this Court suggested that the

states are required to *include aliens,* transients, short-term or temporary residents, or persons denied the vote for conviction of crime in the apportionment base by which their legislators are distributed and against which compliance with the Equal Protection Clause is to be measured.
(Emphasis added).

13. The entire testimony at the trial concerning the 65 per cent formula would not occupy more than three or four pages of transcript.

and political boundaries. *See, e.g., Connor v. Finch,* 431 U.S. at 425, 97 S.Ct. at 1839; *Marshall v. Edwards,* 582 F.2d at 937. It would be a colorblind map. I do not know what the effect on minority bloc voting would be, but since my remedy would take down the wall and would not gerrymander against blacks, I do not see how blacks could have fewer majority districts than they would have under the Commission plan. Conceivably, they would have more than the court plan provides. But whatever the bloc voting effect of a colorblind map might be, it would be unintended. That, in my view, is the only way the Constitution permits. There is no way to draw racially conscious lines that will be "neutral." If the lines give minority groups anything less than strict proportional representation based on their percentage of the population as a whole, the minorities will claim their vote was "diluted;" yet, the law is clear that proportional representation is not a constitutional requirement.

My instructions to a court reapportioner would be to draw contiguous, compact, one-person-one-vote districts in the City of Chicago, starting at some point on the edge of the lake (selected either arbitrarily or with some neutral logic the reapportioner might have) and work out from there. I would forbid any initial reference to demographic maps showing racial and ethnic distribution. If the end result turned out to be clearly unfair to some racial or ethnic minority, this would be cause for some redrawing. I do not suggest that a completely random map would necessarily be adequate on the first try. What I do suggest is that it is the only appropriate starting point for a court-ordered plan in a case where there is no prior history of official discrimination, and thus, no basis for affirmative action.

The majority opinion, in footnote 95, addresses itself to the idea of a colorblind map and concludes that it would have to be drawn by a computer because "any *human*

redistricter is well aware of the racial concentrations in the city . . . ." The majority also expresses "grave doubts as to whether such a 'colorblind' map would be accepted as neutral by any of the parties to this lawsuit."

It seems to me a non sequitur to say that because a redistricter would be aware of the racial concentrations in the city he would be unable to draw a map that ignored racial concentrations. To know something is not to be controlled by it, unless, of course, one wants to be. Much of our civil rights legislation is based upon the premise that decisionmakers can and should make decisions without regard to race, religion, national origin, or other invidious factors. Employers who obviously know the race or sex of job applicants are required by law to make hiring decisions without regard to race or sex. If the majority opinion is correct, this would be impossible. Yet, it is done every day. Fair Housing laws require sellers and landlords to sell and rent real estate without regard to race, religion or national origin. The same laws also require realtors to show available housing on a non-discriminatory basis. These are person-to-person, face-to-face dealings. There is no doubt that the seller of a home or a landlord or a realtor knows the race of the applicant. Age discrimination laws provide another example of a situation where the decision-maker is expected to act without regard to a particular factor even though he knows that factor exists.

A closer analogy to the drawing of electoral district lines would be the drawing of school attendance boundary lines. Surely our law presumes that school attendance boundaries can be drawn along neutral lines, without regard to race, because this is what federal law requires.[14] If the majority opinion is correct about the frailty of a "human" decisionmaker, it would be impossible to draw school attendance boundaries which are not based upon race. Again,

---

**14.** I am not referring to a situation where racially conscious lines would have to be drawn in order to correct for past discrimination.

however, I hope it is safe to say that the vast majority of school districts in this country have boundary lines which have not been drawn on the basis of race.

The computer will be involved whether the lines are colorblind or not, since so much of the redistricting process is based upon computer data. The census information itself, which provides the reapportioner his most important data base, is computer-generated. All of the maps received in evidence, including Court Exhibit 1A and *DelValle* Exhibit 208, which the majority adopts as its plan, are drawn from data supplied by computers. (The information could, of course, be derived in other ways; the computer merely speeds up the process).

Finally, I would not worry about whether any of the parties to this lawsuit would consider a colorblind map to be neutral. All of the plaintiffs in this case desire not a neutral map but one which will maximize their group voting potential. The *DelValle* plaintiffs have achieved this under the court-ordered plan. I assume they will be fully satisfied with the court plan. The *Crosby* plaintiffs, on the other hand, have not achieved the maximum bloc voting strength for blacks which they sought in this lawsuit, and I suspect they will be no happier with the court plan than they were with the Commission plan. I believe these cases must be decided according to the law, not according to what the parties want or think they should have. The majority's concern with whether the parties would "accept" a colorblind map reveals again the desire of the majority for compromise.

The drawing of a colorblind map might have pitfalls of which I am unaware. Should that prove true, adjustments would have to be made. Whatever the difficulties might be, I think they would be less formidable than those which are found in the majority plan. If we were to tell a reapportioner to draw a colorblind map, he would have instructions he could understand. I do not know what instructions are given by the majority decision. The rationale for the lines being drawn as they are is

not stated. The result is in reality a political compromise, but the opinion does not say so. It gives no guidance to the next set of reapportioners who will have the task of drawing a map that complies with the Constitution. Heretofore, it has been thought sufficient to avoid purposeful discrimination or dilution of minority voting strength. Now, some unspecified degree of affirmative action is required, even without a prior finding of official discrimination. Perhaps the explanation omitted from the majority opinion can be spelled out in future cases. On the basis of today's decision, I suspect there will be plenty of them.

*The DelValle Plaintiffs*

The majority opinion adopts the Hispanic post-trial settlement with the Commission as part of the court-ordered plan and finds that the settlement is "fair." The parties were, of course, free to settle the case and were encouraged by the court to do so. If that was all that occurred here, I would have no occasion to dissent. But this settlement is receiving the imprimatur of this court, both by its incorporation into the court's judgment order and by the specific finding of the majority that the settlement is "fair." Thus, the settlement will apparently have precedential value. In future reapportionments, Hispanics and other groups, could believe, quite reasonably, that they are entitled to the same treatment the Hispanics receive in the settlement adopted by the court today. For this reason, I am compelled to state that, in my view, the settlement is not fair. It gives the Hispanics full relief when, under the evidence, they are entitled to none.

The Hispanic plaintiffs, in my opinion, have not met their burden of showing that the defendants purposefully discriminated against them because of their Hispanic ancestry. It is true that the Commission map is not drawn so as to maximize the voting strength of either the Puerto Rican community on the near north side of the City or the Mexican-American community on the south side. The lines could have been drawn so as to form districts which would

concentrate larger numbers of Hispanic voters, thus making more likely the election of a candidate of their choice. But there is no showing that the failure of the Commission to draw the lines in that manner was the result of purposeful discrimination *against Hispanics.* Unlike the situation regarding the black population of the City, there was no testimony that anyone wanted to put the Hispanics in districts separate from whites or other identifiable groups. There was no testimony concerning tension between Hispanics and whites or any perceived difficulties that a white candidate or a Hispanic candidate might experience running in a district composed of a majority of Hispanic and a minority of white voters. This is not to say that such tensions do not exist or that such difficulties might not be encountered. The point is they were not part of the evidence, and there is no reason to conclude that any such ethnic-political considerations played a part in the way the lines effecting the Hispanic neighborhoods were drawn. What the evidence does disclose, without contradiction, is that the lines were drawn so as to protect and enhance the reelection chances of incumbent legislators. It happens that those legislators are white, but the evidence does not show this is why they were favored. They were favored because they are incumbents. Some of them are members of the Democratic organization, and two of them, Senators Netsch and Marovitz, were favored because of the intervention of former Governor Shapiro, the tie-breaking member of the Commission. Shapiro told the Democrat members of the Commission that the one condition of his voting for their map was that they revise it to make separate districts for Netsch and Marovitz. If defendants had not made that concession they would have had no map. There is no evidence that Governor Shapiro, in causing the lines to be drawn so as to provide separate districts for Netsch and Marovitz, did so because he desired to discriminate against Hispanics. This situation

is unlike that on the South Side involving Senators Joyce and Dawson. There, the districts were gerrymandered precisely because the Commission believed blacks would not vote for Joyce and Dawson. On the North Side, Netsch and Marovitz were not going to be in districts with heavy Hispanic concentrations in any event. The only question was whether they would be placed in one district or in separate districts. As a consequence of the decision to give them separate districts, the configurations of the districts to the west, where heavy concentrations of Hispanics live, had to be changed. The evidence is undisputed that, without the intervention by former Governor Shapiro, the Commission map would have given the Puerto Rican community almost as much voting strength as it would have under the Coalition map.[15]

Plaintiffs also point out that the Commission acceded to the requests of Evanston and Oak Park not to be divided, while ignoring the requests of Hispanic leaders that the Hispanic neighborhoods in Chicago be given the same treatment. Plaintiffs argue that this disparate treatment of the various requests is, of itself, unconstitutional discrimination against the Hispanic community. While the argument has some equitable appeal, I believe it must be rejected. Failure or refusal to comply with the request of Hispanics, even while complying with similar requests by other groups, does not show purposeful *ethnic discrimination.* What it shows is that a particular group of residents was not afforded the same consideration as other groups of residents. The evidence showed that the Commission was beleagered with requests and demands of all kinds, many of which were in conflict, so that, necessarily, not everyone could be satisfied. There must always be disappointed suitors in every reapportionment. The fact that the suitor happens to be white, black or Hispanic does not show that this was the reason for the decision.

**15.** The court received into evidence the map that the Commission had prepared for adoption prior to the intercession of Governor Shapiro on

behalf of Netsch and Marovitz. Def. Ex. 81. This map could not reasonably be regarded as an intentional dilution of the Hispanic vote.

There are good reasons for including an entire city, such as Evanston or Oak Park, within one electoral district rather than splitting it up. It cannot be argued that the Commission complied with unmeritorious requests by these municipalities and yet ignored legitimate demands by the Hispanic communities.

There is no doubt that the Commission knew the effect of its lines on the Hispanic communities. It knew that the voting strength in each of the communities would be divided in such a manner that there would be no district in which Hispanics, as a bloc, would be likely to elect a candidate of their choice. Plaintiffs placed heavy emphasis on this awareness. However, as the Supreme Court has held, the discriminatory intent required for a constitutional violation means more than that the decisionmaker was aware of the consequences; it means that the decisionmaker selected the particular course of action not merely "in spite of" but at least in part "because of" its adverse affects upon the objecting group. *Mobile v. Bolden*, 446 U.S. 55, 72 n. 17, 100 S.Ct. 1490, 1502 n. 17, 64 L.Ed.2d 47 (1979), *quoting from Personnel Administrator of Mass v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). It is clear that the Commissioners acted "in spite of" the adverse affect upon the block voting strength of the Hispanic communities. There is no evidence, however, that the Commission acted, even in part, "because of" that adverse effect.

Plaintiffs also argued at trial, and the majority appears to agree, that the Commission's "snowsuit theory" about the Hispanics amounted to intentional ethnic discrimination. This is as close as the plaintiffs came to the necessary showing, but it falls short. First, it is clear to me that the "snowsuit theory" was a defense devised in preparation for trial. It was not something the reapportioners had in mind when drawing the Commission map. The notion that Michael Madigan and Martin Murphy, the authors of the Chicago portion of the Commission map, gave careful consideration to the probable direction of future Hispanic population movement is not one I find to be supported by any credible evidence. It is ironic that this post-event rationalization offered by the defendants is now the principal evidence against them.

Even assuming that Madigan and Murphy did consider probable Hispanic residential trends at the time they were drawing the map, it seems to me that such a consideration would still be in the "in spite of" category rather than the "because of" category. The lines were not drawn as they were because of the direction of anticipated Hispanic migration. They were drawn that way because of Governor Shapiro's insistence that Senators Netsch and Marovitz be accommodated. The snowsuit theory, assuming it played a role, was simply a prediction that the Netsch-Marovitz concession would not hurt the Hispanics in the long run because they would "grow into" the districts as drawn.

*Conclusion:*

What has happened here, in my view, is that a federal court has adopted as constitutional *requirements* the racial considerations which the Constitution permits a state voluntarily to consider. It is undoubtedly good government and good politics to try to accommodate as many competing demands as the law and reason will allow when a state is reapportioned. Obviously, one of the prime demands in recent times has been that of racial and ethnic minorities for fair treatment. Thus, the state reapportioner works with a mass of demographic information which inevitably becomes depicted in demographic maps, showing the concentrations of blacks and Hispanics. This is all made possible by the census conducted every ten years, which reveals this information. Federal courts are therefore always going to be confronted with an abundance of demographic maps, showing where blacks and Hispanics live. At the present time, we have no maps showing where other ethnic groups live, but if called upon, the computer could probably deliver them. It seems to me important for federal courts to realize that this information, in all its splendor, may be very

useful to the state reapportioners, but it does not form the basis for a rule of federal law. I believe that my colleagues, with the best of intentions, have been diverted from their proper inquiry by a preoccupation with the census data. In short, they have tried to do a better job with the census data than the state legislature did. Apart from the question of the wall, they may have succeeded in doing exactly that. From the standpoint of social policy, the court plan imposed by my colleagues may be better than the Commission plan. However, it is not our proper office to substitute our social philosophies for those of the state legislature. Our very limited function in reapportionment cases is to see to it that the requirements of the federal constitution are observed.

*Appendix To The Dissent*

This Appendix consists of a map of the House Districts on the South Side of Chicago as they appear in both the Commission Plan and the plan ordered by the court. The shaded portions of the map represent those census tracts in which Blacks make up at least 85 percent of the population. In the unshaded portions, Blacks constitute less than 20 percent of the population. The heavy dark line drawn along the westernmost boundary of House Districts 23, 24, 31, 33, 27 and 34 represents what is referred to in both opinions as the "wall." The white neighborhoods of Bridgeport, Canaryville, Gage Park, Marquette Manor and Marquette Park lie immediately west of Districts 23, 24, 31 and 33.

Page 149

NORTH

Lake Michigan

1980 DEMOGRAPHICS

COMMISSION REPRESENTATIVE LINES